UNITED STATES of America,
Plaintiff-Appellee,

and

States of Alabama, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virgin Islands, Virginia, West Virginia, Wisconsin, and Wyoming, Intervenor-Appellees,

v.

EXXON CORPORATION,
Defendant-Appellant;

National Oil Jobbers Council and the Jobbers' Group,
Intervenor-Appellants;

Gladieux Refinery, Inc., and U.S. Oil and Refining Company,
Intervenor-Appellants;

Indicated Refiners, Champlin Petroleum Company, Ashland Oil, Inc., Tenneco Oil Company, American Independent Refiners Association, Pennzoil Company, and Texas City Refining, Inc., Intervenor-Appellants;

Gasoline Retailers, Luther Griffin, t/a Palmer Highway Exxon, Edward McGovern, t/a Maple Avenue Exxon, Anthony Monaco, t/a Milltown Exxon Servicecenter, Inc., Donald E. Skilling, t/a Edon Service Corp., Tex Shipley, t/a Shipley's Standard Service, Intervenor-Appellants;

Tosco Corporation,
Intervenor-Appellant;

Philadelphia Electric Company,
Intervenor-Appellant;

Air Transport Association of America,
Intervenor-Appellant;

Geraldine H. Sweeney, RJG Cab, Inc., National Freight, Inc.,
Intervenor-Appellants;

Marathon Petroleum Company, Mobil Oil Corporation, and Murphy Oil Corporation, Intervenor-Appellants.

Nos. DC-91 to DC-100.

Temporary Emergency Court of Appeals.

Argued May 23, 1984.

Decided July 1, 1985.

David J. Beck, Fulbright & Jaworski, Houston, Tex., for defendant-appellant, Exxon Corp. With him on brief were Ronald D. Secrest, Fulbright & Jaworski, Houston, Tex., David R. Johnson, John M. Simpson, Robert A. Burgoyne, Fulbright & Jaworski, Washington, D.C., and W.J. McAnelly, Jr., Houston, Tex.

Larry P. Ellsworth, Dept. of Energy, Office of Gen. Counsel, Washington, D.C., for plaintiff-appellee, U.S. With him on brief were Daniel F. Shea, Dept. of Justice, Civ. Div., Washington, D.C., Thomas C. Newkirk, Arthur S. Weissbrodt, David A. Engels, Marcia K. Sowles, Ellen P. Rosenberg-Blatt, Rodney L. Solenberger, Dept. of Energy, Office of Gen. Counsel, Washington, D.C., and George Kielman, Dean S. Cooper, Joseph L. Gibson, Gilbert T. Renaut, Dept. of Energy, Office of the Sol., Economic Regulatory Admin., Washington, D.C.

John P. Mathis, Baker & Botts, Washington, D.C., Atty., for Tenneco Oil Co. and Pennzoil Co., presented argument for intervenor-appellants, The Indicated Refiners. With him on Brief were Catherine C. Wakelyn, Baker & Botts, Attys., for Tenneco Oil Co. and Pennzoil Co., Joseph C. Bell and Mary Anne Sullivan, Hogan and Hartson, Washington, D.C., and B.J. Zimmerman and Kendor P. Jones, Fort Worth, Tex., Atty., for Champlin Petroleum Co. Thomas A. Donovan, Wendy D. Smith, Kirkpatrick, Lockhart, Johnson and Hutchison, Pittsburgh, Pa., Attys., for Ashland Oil, Inc. Ralph J. Maynard and Alfred B. Smith, Jr., Houston, Tex., Attys., for Tenneco Oil Co. Van R. Boyette, Nossaman, Guthner, Knox & Elliot, Washington, D.C., Attys., for American Independent Refiners Ass'n. Perry O. Barber and James W. Shaddix, Houston, Tex., Attys., for Pennzoil Co. Richard P. Noland, and Robert R. Morrow, Sutherland, Asbill & Brennan,

Washington, D.C., Attys., for Texas City Refining, Inc.

Kenneth L. Bachman, Jr., Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., presented argument for intervenor-appellant, Tosco Corp. With him on brief were Eugene M. Goott and John G. Finneran, Jr., also of Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., and Eric Schwartz, of counsel, Tosco Corp., Los Angeles, Cal.

Alphonse M. Alfano, Bassman & Mitchell, Washington, D.C., presented argument for intervenor-appellants, Nat. Oil Jobbers Council and the Jobbers' Group, and for intervenor-appellants Gasoline Retailers, Luther Griffin, et al. With him on brief for Nat. Oil Jobbers Council were Robert S. Bassman and Douglas B. Mitchell, also of Bassman & Mitchell, Washington, D.C., Attys., for Nat. Oil Jobbers Council, and, of counsel, Barbara J. Faulkner, Gen. Counsel, Nat. Oil Jobbers Council. With him on brief for Gasoline Retailers, Luther Griffin, et al., were, Jerry S. Cohen, Michael D. Hausfeld, and Patricia F. Bak, Kohn, Milstein, Cohen & Hausfeld, Washington, D.C., Attys., for appellant intervenors, Gasoline Retailers.

Harold E. Kohn, Kohn, Savett, Marion & Graf, Philadelphia, Pa., Attys., for Philadelphia Elec. Co., presented argument for intervenor-appellants Geraldine H. Sweeney, RJG Cab, Inc., Natl. Freight, Inc., and Philadelphia Elec. Co. With him on brief were Joseph C. Kohn, also of Kohn, Savett, Marion & Graf, Philadelphia, and Philip P. Kalodner and Lee Ann Glanton, Philadelphia, Pa., Attys., for Geraldine H. Sweeney, RJG Cab, Inc., and Natl. Freight, Inc.

David Frohnmayer, Atty. Gen. of Or., Salem, Or., presented argument for intervenor-appellee States. With him on brief were Don Arnold, Asst. Atty. Gen. of Or., Salem, Or., John K. Van de Kamp, Atty. Gen., and Yeoryios Apallas, Deputy Atty. Gen., for the State of Cal., San Francisco, Cal. Francis X. Bellotti, Atty. Gen., and Alan Kovacs, Asst. Atty. Gen., for the State of Mass., Boston, Mass. Bernard Nash, and Edward G. Modell, Blum & Nash, Washington, D.C., Attys., for Pa.,

Hawaii, Nev., Guam and the Virgin Islands. James F. Flug and Paula Dinerstein, Lobel, Novins & Lamont, Washington, D.C., Attys. for Ala., Cal., Conn., Idaho, Ill., Ind., Md., Mich., Miss., Mont., Ohio, Vt., Wis. and Wyo. William J. Guste, Jr., Atty. Gen. of La., New Orleans, La., and Andrew P. Miller and Stephen G. Wielgoz, Dickstein, Shapiro & Morin, Washington, D.C., Attys. for Ark., Del., Iowa, Kan., La., N.D., R.I., Tex. and W.Va.

William H. Bode, John E. Varnum, and William C. Lane, Spriggs, Bode & Hollingsworth, Washington, D.C., Attys., on brief, for intervenor-appellants Gladieux Refinery, Inc., and U.S. Oil and Refining Co.

Kathleen O. Argiropoulos, Air Transport Ass'n of America, Washington, D.C., and Kadison, Pfaelzer, Woodward, Quinn & Rossi, Richard T. Williams and Philip J. Mause, Los Angeles, Cal., Attys., on brief, for intervenor-appellant, Air Transport Ass'n of America; and R. Bruce McLean, Daniel Joseph, Warren E. Connelly, Edward L. Rubinoff, David A. Holzworth, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Attys., on brief, for intervenor-appellants Marathon Petroleum Co., Mobil Oil Corp., and Murphy Oil Corp., of counsel, on this brief were J. Furman Lewis and John A. Evans, Marathon Petroleum Co., Findlay, Ohio. Charles S. Lindberg, William C. Streets, and Gail F. Schulz, Mobil Oil Corp., Fairfax, Va., and H.Y. Rowe and W. Bayless Rowe, Murphy Oil Corp., El Dorado, Ark.

James W. Collier, and Janet L. Leary, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., and L.C. Ross, Denver, Colo., Attys., on brief, for amicus curiae, Total Petroleum, Inc.

Stark Ritchie and Stephen E. Williams, Washington, D.C., Attys., on brief, for amicus curiae, American Petroleum Institute.

Douglas L. Parker, Institute for Public Representation, and Charles E. Hill, Natl. Consumer Law Center, Washington, D.C., Attys., on brief, for amicus curiae, Low Income People Together, et al.

Charles D. Tetrault, Vinson & Elkins, Washington, D.C., G. Edward Ellison, John D. Taurman, and John C. Ale, Vinson & Elkins, Houston, Tex., Attys., for Conoco, Inc., and Derryl L. Collins and Xavier C. Lemond, Conoco, Inc., Houston, Tex., on brief, for amicus curiae Conoco, Inc.

J. Peter Segall, Washington, D.C., Atty., for The Navajo Nation, and of counsel: Claudeen Bates-Arthur, Atty. Gen., Lawrence A. Aschenbrenner, Deputy Atty. Gen., Navajo Nation Dept. of Justice, and Bassman & Mitchell, Chartered, Washington, D.C., on brief, for amicus curiae The Navajo Nation.

James Baller, Washington, D.C., Edward J. Ciechon, Jr., Radnor, Pa., C.L. Carpenter and Charles L. Spann, Sun Exploration and Production Co., Dallas, Tex., Attys., for Sun Co., Inc., and Sun Exploration and Production Co., and Paul J. Mode, Jr., Jay F. Lapin, Bruce D. Ryan, Wilmer, Cutler & Pickering, Washington, D.C., and Robert E. Anderson, Asst. Gen. Counsel, American Petrofina, Inc., Dallas, Tex., Attys., for American Petrofina, Inc., on brief, for amici curiae, American Petrofina, Inc., Sun Co., Inc., and Sun Exploration and Production Co.

Stephen A. Bokat, Nat. Chamber Litigation Center Inc., Washington, D.C., on brief, for amicus curiae, The Chamber of Commerce of the U.S.

Neal A. Hawthorn, Longview, Tex., Atty., on brief, for amicus curiae, R. Lacy, Inc.

Before WILLIAM H. BECKER *, WESLEY E. BROWN, and MAXWELL, Judges.

WESLEY E. BROWN, Judge.

## I. STATEMENT OF THE CASE

These appeals arise from an action filed in the District of Columbia by the United States against the defendant-appellant, Exxon Corporation, pursuant to the provisions of Sections 208(b), 209, of the Economic Stabilization Act of 1970, 12 U.S.C.A. Section 1904 note.[1] (Hereafter, ESA)

The United States sought civil penalties and restitution from Exxon for overcharges which occurred in an unitized field known as the "Hawkins Field Unit," (HFU) located near Tyler, Texas. It was claimed that the overcharges resulted from miscalculations of "old" and "new" oil within HFU from January, 1975, until the end of price controls in January, 1981.

Upon cross motions for summary judgment, the District Court found that Exxon had violated the two-tier oil price regulations set out in 10 CFR Sections 212.73, 212.74 (1975). *United States v. Exxon Corp.*, 561 F.Supp. 816 (D.D.C.1983).[2]

Although Exxon did not own all of the production in HFU, the Court found that it, as Operator, had caused, and was respon-

---

* Judge Becker filed an opinion, attached hereto, concurring in part and dissenting in part.

**1.** Section 208 of the Act, paragraph (a) provides for a $5,000 criminal fine for violations, while paragraph (b) provides for a civil penalty of not more than $2,500 for each violation.

Section 209 states that the Attorney General may bring an action for temporary and permanent injunction to restrain violations. In addition, the Court is authorized to:

"... issue mandatory injunctions commanding any person to comply with any such order or regulation. In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation."

**2.** Prior to this appeal Exxon moved to dismiss the case for lack of subject matter jurisdiction. The District Court denied that motion. *United*

*States v. Exxon Corp.,* 470 F.Supp. 674 (D.D.C. 1979). This Court affirmed on the basis of the District Court's opinion. *Exxon Corp. v. United States,* 616 F.2d 526 (TECA 1980).

In August, 1980, Exxon moved to dismiss the case for lack of indispensable interest owner parties. This motion was denied. *United States v. Exxon Corp.,* 94 F.R.D. 252 (D.D.C.1981).

In January, 1981, the District Court, upon motion of the DOE, enjoined Exxon from litigating any legal issue presented in this case in connection with its defense in a case pending in Texas, styled *Jarvis Christian College v. Exxon Corp.,* No. TY–80–43A–CA (E.D.Tex., filed November, 1980).

In *Exxon Corp. v. United States,* 655 F.2d 1112 (TECA 1981) we determined that all pricing and regulatory issues should be heard in the District of Columbia action, and all proceedings in the *Jarvis* action were stayed pending final determination in that District.

sible for, the violations, and that it was therefore liable, in restitution, for all of the overcharges arising from the violations, an amount exceeding $895 million during the period in question. With interest, the judgment entered in this action exceeds $1.6 billion.[3] Under the District Court's findings, the sum ultimately paid in restitution will be distributed to the separate States and Territories, in accordance with guidelines established by Congress in Section 155 of Pub.L. 97–377, 96 Stat. 1830 (1982), sometimes referred to as the "Warner Amendment."

## II. THE PARTIES AND CONTENTIONS ON APPEAL

Eleven separate appeals were filed in this Court, but the United States has dismissed its cross-appeal of the denial of civil penalties, and that issue is no longer in controversy at this stage of the proceedings.

The principal contenders appear in Case No. DC–93, in which Exxon appeals the grant of summary judgment to the United States. The multiple issues which have been raised in this appeal will be discussed at length, but for present purposes it may be said that the questions here are directed principally to liability and the proper interpretation of the applicable regulatory framework. In particular, of course, is Exxon's objection to the finding of liability by summary judgment, without an evidentiary hearing. Exxon likewise disputes the extent of its liability, and the legality of ordering payment into the United States Treasury for distribution to the States and Territories.

Exxon also raises the question of this Court's jurisdiction, in view of the recent decision of the Supreme Court in *Immigration and Naturalization Service v. Chadha, et al.*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d, 317 (1983). It is suggested that its liability, if any, will be "significantly

reduced, if not eliminated altogether" by the *Chadha* ruling.

The remaining cases are appeals filed by various "Intervenor Appellants," who were permitted to intervene by the District Court, after judgment was filed, for the purpose of setting forth their various claims to a share in restitution, and their claims against the judgment. None of these appellants supports the claim of appellant Exxon on the issue of liability. They appeal only from that portion of the judgment which requires that all of the restitution funds be disbursed to the States without any attempt to first identify and compensate various purchasers of petroleum products who were the alleged victims of Exxon's violations.

The various Intervenor Appellants are:

Case No. DC–91—

National Oil Jobbers Council and the Jobbers' Group;

Case No. DC–92—

U.S. Oil & Refining Co., and Gladieux Refinery, Inc., appearing as "Old Oil Entitlements Program" participants;

Case No. DC–94—

Intervenors, referred to as "Indicated Refiners," also participants in the Entitlements Program;

Case No. DC–95—

Intervenors, referred to as "Gasoline Retailers" who claim to have been directly injured by Exxon violations;

Case No. DC–96—

Tosco Corporation, Intervenor, a participant in the Entitlements Program, and also a direct purchaser of crude oil from Exxon;

Case No. DC–97—

Philadelphia Electric Company, representing a class of purchasers, and consumers of petroleum products;

---

**3.** The judgment required Exxon to remit to the Treasury Department the sum of $1,635,604,-638.10, representing $895,501,163.85 in overcharges, and $740,103,474.25 in interest in overcharges, and $740,103,474.25 in interest, accumulated through March 31, 1983, plus $469,035.40 per day in interest, for each day of April, May, and June, 1983, to date of judgment (June 7, 1983), with interest thereafter to be computed in accordance with 28 U.S.C. Section 1961.

Case No. DC–98—

The Air Transport Association of America, representing the air transportation industry as a consumer of petroleum products;

Case No. DC–99—

Geraldine Sweeney, an automobile owner, RJG Cab, Inc., and National Freight, Inc., commercial transportation companies, all end users of refined petroleum products;

Case No. DC–100—

Intervenors Marathon Petroleum Company, Mobil Oil Corp., and Murphy Oil Corp., also participants in the Entitlements Program.

In addition to the Intervenor Appellants, the appeals include a group of Intervenor Appellees, these being the various States of the United States. These Intervenors support the remedy ordered by the District Court, whereby the monies paid in by Exxon will be distributed among the States and Territories.

Other groups and organizations, appearing as Amici Curiae, present additional questions which touch upon the direct issues raised on appeal. In this respect, the owners of working interests in HFU, who have heretofore entered into "global settlements" with the Department of Energy on other occasions, contend that they may be adversely affected by a precedent established in these cases. The Navajo Nation asserts its rights as an end consumer of refined petroleum products, and complains also that as a sovereign political entity, it is entitled to share equally with the States and Territories in any distribution of the judgment in this case. The Chamber of Commerce of the United States objects to "retroactive law-making" by the district court. The American Petroleum Institute objects to distribution of the judgment to "unidentified consumers" without any effort being made to reimburse members of the petroleum industry who sustained damage from the Exxon violations. R. Lacy Inc., an interest owner in the Hawkins Field, is concerned with the question of contribution and indemnity, should Exxon's liability for all overcharges in the Unit be affirmed. The "Low Income People Together," et al., appear on behalf of some thirteen community organizations across the country which represent senior citizens, tenant organizations, etc. Such groups would be among the ultimate beneficiaries of any distribution of funds to the States pursuant to guidelines set out in Section 155 of Public Law 97–377. Total Petroleum, an Intervenor in *In re The Department of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378, now pending in the District of Kansas, appears to urge that it was error to fashion a restitution remedy without consideration for the rights of direct purchasers of petroleum products. Total Petroleum claims that the remedy and judgment in this action will have important consequences for the parties involved in the Stripper-Well litigation.

## III. REGULATORY FRAMEWORK

The controversy between Exxon and the Government[4] concerns the manner in which accountings were made in determining the identity and quantity of "new oil" removed from HFU. The overcharges which accrued here are attributable to the fact that Exxon, in making this determination, calculated upon a "lease by lease" basis, rather than upon a unit-wide comparison of field production.

The regulatory history of the Economic Stabilization Act of 1970, 12 U.S.C. Section 1904, Note, (ESA) and the subsequent passage of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. Sections 751 et seq., (EPAA) has been many times reviewed by this Court, most recently

---

**4.** For simplicity's sake, the Department of Energy (DOE), and the predecessor administrative organizations which have been charged with the duty of enforcing price regulations from time to time—the Cost of Living Council (CLC), the Federal Energy Administration (FEA), and the Federal Energy Office (FEO), are generally referred to hereafter as "the agency," and sometimes as "the government." For further explanation, see *Pennzoil Co. v. United States Dept. of Energy,* 680 F.2d 156, at 161, and Footnotes 6, 7, (TECA 1982), *cert. dismissed,* 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983) (hereafter *"Pennzoil".*)

in *Exxon Corp. v. United States Dept. of Energy*, 744 F.2d 98 (TECA 1984), *cert. den.*, —— U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984). It is sufficient to state that the purpose of petroleum price regulation was to ensure fair allocation of petroleum resources at equitable prices and to encourage the search for new energy resources.

Basic to the regulation of petroleum prices was a "two-tier" pricing structure, whereby monthly oil production which was less than, or equal to a corresponding 1972 level of production from a "property" was to be sold as "old" oil at a posted price, while production in excess of the 1972 level could be sold as "new" oil, at prices substantially higher. May 15, 1973, 10 C.F.R. Sections 212.73(b), and 212.74(b). The "based production control level," or "BPCL" by which "old" and "new" oil production was to be determined was basically defined, with respect to months ending prior to February 1, 1976, as "the total number of barrels of domestic crude oil produced and sold from that property the same month of 1972;" 10 C.F.R. Section 212.72.

Since all computations of old and new oil were to be made on the basis of production levels from a "property", it was necessary to determine the boundaries of each "property." The term "property" was broadly defined as "the right which arises from a lease or fee interest to produce domestic crude petroleum." See 10 C.F.R. Section 212.72, January, 1974. In February, 1976, the property definition was slightly restructured, without substantive change, to read "the right to produce domestic crude oil which arises from a lease or from a fee interest." Effective September 1, 1976, the definition of property was changed so that separate reservoirs subject to a single right to produce could thereafter be treated as separate properties. R. 37,606. See *Department of Energy v. Louisiana*, 690 F.2d 180 (TECA 1982), *cert. den.*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946; *Pennzoil Co. v. United States Dept. of Energy*, 680 F.2d 156, 162, note 9. (TECA 1982), *cert. dismissed*, 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983).

Questions arose in the case of properties which were not unitized in 1972. This was the situation of Hawkins Field, which did not become formally unitized until January 1, 1975. On five separate occasions in 1974 and 1975, the General Counsel of the Federal Energy office issued interpretations to the effect that unitized multi-lease units were single properties. These interpretations were later published in May, 1977. *See Pennzoil, supra.*

This same interpretation was issued as a general guideline for the industry in August, 1975, in the form of Ruling 1975–15. With respect to properties unitized after 1972, the Ruling provided that:

"... the need for comparison of like quantities requires the producer in computing the BPCL to measure and total the individual 1972 monthly production levels for each of the leases that now comprise the unit. Accordingly, for example, where a unit consists of several leases that were unitized in 1973, the property consists of the unit, and the BPCL is the total 1972 monthly production from all of the several leases that now comprise the unit."

A few months later, and in December, 1975, Congress enacted the Energy Policy and Conservation Act ("EPCA"), which allowed the agency to permit price increases, without current increases in production, when the agency found that such price increases would give incentives for "enhanced recovery techniques." 15 U.S.C. Section 757(b)(2)(A); *DOE v. Louisiana, supra*, 690 F.2d at 185.

The agency then proposed a new regulation, and after considering comments, adopted 10 C.F.R. Section 212.75, which applied only to "operators of 'enhanced recovery' units formed on or after" *February 1, 1976*:

"(a) *Rule*. A producer shall, as of the date of implementation of enhanced recovery operations on a unit or as of the date production patterns with respect to individual leases within a unit are substantially altered (which ever date occurs

first) establish a unit base production control level for the unit.

\* \* \* \* \* \*

" 'Unit base production control level' means the total number of barrels of old crude oil (1) produced and sold from all properties that constitute the unit plus (2) the total number of barrels of crude oil produced from all stripper well leases that constitute the unit during the 12 month period immediately preceding the establishment of a unit base production control level for the unit, such total divided by 365, multiplied by the number of days in that particular month.

" 'Unit' means the right to produce crude oil that arises from a unitization agreement approved by the applicable state or municipal regulatory authority. . . ."

The term "enhanced recovery" was defined by Section 212.75 as

". . . any method, previously approved by applicable state or municipal regulatory authority . . . of recovering crude oil in which part of the energy employed to move the crude through the reservoir is applied from extraneous sources by the injection of liquids or gases into the reservoir."

In addition to adopting Section 212.75, discussed above, the old Section 212.72 was amended to allow operators of all other properties the option of calculating a new BPCL equal to 1975 old oil production. This had the effect of lowering the BPCL at properties where production had declined.

In the preamble to Section 212.75, the agency also announced that Ruling 1975–15 would be rescinded *ab initio* insofar as it required producers of unitized properties to treat the unit as a single property *upon unitization*. The producers were given

permission to delay implementing a unit BPCL until there "has been a significant alteration in pre-unitized producing patterns of the individual leases." The preamble further noted that:

"If a significant alteration of producing patterns does not occur until the actual implementation of enhanced recovery operations, the unit operator may continue to determine quantities of upper tier crude oil . . . on a lease-by-lease basis. *Once enhanced recovery operations begin, the producer will be required to calculate a unitized BPCL,* as set forth in new 10 CFR 212.75 . . . and to treat the unit as a distinct property." (Emphasis supplied.)

In August, 1976, after the agency received comments on the definition of the term "significant alteration in producing patterns" as used in Section 212.75, the term was formally defined as follows:

" 'Significant alteration in producing patterns' means the occurrence of either (1) the application of extraneous energy sources by the injection of liquids or gases into the reservoir, or (2) the increase of production allowables for any property that constitutes the unitized property." 10 C.F.R. Section 212.75(b).

In January, 1977, the agency issued Ruling 1977–2, stating that the definition of "significant alteration" contained in Section 212.75 would be considered as a "guidance in audits and compliance cases" involving pre-existing units subject to Section 212.72. At that time it was announced that those operating units subject to Section 212.72 would be permitted "to justify the establishment of the date of 'significant alteration' on 'reasonable bases' other than injection or an increase in production allowables." [5]

---

5. Paragraph IV(A)(3) of Ruling 1977–2 applied to all unitized properties required to establish a unit BPCL prior to February 1, 1976 and unitized properties required to establish a unit BPCL prior to September 1, 1976. Determinations of the status of oil produced from units formed prior to the date on which unit BPCL regulations were adopted (February 1, 1976 for enhanced recovery units and September 1, 1976

for all units) were subject to the provisions of Ruling 1975–15, as modified on February 1, 1976. Therefore:

". . . all such units formed during or after 1972 were required to calculate a BPCL by aggregating the BPCL's of all the participating properties at such time as significant changes in the units producing patterns occurred (and with respect to enhanced recovery unitized

To summarize these regulations then, it may be stated that

a) the agency interpreted 10 C.F.R. Section 212.72 to require a producer to calculate a single aggregated BPCL for multilease units, as of the date of unitization. Ruling 1975–15 so required;

b) In February, 1976, the agency changed this requirement, and allowed Operators of units already formed to delay implementation of a unit BPCL until the date on which producing patterns were "substantially altered;"

c) In addition, and in February, 1976, the agency adopted 10 C.F.R. Section 212.75 which applied only to operators of enhanced recovery units formed on or after February 1, 1976. This provided prospective incentives for oil producers to enhance long-run production through future unitizations;

d) In January, 1977, by Ruling 1977–2, the agency determined that the definition of "significant alteration in producing patterns," first published in September, 1976, would be used as "guidance" in determining whether a significant alteration occurred in pre-existing units.

## IV. THE HAWKINS FIELD

The record on appeal in this case consists of over 39,000 pages in 47 volumes. Included in this record are over 500 exhibits, consisting of more than 6,000 pages, which were presented to the District Court in support of the cross motions for summary judgment. Many of these exhibits are from Exxon files—inter-office memos, copies of correspondence, reservoir studies, oil production ledgers and schedules, and computer print-outs. In addition, the District Court had records and orders of the Texas Railroad Commission, which regulated the

Hawkins Field, and the parties' statements of uncontested material facts.

From this evidence, the District Court made findings of fact concerning the history of the Hawkins Field, and Exxon's application of pricing regulations to the production from that field. These findings may be summarized as follows:

### A. Development of the Unit.

Oil was discovered in the 10,000 acre field near Tyler, Texas in 1940. By the late 1940's, more than 200 individuals and companies produced oil on more than 300 leases in the field. In 1969 Exxon (through its predecessor, Humble Oil and Refining Company), owned two-thirds of the field's production.

Under state law, the Texas Railroad Commission regulated the number of oil wells within the field, as well as the number of barrels of oil each well could produce. These were termed "production allowables."

The Hawkins Field was what is termed a "MER field" in Texas. In such fields the Texas Commission assigned an aggregate allowable for the entire field, which was called the maximum efficient rate of production, or "MER". This was a limit on the number of barrels which could be pumped daily from the field as a whole. The advantage of the "MER" designation was that whenever a lease operator could not produce its allowable, the Commission distributed pro rata, any unused allowable from one lease to every producing well in the field.

By mid-1960 the natural reservoir pressure in the field declined, allowing invasion of water and loss of oil into the field's original gas cap. The interest owners, led by Exxon, determined that this trend could be reversed, and the life of the field pro-

properties beginning February 1, 1976, as of the date of implementation of enhanced recovery operations).

The Ruling then provided:

"Although a regulatory definition of 'significant alteration in producing patterns' was not provided until September 1, 1976, that definition will be considered as guidance in audits

and compliance cases in determining whether a significant alteration has occurred with respect to such units. FEA will, however, on a case-by-case basis, permit unit operators to justify the establishment of the date of significant alteration in producing patterns in such units on reasonable bases other than those specified by the present definition."

longed, by means of an enhanced recovery project. This would require the construction of a plant to produce inert gas, which would then be injected underground in order to increase the reservoir pressure.

Before the recovery project could proceed, it was necessary that the field be unitized in order that the costs of the gas plant could be spread among the owners, and also because the injection of gas would cause crude oil to flow underground across lease lines. As noted by the District Court, when a field becomes unitized it most likely results in the shutting in of wells within certain leaseholds, and the increase of production at others, because enhanced recovery operations cause oil to flow underground across lease lines. In such circumstances, payments to unit participants are not based upon actual production from a particular well, but upon an imputed percentage of the unit's total production. *United States v. Exxon Corp., supra,* 561 F.Supp., fn. 6, p. 820.

In 1969 Exxon actively began to promote unitization, meetings were had with 300 other working interest owners in the field, and negotiations went on with more than 2,200 royalty interest owners. At this time, Exxon secured permission from the Commission for an interim conservation project, whereby up to 20 million cubic feet of natural gas per day could be injected into the field for the purpose of increasing production. In November, 1974, and in anticipation of unitization, the Commission increased the Hawkins Field MER from 87,-000 barrels per day to 112,000 barrels per day.

In late 1974 the Unit Agreement was finally executed and approved by the state Commission. Under its terms, Exxon was named Unit Operator, costs of the proposed gas plant were to be shared, and production was divided according to a formula based upon estimates of the recoverable reserves under each tract.

At the time the Unit Agreement was approved the state Commission provided Exxon with a "unit production allowable," to be effective on January 1, 1975. Under prior Commission orders, the production allowable of an individual shut-in well could be transferred only pro rata among all other wells at the Hawkins Field. The new "unit allowable", which was equal to the then existing MER of approximately 112,-000 barrels per day, allowed Exxon to transfer production among wells within the unit, *at will.*

The natural gas injections which were initially permitted by the state Commission in 1969, continued beyond the effective date of unitization, and through the years, until the inert gas plant was completed and put into operation in March, 1977.

### B. *Exxon's Pricing Policies.*

The trial court found; that when oil price control regulations were initiated in 1973, Exxon already operated several multi-lease units, some of which, like Hawkins Field, were formed after 1972, the base year designated for calculation of the BPCL; that Exxon applied an aggregated, unit, BPCL at other units it operated in Texas, California, Alabama and Florida; that Exxon departed from this practice at Hawkins Field following a determination it made in 1974 that an 80% reduction in the amount of new, released and stripper oil which could be claimed would follow if calculations were made upon a unit basis.

Exxon contends that the trial court's finding that "Exxon departed from its prior practice" at Hawkins Field was erroneous and based upon a "one-sided view of disputed evidence," inasmuch as "Exxon's prior practice was to review its general guidelines, the many oral and written modifications thereto, and then to examine each situation carefully and independently—which was the same practice employed at the HFU."

Exxon's argument is without merit. Exxon's own records establish that in the fall of 1973, following initial price regulation, Exxon issued instructions to treat several multi-lease units which it operated as single properties, with a single, unit BPCL. These instructions included units formed

after 1972, the base year designated in the regulations for the calculation of the BPCL. In accordance with this practice, Exxon applied an aggregated, unit BPCL at units it operated in Texas, California, Alabama and Florida. These units included the Friendswood Unit, unitized on September 1, 1973. As an interest owner, and as a purchaser of crude oil, Exxon received notification from many other companies that units were to be treated as single properties, each with a single, aggregated BPCL. Nevertheless, when Hawkins Field was formally unitized on January 1, 1975, Exxon thereafter did in fact apply individual lease-by-lease BPCL calculations.

When Ruling 1975–15 was issued in August, 1975, making explicit the regulations' requirement that a unit BPCL be calculated and applied to every unit, as of the date of unitization, Exxon, along with other industry critics requested modification or clarification of the Ruling. When the February, 1976 amendments to the oil price regulations were under consideration, Exxon suggested that the provision for lease-by-lease calculation of exempt oil should be extended for two years after formation of the unit, or until injection began in an enhanced recovery project. Exxon also urged that the same rules be applied to units formed *before* February 1, 1976. As noted, however, the February, 1976 amendments adopted by the agency applied only some of the new incentives to pre-existing units, and provided that the new Section 212.75 would only apply prospectively.

Following a meeting in mid-February, 1976, with agency representatives, Exxon decided that until the meaning of the new regulations was "clarified," it would be proper to continue its lease-by-lease calculations at the Hawkins Field, and it so advised the other interest owners.

The agency solicited comments in April, 1976, as to how best to determine when there was "a significant alteration" in producing patterns. Exxon suggested that the term be defined as "the initiation of the major injection or other programs contemplated by the unit, provided however that

the date will be no longer than two years from the formation of the unit." The agency in August, 1976, published the definition of "significant alteration in producing patterns" as being either the injection of liquids or gases into the reservoir or the increase of production allowables for any property constituting the unit. Exxon then determined that the regulations did require the calculation of an aggregated, unit BPCL for the Hawkins Field Unit, but it did so only as of September 1, 1976, and then under the more generous provisions of Section 212.75. Exxon continued this manner of calculation until the repeal of the oil price regulations in January, 1981.

In reviewing the production data from the Hawkins Field, the Trial Court concisely illustrated the effect of Exxon's pricing policies which we described above:

"From January 1975 through August 1976 production at the Hawkins Field remained relatively stable at about 112,000 barrels per day. . . . Thereafter, despite the implementation of the inert gas enhanced recovery project in March 1977, production began to decline, to about 90,000 barrels per day in July 1977, and finally dropping to about 45,000 barrels per day in January 1981 at the same time oil prices were decontrolled. . . . Despite the steady decline in production, an increasing percentage of oil was accounted for by Exxon as upper-tier, higher-priced oil, until beginning June 1, 1979 *almost all* of the then 62,000 barrels per day was classified as new oil." 561 F.Supp. at 825. (Emphasis supplied.)

## V. CONCLUSIONS OF THE TRIAL COURT

In sustaining the Government's motion for summary judgment the trial court made a series of determinations applicable to our consideration of these appeals.

1. Section 212.72, the unit property regulation, was procedurally valid. 561 F.Supp. at 826–829. That issue has not been raised on appeal.

2. Under *Pennzoil, supra,* a unitized field must be considered a single property for purposes of computing a unit BPCL.

3. The rescission of Ruling 1975–15, which had required that a BPCL be established upon unitization, was not a mere "relaxation in enforcement policy," as claimed by the government. The agency's Ruling in February, 1976 "amounted to a completely new, although less strict, interpretation of the property definition found in Section 212.72." 561 F.Supp. at 835.

4. The agency's determination in 1976 to allow unit operators subject to 10 C.F.R. Section 212.72 to postpone adoption of a unit BPCL until the occurrence of a "significant alteration in producing patterns," was reasonable. The definition of this term, as being either "the application of extraneous energy sources by the injection of liquids or gases into the reservoir," or, "the increase of production allowables for any property that constitutes the unitized property," was consistent with the intent of Congress that the administration of price controls be workable and effective.

5. A "significant alteration in producing patterns" occurred at Hawkins Field on January 1, 1975, the date of unitization, because Exxon then transferred production allowables among contingent leases, thus significantly altering producing patterns within the field. In addition, Exxon was also injecting gas on that date. 561 F.Supp. at 843. Under these circumstances, Exxon's obligation to calculate a unit BPCL then accrued.

6. Exxon failed to establish a reasonable alternative basis to justify a finding of significant alteration in producing patterns in the field on a date other than January 1, 1975. A date based upon evidence of the field's "underground drive mechanism" would not be a reasonable alternative basis because it would not be a workable system for enforcing the pricing program.

7. Exxon's estoppel defense is without merit because the undisputed facts in the case establish that its reliance, if any, on unauthorized, informal statements of agency employees, was not reasonable. Fur-thermore, even if there was reasonable reliance, the government pursued "important national policy objectives" in its pricing regulations, and these objectives should not be frustrated by allowing Exxon "unjustly to reap huge profits from its dubious exploration of the limits of regulatory tolerance." 561 F.Supp. at 848.

8. Since Exxon caused all of the overcharges in the field by its pricing, injection and production decisions, it is liable for full restitution of all the overcharges, with interest.

9. Civil penalties would not be imposed because Exxon did not attempt to conceal its pricing practices.

10. Since it would be "impossible" to identify the ultimate victims of Exxon's overcharges, due to the "pervasive system of price controls" in the petroleum industry, the Trial Court adopted a remedy used by Congress in a similar situation, and ordered Exxon to remit all overcharges to an escrow account in the United States Treasury to be held in trust by the Treasury, for future disbursement to the States for the ultimate purpose of funding specific energy conservation programs, in accordance with procedures set out in Section 155 of Pub.L. No. 97–377, 96 Stat. 1830, 1919 (1982). In so doing, the trial court also stated: (561 F.Supp. at 856).

> "In formulating its order, the court in no way relies on Section 155 as an express statutory grant of authority to this court, but acts instead in the exercise of its broad equitable powers to order restitution."

## VI. ISSUES ON APPEAL

Exxon's contentions in this appeal may be summarized in the following manner:

A. The District Court violated established summary judgment principles in granting judgment to the Government because it improperly resolved factual disputes, ignored relevant evidence, viewed all evidentiary inferences in favor of the DOE, and improperly assumed to be true facts outside the record.

B. The District Court erred in summarily determining Exxon's liability because:

1. The history of the unit property rule establishes that Hawkins Field Unit was not subject to the definition of "significant alteration in producing patterns" set out in 10 CFR Section 212.75;

2. The restrictive definition of "significant alteration in producing patterns" can not be given retroactive effect;

3. Retroactive application of only selected portions of 10 CFR Section 212.75 is arbitrary and capricious;

4. When a "significant alteration in producing patterns" occurred at the Hawkins Field Unit was an issue for resolution at trial;

5. Ruling 1977–2 expressly provides that Exxon be afforded an opportunity to establish a reasonable alternative "significant alteration" date for the HFU.

C. The District Court erred in summarily determining questions of remedy in favor of the DOE because:

1. Monetary awards to uninjured state governments are not restitution;

2. Monetary awards to uninjured state governments improperly expose Exxon to multiple liability;

3. The District Court assessed liability on the basis of unpleaded and unproved refiner allocation violations;

4. The amount of the judgment is grossly overstated;

5. Exxon's liability must be reduced, if not eliminated, in view of the unconstitutional one-house veto provisions in the EPAA and the EPCA.

D. The District Court erred in requiring Exxon to pay on behalf of other interest owners alleged overcharges received by them, because the evidence did not establish that Exxon can be reimbursed for such payments;

E. The District Court erred, as a court of equity, in requiring restitution of the full amount of the alleged overcharges and prejudgment interest because:

1. Restitution is an equitable remedy that implicates questions of fairness;

2. A balancing of equities requires an evidentiary hearing;

3. Restitution of the full amount of the alleged overcharges is inequitable;

4. Awarding prejudgment interest is inequitable.

The Government's contentions in this appeal may be summarized in this manner:

A. The District Court correctly held that a single BPCL had to be adopted at the Hawkins Field in January 1975 when it was unitized and a significant alteration in producing patterns occurred, because:

1. This Court has previously determined that Section 212.72 required establishment of a single BPCL upon unitization;

2. The District Court properly applied the less stringent Ruling 1977–2, permitting a unit operator to delay establishment of a single BPCL until occurrence of a significant alteration;

3. The District Court properly granted summary judgment upon the basis of Exxon's own undisputed data, because:

a. Under the definition of significant alteration used as guidance, a significant alteration occurred on January 1, 1975; and

b. The District Court correctly held that Exxon failed to justify the date of the significant alteration on any other reasonable basis.

B. The District Court properly concluded that Exxon, the Operator who caused the overcharges, is liable for all overcharges with interest, because

1. Exxon is liable for all overcharges at the Unit under *Sauder v. DOE*, 648 F.2d 1341 (TECA 1981);

2. Exxon is entitled to no reduction as a result of consent orders between DOE and other companies; and

3. The District Court did not abuse its discretion by awarding interest on the overcharges at the rates provided.

C. The District Court properly concluded that payment of Exxon's overcharges to the states is a lawful and appropriate reme-

dy to effectuate restitution in this case, because

1. The District Court correctly concluded that the overcharges were so widely distributed through the operation of price controls that individual harm could not be calculated with reasonable certainty; and

2. The District Court reasonably exercised its broad discretion to fashion a remedy—payment to the states—which achieves the central purpose of restitution under the EPAA.

## VII. THE *CHADHA* ISSUE

■ Before proceeding to the question of the nature and extent of Exxon's liability in this case, we first address questions which have been presented by the recent decision of the Supreme Court in *Immigration and Naturalization Service v. Chadha, supra,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

Judgment was entered in this action on June 7, 1983. The day before Exxon filed its notice of appeal with this Court, it moved for "reconsideration" of the trial court's decision on the ground that, in view of *Chadha,* the entire EPAA should be retroactively declared void because of an allegedly unconstitutional provision in Section 4(g)(2) of the Act which allowed either House of Congress to veto executive actions.

The District Court denied the motion (a) because it was tardy since it involved an issue which was available, but not raised, prior to judgment; (b) because notice of appeal had been filed and the trial court was divested of jurisdiction; and (c) because Exxon lacked standing to challenge the statutory provisions because it could prove no injury due to the existence of the veto provision. It was also pointed out that the District Court was without power to determine such constitutional issues, jurisdiction being vested instead with the Temporary Emergency Court of Appeals.[6]

On appeal, Exxon claims that the *Chadha* issue remains viable, that it has standing to complain because its injury is obvious, that the veto provisions in question are not severable, and therefore the Act, and all regulations issued pursuant to the Act are void, *in toto.* In addition, it is claimed that the subject matter jurisdiction of both the trial court and this appellate court is placed in question by the *Chadha* precedent.

It is the position of the Government that the *Chadha* issue is not before the Court because, under appellate rules, the question was not timely raised.

The history of the veto provisions which appear within the Economic Stabilization Act of 1970, as well as Section 551, Section 552 of the Energy Policy and Conservation Act, P.L. 94–163, (EPCA), 42 U.S.C. 6201, Note, and the effect of those provisions in terms of the *Chadha* decision, have recently been examined at length by this Court in *Exxon Corp. v. United States Dept. of Energy, supra,* 744 F.2d 98 (TECA 1984), *cert. den.,* —— U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515, which involved certification of constitutional questions raised by *Chadha.*

Similar questions have not, of course, been certified under Section 211(c) in these appeals, but because some question has been raised by Exxon concerning this Court's jurisdiction, this panel of the Court will briefly address Exxon's arguments.

In April, another panel of this Court determined that the Gulf Oil Corporation had standing to challenge the subject matter jurisdiction of this Court by contending that the statutes granting jurisdiction contained unconstitutional legislative veto provisions. *Gulf Oil Corp. v. Dyke,* 734 F.2d 797 (TECA 1984), *cert. den.,* —— U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108. In *Exxon,* we adopted that holding and in addition ruled that the *Chadha* decision would not be applied retroactively to invalidate all or any part of the EPAA, the EPCA, or the

---

**6.** Section 211(c) of the Economic Stabilization Act of 1970, 12 U.S.C.A. Section 1904, note, provides that when a District Court determines that a substantial constitutional issue exists, it shall certify that question to the Temporary Emergency Court of Appeals.

Regulations fashioned to implement those Acts. We further held that even if the rule of *Chadha* should be found to be retroactive, the veto provisions were severable, as found in *Gulf Oil Corporation, supra.* We further ruled that the Regulations were not unlawfully tainted by the presence of the one-House veto, or rendered invalid because the veto power had been exercised on two occasions in July, 1975.

We need not repeat what was said in *Exxon, supra*, with respect to the *Chadha* issue. This Court has determined that *Chadha* may not be used by the oil industry to escape the responsibilities owed to the nation and its people as represented by the law and regulations implemented by the DOE and interpreted by this Court.

We find that we have jurisdiction and that *Chadha* has no effect on any of the issues presented in these appeals.

## VIII. THE LIABILITY ISSUE

Exxon contends that the District Court violated well established summary judgment principles in granting judgment to the Government, in that the trial court improperly resolved factual disputes, ignored relevant evidence, improperly resolved all evidentiary inferences in favor of the Government and improperly assumed to be true facts outside the record.[7]

A. *The Pennzoil Decision.* Our discussion of the trial court's findings and Exxon's contentions regarding liability must begin with a consideration of this Court's decision in *Pennzoil Co. v. United States Dept. of Energy, supra*, 680 F.2d 156.[8]

The *Pennzoil* litigation was initiated by the company upon a claim that Ruling 1975–15 was invalidly promulgated, as an announcement of a new rule not previously inherent in, or justified by, prior regulations. In affirming summary judgment in favor of the government upon this claim, we determined that Ruling 1975–15 was a correct interpretation of 10 C.F.R. Section 212.72, requiring the establishment of an aggregated BPCL upon formation of a unit:

> "Ruling 1975–15 is an interpretative ruling, not a legislative change, *and simply made explicit what was implicit in the property definition from the beginning.*" (680 F.2d at 176)

This Court further held that Ruling 1975–15 was not unlawful "retroactive" legislation, for it did not represent a departure from well established practice, let alone an "abrupt departure" (Note 35, p. 176, 680 F.2d). We found that there was no basis for applying estoppel against the Government because of alleged confusing, misleading and contradictory information or Rulings supplied by agency officials. We refused to do so "on the facts here presented in favor of sophisticated oil field operators exploring the possibility of dubious regulatory leeway without even requesting an official interpretation." (680 F.2d at 177).

The *Pennzoil* case was remanded to the District Court for trial of the Government counterclaim for enforcement of Ruling 1975–15. The case was settled upon Pennzoil's agreement to pay $14.75 million to the United States Treasury. See *Cities Service Co. v. Department of Energy*, 715 F.2d 572 (TECA 1983), *affirming Pennzoil Co. v. DOE*, 4 Energy Mgmt. (CCH) Paragraph 26,415 (D.Del.1983).

B. *Unit Property Rule.* Exxon first claims that the regulatory history of the "unit property rule" establishes that HFU is not subject to the definition of "significant alteration in producing patterns" set out in 10 C.F.R. Section 212.75. In this respect, Exxon argues that the history of the regulation reveals prolonged agency indecision, the subsequent partial rescission of Ruling 1975–15, and the failure to explain or define the term "significant altera-

---

7. Fed.R.Civ.P. 56(c) provides that summary judgment can be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

8. Exxon appeared as amicus curiae in *Pennzoil.*

tion in production patterns" until September 1, 1976 when the term was finally defined as part of an amendment to 10 C.F.R. Section 212.75. Exxon claims that since the Section 212.75 definition does not apply to units formed before September 1, 1976, the term "significant alteration in producing patterns" is only a general concept, when applied to those units, subject to an evidentiary determination upon a case-by-case basis.

According to Exxon, "(t)his result, of course, poses no conflict with this Court's decision in *Pennzoil* ... (because) *Pennzoil* upheld Ruling 1975–15 but also expressly declined to consider the legal effect of the Ruling's ... partial recission *ab initio*.... What we are concerned with here, however, and what was *not* decided in *Pennzoil*, is *when* must a multiple lease unit convert from lease-by-lease accounting to unit-wide accounting." (Brief for Exxon, n. 283, p. 56).

In its insistence that the *Pennzoil* decision resolved only the question of whether HFU constituted a single "property", and not the question of "when" the Unit BPCL was to be calculated for that property, Exxon continues to present arguments which were decided adversely to its position in that decision.

The issue posed by, and resolved in, *Pennzoil* was whether an "aggregation of (Pennzoil's 1972 lease) BPCL's (was required) *upon formation of a post-1972 multiple-property, enhanced recovery unit*." 680 F.2d at 159 (Emphasis supplied).

In *Pennzoil*, we recognized the fact that in February, 1976 the agency rescinded Ruling 1975–15, insofar as it required producers to treat the unit as a single property, before such time as there was "a significant alteration in pre-unitized producing patterns of the individual leases...." Finding that this rescission did not "throw into question the validity" of Ruling 1975–15, as to previous production from unitized leases, we stated (fn. 13, 680 F.2d at 164):

> "There is not now before us any issue concerning the application of this subsequent rule-making and we refrain from expressing any opinion concerning it *other than that it does not militate against our disposition of the issues presented to us on this appeal*." (Emphasis supplied).

■ Under our decisions in *Pennzoil, supra*, and its predecessor, *Grigsby v. Department of Energy*, 585 F.2d 1069 (TECA 1978), *cert. den.*, 460 U.S. 1086, 103 S.Ct. 1780, 76 L.Ed.2d 350, it is clear that Section 212.72 *unembellished by any agency interpretations*, required the adoption of a single BPCL, *upon unitization. See also Francis Oil and Gas, Inc. v. Exxon Corp.*, 687 F.2d 484, at 488 (TECA 1982), *cert. denied*, 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982).

Under these circumstances, we find that Exxon's claim that *Pennzoil* does not control the question of "when" a unit must convert to unit wide accounting is without merit. Apart from Ruling 1975–15, Section 212.72 required the establishment of a single BPCL upon unitization of the Hawkins Field.

C. *Partial Rescission of Ruling 1975–15: The Significant Alteration Test.*

As previously noted, in January, 1976, the agency, in response to the newly enacted EPCA, began proceedings leading to adoption of the new regulation, 10 C.F.R. Section 212.75, designed to provide new production incentives, prospectively. At the same time, and in February, 1976, the agency determined that a "limited part" of Ruling 1975–15, insofar as it required a producer to compute a single unit BPCL upon unitization, should be rescinded *ab initio*. The balance of Ruling 1975–15 was "affirmed in all other respects," see *Pennzoil*, 680 F.2d at 164, n. 13. It should also be remembered that the agency continued to point out that once a significant alteration in producing patterns had occurred at a unit, lease-by-lease accounting procedures would no longer be justified.

Ruling 1975–15 was rescinded only "insofar as it requires producers of unitized properties to total all the BPCL's of the participating leases and to treat the unit as a single property, *before such time as there has been a significant alteration in pre-unitized producing patterns of the individual leases." Id.* (Emphasis supplied). Throughout the administrative proceedings leading to eventual adoption of a precise definition of "significant alteration in producing patterns" in August, 1976, it is clear that attention was centered upon the fact that lease-by-lease accounting was not permissible after some alteration in production methods precluded any "meaningful comparison" of current and base period production, since "the bulk of the actual production thereafter may be concentrated from only a few producing wells on fewer than all of the several leases...." 41 Fed.Reg. at 4937. The agency noted that a significant alteration normally occurs when "enhanced recovery operations are begun, or ... production from certain leases is reduced or discontinued in preparation for enhanced recovery operations." Id. "Enhanced recovery techniques," include the "inject(ion) (of) fluids or gases (which) may have originated in the reservoir ... as long as they are injected by an extraneous energy source." 41 Fed.Reg. at 4938. In soliciting comments on a method of determining the point at which a significant alteration occurs, in April, 1976, the agency pointed out that:

"it is ... clear that due to the eventual *alteration* of lease-by-lease producing patterns, production from the unit must at some point be treated as the aggregate of production from all the participating leases, in order to obtain a meaningful comparison of production levels." 41 Fed.Reg. at 16181, (Emphasis supplied).

The formal definition of "significant alteration", which was finally selected by the agency in August, 1976, was, as previously noted, "the increase of production allowables for *any* property that constitutes the unitized property," or "the application of extraneous energy sources by the injection of liquids or gases into the reservoir." 10 C.F.R. Section 212.75(b). (Emphasis supplied.)

In the District Court, the Government contended that the partial rescission of Ruling 1975–15 was only "a relaxation of enforcement policy," with the "significant alteration" test serving only as a guidance in compliance audits. Exxon claimed that the "significant alteration" test constituted an entirely new regulation, which would not be applicable to the Hawkins Field Unit until September 1, 1976, the effective date of the formal definition of the term.

In ruling on the issue, the District Court ultimately determined that the significant alteration test "amounted to a completely new, although less strict, interpretation of the property definition in Section 212.72." *United States v. Exxon Corp., supra,* 561 F.Supp. at 835.

The District Court particularly noted, and was puzzled by, Exxon's insistence that the new test could not be "retroactively" applied before September 1, 1976: (561 F.Supp., fn. 39, p. 843).

"Exxon's barrage of attacks on the agency's amendments to the regulations in February and September 1976—decrying their retroactive application, their discriminatory effect, and the rigor of their standard—is puzzling. If the court were to uphold Exxon's challenges, at most the court could invalidate all or part of Section 212.75 and the significant alterations test as applied to pre-existing units. *But that would not leave a vacuum.* Instead, there would remain to apply to the Hawkins Field Unit only Section 212.-72, unembellished by either Ruling 1975–15 (rescinded *ab initio* ) or by the significant alterations test. But the TECA has held in the *Pennzoil* case that implicit in the property regulation itself is the unit property rule, the requirement that a unit BPCL be calculated as of the date of unitization.... *Consequently, if Exxon's attacks were to succeed, it would still find itself in the position it is trying to escape. Exxon apparently*

*seeks the best of all possible worlds. It would like the court to uphold the rescission of Ruling 1975–15 and to rewrite the rule which replaced it to suit Exxon's practices at the Hawkins Field, in effect leaving it free of any rule at all. The 1976 amendments to the oil price regulations cannot reasonably be read that way."* (Emphasis supplied).

In an attempt to avoid the inconsistency in its argument which was noted by the trial court, Exxon has shifted ground in this appeal, and now relies upon what it perceives to be a *"generalized significant alteration test"* dependent upon a case by case evidentiary analysis.

In contending that the trial court erroneously determined the issue by summary judgment, Exxon first claims that this Court is somehow bound by its 1981 comment in *Exxon Corp. v. United States, supra,* found at fn. 3, 655 F.2d at 1114, to the effect that the question of when a significant alteration occurred in producing patterns at Hawkins Field was "the key factual question to be litigated at trial." This statement, of course, was *obiter dictum,* made without reference to the circumstances surrounding the partial rescission of Ruling 1975–15 or the enactment of 10 C.F.R. Section 212.75, and certainly without benefit of the record put before the trial court in 1983. Furthermore, we clearly noted that the four issues mentioned in this footnote were not before the Court in the 1981 appeal.[9]

In claiming that the trial court erroneously "rewrote" the generalized concept of

determining whether or not there had been a significant alteration in the Hawkins Field, by its action in adding the "exceptionally restrictive" definition which was not adopted until September 1, 1976, Exxon presents several arguments against "retroactive" application of these tests.

In the first instance, Exxon recites much of the same type of "regulatory history" raised in the *Pennzoil* case with reference to claimed "agency indecision" and inconsistent positions which may have been taken by various agency officials from time to time. While Exxon has not specifically pressed its claim of "estoppel" on this appeal, it appears to rely upon some evidence which it claims indicates that the agency "officially determined" that lease-by-lease accounting at Hawkins Field after January 1, 1975, was not in violation of the regulations.[10] In this respect, an "Audit Review Report," dated May 27, 1976, indicates that since the agency had rescinded "that part of Ruling 1975–15 which specifically stated that units were to be treated as one property," a "potential violation amount has not been calculated and Hawkins Field has been eliminated from our report as a potential violation." However, once the audit of Exxon had been completed, a Notice of Probable Violation was issued on January 10, 1978, focused upon "Exxon's activities as operator of the Hawkins Field Unit ... during the period September 1, 1973, through December 31, 1976...."

The preliminary report of field auditors can not be raised as an official, binding and final agency position upon the question of

---

**9.** In the 1981 appeal we noted that there were four basic issues to be determined: 1) whether or not the Hawkins Field Unit is a single property or separate leases under 10 CFR Section 212.72 of the regulations; 2) assuming that the Hawkins Field Unit is a single property, then when did a significant alteration in producing patterns occur, thus establishing a unit base control level for pricing purposes under 10 CFR Section 212.72; 3) whether Exxon can be held liable for all overcharges in the field; and 4) whether the overcharges should be paid to the United States Treasury. In passing we stated that the question of when a significant alteration occurred was "the key factual question to

be litigated at trial," and that the other issues presented disputed legal questions.

**10.** In the trial court Exxon claimed that the decision to unitize Hawkins Field, and the decision to maintain lease-by-lease accounting, were made in reasonable reliance "on repeated agency assurances to Exxon and others that such practices were allowable under the regulations."

The trial court found that the estoppel defense failed because "the undisputed facts in this case demonstrate that Exxon's reliance, if any, on unauthorized informal statements by agency employees, was not reasonable." 561 F.Supp. at 845.

what constitutes a "significant alteration in producing patterns," or a determination of when such alteration occurred at Hawkins Field. See *Johnson Oil Co., Inc. v. U.S. Dept. of Energy*, 690 F.2d 191, 202 (TECA 1982), holding that a proposed remedial order following audit was not an official agency position, and *United States v. Fitch Oil Co.*, 676 F.2d 673, 677 (TECA 1982), ruling that audit policies intended to govern internal agency procedures are not binding on the Department of Energy.

D. *Ruling 1977–2: Application of Section 212.75 to Hawkins Field.*

As noted, in January, 1977, the agency determined in Ruling 1977–2 that the definition of "significant alteration" found in Section 212.75 would be used as "guidance" in audits and compliance cases involving units which were formed before February, 1976, which were otherwise subject to the provisions of Section 212.72.

■ After reviewing the Record, and the administrative history of the Ruling, we determine that the District Court properly applied Ruling 1977–2 in allowing Exxon, as Unit Operator, to delay establishing a single BPCL until a significant alteration occurred at Hawkins Field.[11] We further find that the trial court properly determined that question according to the definition of significant alteration found in Section 212.75.[12]

The purpose of Ruling 1977–2 was to clear up certain "technical issues" which had arisen in connection with the agency's implementation of the new crude oil pricing policies set out in the EPCA, and to clarify the August 20, 1976 Notice regarding price regulations applicable to crude oil. These clarifications, of course, were designed to improve the incentives offered under the two tier pricing system. 42 Fed.Reg. at 4409.

The agency summarized separate treatments to be afforded three different types of Units, according to the date upon which each became unitized, and/or when significantly altered producing patterns occurred on the property.

The comments of the District Court upon the purposes and effect of Ruling 1977–2 succinctly sum up its provisions, 561 F.Supp., fn. 33, at pp. 837–838:

"Although Ruling 1977–2 is not a model of clarity, three categories of units may be distilled from it. The first category consisted of all units formed before February 1, 1976, and at which enhanced recovery operations or a significant alteration in producing patterns occurred *before* September 1, 1976.... (At these units) a unit BPCL had to be established as of the date the significant alteration in producing patterns occurred. *Only Section 212.72 applied to these units....*

"The second category consisted of all units, whenever formed, at which a significant alteration in producing patterns occurred only *after* August 31, 1976. At units in this second category, as well, a unit BPCL had to be established as of the date the significant alteration in producing patterns occurred, but such units enjoyed all the benefits of Section 212.75....

"The third category consisted of units formed between February 1, 1976 and August 31, 1976 and at which either enhanced recovery operations began, or a

11. "A unit base production control level must in general be established as of the effective date of unitization, and the producer must treat the unit as a single property. Section 212.75 provides an exception to this requirement where ... 2) the unitized property has not sustained a significant alteration in producing patterns ..." 42 Fed.Reg. at p. 4414.

12. "Section 212.75, adopted on February 1, 1976, is applicable only to enhanced recovery unitized properties which established a unit BPCL on or after February 1, 1976." Since

Section 212.75 did not contain a definition of "significant alteration" until September 1, 1976, enhanced recovery units formed during that time period were permitted to continue lease-by-lease accounting until such time as enhanced recovery operations had begun. As to these units, the definition adopted in the August 20 Notice was not applicable *until* September 1, 1976, even though the alteration occurred prior to September 1, 1976. 42 Fed. Reg. at p. 4415.

significant alteration in producing patterns occurred, *prior to* September 1, 1976. The agency defined 'enhanced recovery' in February 1976 to include gas or liquid injection operations. 41 Fed. Reg. at 4941. The definition of significant alteration in producing patterns, which came only as of September 1, 1976, swallowed up the concept of enhanced recovery, because the new definition included 'the application of extraneous energy sources by the injection of liquids or gases into the reservoir.' ... The agency recognized, however, that producing patterns might be altered before gas injection, and so added as an alternative definition of significant alteration 'the increase of production allowables for any property that constitutes the unitized property.' ....

"Because operators of units in this third category, formed after February 1, 1976, knew the definition of enhanced recovery when their units were formed, whereas 'significant alteration' was defined only in September, the agency chose to apply the two concepts differently. Operators of units at which enhanced recovery operations began before September 1, 1976 were required to establish a unit BPCL as of the date such operations began ... But operators of units at which no enhanced recovery operations began, but where a significant alteration in producing patterns occurred, before September 1, 1976, were allowed to wait until September 1, 1976 to establish a unit BPCL....

"As a practical matter this meant that if an operator began gas or liquid injection—which would constitute both enhanced recovery and a significant alteration—the operator had to establish a unit BPCL as of that date. If there occurred only a shift in production allowables—which would constitute a significant alteration but not enhanced recovery—the operator could wait until September 1, 1976 to establish a unit BPCL." (Emphasis supplied.)

Ruling 1977–2 provided that as to the third category of units, once a unit BPCL was established, "the provisions of Section 212.75 then in effect are applicable...." 42 Fed.Reg. at 4415. As noted by the trial court, "such units were not allowed any measure of imputed new oil, but they were allowed to use the special unit BPCL rule and the provisions for imputed stripper well oil." 561 F.Supp., fn. 33 at p. 838.

Exxon claims that 10 CFR Section 212.75 may not be retroactively applied because standards for retroactivity have not been met. It claims that retroactive application of only "selected portions" of Section 212.-75 is arbitrary and capricious because this creates discriminatory treatment of unitized fields, and irrationally treats "similarly situated" parties in a dissimilar manner. Finally Exxon argues that if the "significant alteration" portion of Section 212.75 is to be applied retroactively, then the beneficial portions of Section 212.75 must also be given retroactive effect.

After fully reviewing the record, we determine that the District Court correctly applied Section 212.75 in holding that a single BPCL must be adopted at the Hawkins Field in January, 1975, when it was unitized, because a significant alteration in producing patterns occurred at that time.

In the first instance, we reiterate the fact that this Court has previously determined that Section 212.72 in and of itself, required that a single BPCL be established upon unitization.

Secondly, and as found by the trial court, the agency, in rescinding the strict unit-property rule established by Ruling 1975–15, established "a completely new, although less strict, interpretation of the property definition in Section 212.72." 561 F.Supp. at 816.

Finally, and as the trial court found, Exxon suffered no prejudice or inquiry from substitution of the Section 212.75 test for the requirement of Ruling 1975–15 that a unit BPCL be established as of the legally effective date of the unitization agreement. Application of Section 212.75 as "guidance" to the question of significant alteration would not be more restrictive than the new

February, 1976 announcement which allowed a producer to postpone unit accounting until production patterns had been significantly altered, which occurred generally upon implementation of "enhanced recovery techniques," or earlier, upon the closing-in of wells and transfer of production to other leases in preparation for enhanced recovery operations. Certainly Exxon can not claim prejudice through reliance upon any "general test" contained in the 1976 announcement, for its decision to unitize and to account upon a lease-by-lease basis was made in 1974, with full knowledge that Section 212.72, unaided by Ruling 1975–15, required unit wide accounting upon unitization.[13]

■ Exxon next asserts that it will sustain prejudice if the Section 212.75 significant alteration test is applied retroactively because the Hawkins Field would never have been unitized if the participants had known that unitwide accounting would be required upon unitization, since many participants would lose "new oil" which they were legitimately getting prior to unitization, under lease by lease accounting. Such after-the-fact speculation is not persuasive.

The record establishes that Exxon was well aware that Section 212.72 required adoption of unit-wide accounting upon unitization, and that this requirement was a problem to Exxon in its effort to convince all participants to join the unit. At the same time, Exxon clearly feared that *all* "new oil" would be lost because the increased MER (Maximum Efficient Rate) for the field, which had been raised by the Texas Railroad Commission, in prospect of the unitization, would be reduced to its former level if Exxon's plan for unitization fell through.[14] This threat had been raised by "a number of smaller, edge operators in the field" who believed that the field MER of 112,000 barrels per day was too high. A State Hearing Examiner believed that the 1974 producing rate in the field was damaging the reservoir. In May, 1974, Exxon was concerned that the Texas Commission might reduce the MER rate of 112,000 barrels per day to 87,000. In a presentation to management in July, 1974, Exxon employees emphasized "the critical need for operation flexibility," with "substantial changes from current producing practices" so that the Hawkins Field allowable would be produced from "the more capable" wells. The possibility of a reduction in the MER for

13. As noted, unit accounting had been adopted by Exxon for other Units.

> PX 56, an Exxon Memo dated 2/7/74 concerned pricing policy for the Hawkins Unit: "... it is recommended that Exxon should begin calculating exempted unit oil on a lease basis rather than on a total field basis. These changes would prevent an 80 percent reduction in new and released oil when Hawkins is unitized...."

> PX 77, an Exxon Memo dated 8/8/74, noted that unit accounting was established in two other fields, unitized on September 1, 1973, the date that two-tier pricing went into effect, and on March 1, 1974. However, in the Hawkins Field, Exxon:

> "... proposed that the calculation of new and released oil be on the basis that each pre-unitization accounting lease is a separate 'property' for FEA purposes. A calculation based on the total unit would result in less new and released oil than if the field had not been unitized...."

In drawing a distinction between the two other units (using unit accounting), this memo noted:

> "Hawkins unitization differs from Jay and Webster in that a large number of royalty owners have not signed up for the unit." At that time over 75% of the 327 unit tracts in Hawkins Field had less than 100% royalty approval.

14. PX 54 discusses the MER aspect in this manner:

> "One of our biggest problems in the unitization was that the entire project has been conducted on a highly accelerated basis, because Exxon has so much at stake .... As part of an interim pressure maintenance program Exxon got the Railroad Commission to increase the field allowance by 25,000 barrels a day. While this has increased the Company's current income considerably, the increased production is causing edge tracts in the field to deplete faster. The owners of these tracts have been threatening to ask the Railroad Commission to remove the increased allowable. Exxon has succeeded in holding this off by showing its good faith effort to get the unitization under way as soon as possible ... the unit has to be made effective within two years or all the past effort will be lost."

the field by 25,000 barrels per day was specifically feared if unit approval was delayed past January 1, 1975. Since Exxon owned 76% of the working interest, 19,000 barrels of this loss would fall on Exxon's interest in the field. An Exxon budget summary in November, 1974,[15] "assumed" that the Hawkins Field allowable would be cut from 112,000 to 87,000 B/D on July 1, 1975, if the field was not unitized because "(p)olitical pressure from other operators would force the Texas Railroad Commission to reduce the field rate."

Under these circumstances, there was no prejudice to Exxon which would prohibit retroactive application of the significant alteration tests of Section 212.75 as guidance in a determination of the question at Hawkins Field.

■ We further find that Exxon is not entitled to the beneficial "special incentives" of Section 212.75, which, by its terms applies only to certain classes of units, not including HFU. Exxon claims that it was arbitrary to discriminate between those units formed before February 1976, and those formed between February and September 1976.[16]

The District Court recognized the disparity in treatment with these comments: (561 F.Supp. fn. 35 at p. 839):

"The agency articulated no reasons for acting so generously towards such units when its stated purpose was only to encourage prospective unitization.... One might speculate that because such units had not yet undergone a significant alteration in producing patterns, they faced a greater risk of dissolution than did units where significant and perhaps irreversible alteration had already occurred. The agency may have wished to provide particular incentives for the maintenance of such units by holding out the prospect of greater rewards. But whatever the

agency's reasons, the issue of the reasonableness of extending the benefits of Section 212.75 to some units formed before February 1976 is not before the court. Even if it were, the court could at most strike down that small portion of Section 212.75 as an unjustifiable windfall to preexisting units. *That decision would not affect the validity of the agency's decision to provide incentives for the creation of new units while denying those incentives to pre-existing units like the Hawkins Field Unit.* (Emphasis supplied).

Regardless of the generous treatment given to some newly formed units, the trial court determined that the agency need not give the benefits of Section 212.75 to those pre-existing units subject to the provisions of Section 212.72, since by refusing to extend greater benefits, "the agency performed precisely the delicate weighing of competing statutory objectives with which Congress had entrusted it and to which judicial deference is due." 561 F.Supp. at 839–840. We agree with the court's conclusion, found at 838–839 of 561 F.Supp.:

"Working within the narrow constraints imposed by Congress, the FEA reasonably balanced the competing aims of increased production and price control by extending the most favorable incentives to new units. Indeed, the FEA could not have treated all units alike, whenever formed. Had the FEA allowed all units, including the Hawkins Field, to benefit from the favorable provisions of Section 212.75, it would have violated the EPCA directive that no old oil be reclassified as higher-price oil unless it would not have otherwise been produced. The owners of the properties .... such as the Hawkins Field Unit made their economic decision to unitize and to pursue enhanced recovery efforts long before February 1976.

---

**15.** The summary noted that Exxon's working interest in the Unit was 79.52% until about the second quarter of 1977 when it would drop to 75.97%. PX 92. Exxon owned about 77.8% of the field allowable.

**16.** The District Court rejected Exxon's claim to retroactive benefits of Section 212.75. 561 F.Supp., at 837, n. 33. Exxon does not now claim on appeal that it is entitled to an amount of "new" and "stripper well" oil from Hawkins Field beginning in September, 1976, on account of the provisions of Section 212.75.

Any further inducement to them would have produced no additional oil that they had not already decided was worth producing. They could not be encouraged to do what they had already done...."

It clearly appears that HFU, a pre-February 1976 unit which was subject to Section 212.72, was not "similarly situated" to units created later in response to new incentives for enhanced recovery operations. There was no arbitrary discrimination between two types of units which would entitle Exxon to claim any sort of prejudice from its treatment under Section 212.75.[17]

### E. The "Significant Alteration" at Hawkins Field.

Following a review of the record, we find that the trial court correctly held, as a matter of law, that a significant alteration in producing patterns occurred at Hawkins Field in January, 1975, and that Exxon was required to establish a unit BPCL at that time.

On the cross-motions for summary judgment, the Government filed its statement of material facts as to which there was no dispute, and Exxon filed its statement of "genuine issues," to be litigated at trial. The Government's statement was based upon Exxon's admissions and answers to interrogatories, transcripts and documents connected with Texas Railroad Commission proceedings, Exxon's own undisputed production, allowable and injection data from the Hawkins Field, and other contemporary documents relating to planning, production, and pricing for the unit.

Exxon, in its statement of issues to be litigated at trial, did not, and does not, on this appeal contest these facts. Instead, the argument is made that since the agency intended that the Section 212.75 definition

of substantial alteration be used only as "guidance," in flexible case by case determinations, an evidentiary hearing was required to determine the alteration question at Hawkins Field. In this respect, it is Exxon's claim that the deposition testimony of thirteen petroleum engineers refutes any conclusion that gas injection and realignment of production at the unit amounted to significant change in production methods at Hawkins Field. In Exxon's opinion, such testimony would establish that operations in January 1975 "were just a continuation of the temporary 'holding action' " that began at the Hawkins Field in 1969 to combat the waste of crude oil. According to Exxon, producing patterns in the field could not have been significantly altered until the inert gas plant began operations in March, 1977.[18]

1. The Assignment of a Unit Allowable. One of the definitions of "significant alteration" used as guidance by the trial court in determining the status of Hawkins Field under Ruling 1977–2 and Section 212.-75, was the question of when there occurred at Hawkins Field an "increase of production allowables for any property that constitutes the unitized property."

Upon the basis of uncontradicted evidence, the trial court found that the state designated unit allowable assigned to the field in January 1975 was a significant alteration in producing patterns within the contemplation of Section 212.75. As explained by the trial court at p. 843, 561 F.Supp.:

"Prior to unitization the Texas Railroad Commission ... limited the number of barrels of oil ... each well within the Hawkins Field could produce. When a producer-shut in an unproductive well ... that well's allowables were transfer-

---

17. The trial court noted that even if extending benefits to a few units formed before February 1976 could be said to be "unfair," the most it could do was to strike down a small portion of Section 212.75 as "an unjustifiable windfall to pre-existing units." On appeal, Exxon claims that the solution to such "unfairness" would be to extend the benefits to Exxon, and not to take them away from other units. Such argument is

without merit. This court will not rewrite the regulations to fit Exxon's situation. It was not similarly situated to the units which were given favorable treatment.

18. Exxon, of course, has previously determined that unit-wide accounting was required at Hawkins Field as of *September 1, 1976.*

red pro rata among all the other wells in the field. In its order approving the unitization of the Hawkins Field, the (Commission) granted the field a unit allowable and in doing so relinquished to Exxon the control of allocating production among the properties comprising the unit.... The unit allowable permitted Exxon to transfer production from lease to lease at will, without regard to prior limits on production at any lease, provided total unit production did not exceed the unit allowable. In effect, therefore the (Commission) accorded Exxon as of January 1, 1975 an increase in production allowables for any property within the Hawkins Field Unit to which Exxon chose to transfer production, and thereby triggered a significant alteration in producing patterns as of January 1, 1975." [19]

The evidence established that Exxon immediately used the unit allowable in January 1975 by raising production above prior allowables by nearly 320,000 barrels at 65 leases, while production declined in an equal amount at 137 other leases. As found by the trial court—"(b)y shifting production within the unit at will, with only an eye to the unit allowable limit, Exxon effectively 'transfer(red) production allowables among participating leases.' " 561 F.Supp. at 844. This, of necessity, resulted in substantial increases in "new" oil, without any actual increase in total production from the field. Prior to unitization, it was not possible for an Operator to increase production by transferring allowables from one partic-

ular lease to another, because if one well became incapable of producing its allowable, any shortfall was assigned by the state Commission to all capable wells in the field, pro rata. PX 5 at Rule 15.

Exxon does not dispute the evidence establishing this transfer of production among leases.[20] Instead, it claims that in an MER field, such as Hawkins, the "increase in allowables" portion of the "significant alteration" definition, should be construed to mean an increase in the *unit allowable*. From this proposition, Exxon then argues that since the unit allowable was the same as the pre-unitization MER for the entire field, there was no "increase in allowables."

■ The definition of what constitutes a "significant alteration in producing patterns" is to be applied as guidance to "all unitized properties" required to establish a unit BPCL prior to February 1, 1976. There is no exception made for units formed at MER fields, or for Exxon's particular circumstances. The preamble to the significant alteration definition of Section 212.75 includes the following language:

"The (significant alteration in producing patterns) exception provides that notwithstanding the requirement to adopt a unitized BPCL as of the effective date of unitization, determinations of upper and lower tier crude oil volumes may continue to be made separately for properties that comprise the unit ... only for as

---

**19.** The Order of the Texas Railroad Commission, dated November 26, 1974, approving the unitization agreement for Hawkins Field, provided in pertinent part that:

"It is further ordered that the proration units as established for the individual wells, within the unitized area, prior to the approval of the subject Unitization Agreement, are hereby adopted, approved and continued in effect for allowable allocation purposes for such wells, unless the unit Operator elects to revise such proration units."

When Exxon petitioned the Commission to approve the unitization, it requested a single unit production allowable for "operating flexibility" so that allowables could be transferred among tracts of Exxon's choice. PX 86.

**20.** The District Court found that by Exxon's own measurements, "almost 20 percent of 1975 production had shifted across lease lines, almost two and one-half times as much as had shifted in either 1974 or 1973." 561 F.Supp. at 844, n. 42. Despite Exxon's claim in this appeal that this finding was incorrect, the record supports the finding. See PX 200 at 2.

In January, 1975 the M.A. Kay Estate lease produced 47,531 more barrels than it had been allowed to produce on the average in any month during 1974. This was a 33.3% increase in production in that one lease. All of these barrels were treated as "new oil" under Exxon's lease-by-lease accounting. See Appendices B–1, D, "Charts and Graphs."

It is clear that such shifts of production across lease lines were the result of unitization.

long as (1) injection has not begun, and (2) *there has been no transfer of production allowables among participating leases.*" 41 Fed.Reg. at 36182, Reg. APX p. 278. (Emphasis supplied).

In *Wiggins Bros., Inc. v. Department of Energy,* 667 F.2d 77, 88, (TECA 1981) *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982), we noted that the District Court was not free to disregard the intention of the agency which was expressed in a preamble to Ruling 1974–29. We there stated:

"It is well settled by decisions of this Court that the preamble to a regulation of DOE and its predecessors should be considered in construing the regulation and determining the meaning of the regulation. . . .

\* \* \* \* \* \*

Further, there is no support for the view that, under federal rules of construction of statutes and legislative regulations, definitions in a preamble may be ignored. The rule is contrary to this view."

Exxon's rewriting of Section 212.75 would eliminate the phrase "any property that constitutes" from that section, and require the Court to find that a significant alteration occurs only when there is an "increase in production allowables for . . . the unitized property."[21] Such construction would ignore the clear language of Section 212.75 itself, as well as the manifest intent of the agency as expressed in the preamble to the amendment of Section 212.75, 41 Fed.Reg. 36,182.

The District Court correctly looked to agency intent, as expressed by the language of the regulation and its preamble, for the appropriate explanation of the term

"increase of production allowables for any property that constitutes the unitized property." This term clearly includes a "transfer of production allowables among participating leases." Exxon did in fact so transfer production allowables in January 1975.[22]

2. *Gas Injection at Hawkins Field.* The second definition of "significant alteration" provided by Section 212.75, and used as guidance by the trial court in determining the status of Hawkins Field, concerns the injection of gas in and after January, 1975. The trial court found that:

". . . after unitization Exxon continued—and increased—the injections of natural gas it had begun in 1970. Even if Exxon had only continued to inject natural gas at the rate it had done so before unitization—or even some lesser rate—it would have engaged in 'the application of extraneous energy sources by the injection of liquids or gases into the reservoir'—itself a significant alteration in producing patterns. . . . But Exxon in fact substantially increased gas injection after unitization." 561 F.Supp. at 844.

While the Railroad Commission had initially authorized injection of gas at an average of 20 million cubic feet per day in 1969 as a part of Exxon's "interim plan" in preparing for unitization, this limit was removed by the Commission upon unitization. The trial court summed up the uncontested data from Exxon files, in this manner:

". . . Exxon injected 28.2 mcf per day in January 1975—40 percent more than a year earlier. PX 177. Indeed, Exxon increased injections thereafter until by the fall of 1975 it was injecting more than twice as much gas as a year before. . . . Over all, in the first ten

---

**21.** The definition of "significant alteration in producing patterns" set out in the amendment to Section 212.75, effective September 1, 1976, provided in pertinent part that the term meant: ". . . . (2) the increase of production allowables *for any property that constitutes* the unitized property." (Emphasis supplied.) 41 Fed. Reg. at 36184.

**22.** This was contemporaneously understood by an Exxon employee upon review of the August

1976 regulations. His conclusion was that the language contained in the preamble would be of no benefit to Hawkins Field "because of the transfer of allowable provisions" so that Hawkins would be required to begin unit calculations on February 1, 1975 with a consequence being "about a $70MM retroactive exposure for Exxon." PX 230 at 4.

months of 1975 Exxon injected an average of 36.5 mcf per day—almost an eighty percent increase over the same period in 1974 ...  Comparing totals for the years 1972 through 1975 reveals the same clear jump after unitization.  Although between 1972 and 1975 increases averaged only 5 percent annually, total gas injections at the Hawkins Field in 1975 leaped 82 percent, ... with the 1975 total more than double the amount for 1972...."  561 F.Supp. at pp. 844–845.[23]

In response to this uncontroverted evidence, Exxon first claims that the 1975 injection program was merely a "continuation of the interim project," and therefore there was no significant alteration in producing patterns.  The evidence cited above is to the contrary.

Exxon next claims that the district court erred in making post-unitization comparisons because pre-unitization gas injection in the eastern part of Hawkins Field was omitted.  The record discloses that in 1974 Texaco and Amoco were the only operators injecting gas in the eastern portion of Hawkins Field.  This injection was not to maintain pressure in the gas cap, but was for the purpose of regulating proportions of gas to oil in some wells.  Even if the small amount of gas injected in the eastern field is added to Exxon's injections in the western segment, the undisputed evidence is that post-unitization injection continued a dramatic climb above 1974 rates.

Exxon next claims that the gas injected at Hawkins Field was not from an "extraneous" energy source.[24]  According to Exxon, the definition of "extraneous" means "gas not produced from the subject reservoir."  Since the gas injected at Hawkins was "entirely from the field reservoir," Exxon insists that there could be no substantial alteration in production patterns at the Hawkins Unit.

The District Court correctly rejected this argument, citing the preamble to the February 1976 amendments, in which it was explained that the term "extraneous" included gas recycled from the reservoir. 561 F.Supp. at 844, fn. 43.  That preamble provided, in pertinent part, that

"In response to the proposed definition, many comments expressed concern that the language 'from extraneous sources' might preclude some types of enhanced recovery projects that recycle reservoir gas....  *The fact that the injected fluids or gases may have originated in the reservoir is irrelevant as long as they are injected by an extraneous energy source.*"  41 Fed.Reg. at 4938, R. 37585.  (Emphasis supplied).

As previously noted, the definition contained in this preamble has controlling weight.  See *Wiggins Bros., Inc. v. DOE, supra,* 667 F.2d 77.

Exxon further argues that the explanation of "extraneous energy source" is somehow inapplicable, since it was intended to apply only to "enhanced recovery projects," where the injected gas would "move crude oil through the reservoir."  In this respect, Exxon claims that "the continuation of the interim program at the HFU in 1975 was *not* an enhanced recovery project."  Exxon brief, p. 72.  Such a claim at this stage of the proceedings is startling, and without merit.  In its "Statement of Material Facts," Exxon asserted that "The Hawkins Field Unit Agreement, ... as approved by the TRRC, authorized the establishment and operation of the unit facilities necessary for enhanced recovery operations in the Hawkins Field."  Various Government exhibits establish that Exxon admitted that gas injection at the Hawkins Field Unit was an enhanced recovery operation.[25]

23. These figures come from data submitted by Exxon to the Texas Commission on December 18, 1975.

24. As previously noted, one of the alternative tests for "significant alteration" in the September 1976 definition, used as guidance here, was "the application of extraneous energy sources by the injection of liquids or gases into the reservoir." 10 C.F.R. Section 212.75(b).

25. PX 68, PX 94, PX 103, PX 109, etc.

■ Since the undisputed evidence established that gas injection occurred in January 1975, the trial court correctly found that a significant alteration in producing patterns at HFU occurred at that time.

F. *The "Reasonable Alternative Basis" of Ruling 1977-2.*

■ After having determined that a significant alteration in producing patterns occurred at HFU in January, 1975, under both the test of an "increase in production allowables," and/or by gas injection at the field, the trial court further determined that Exxon had failed to justify another date upon some other "reasonable basis," as allowed by Ruling 1977-2.[26]

Exxon argued that "the only truly significant alteration that occurred in the producing patterns of the Field after unitization was the permanent arrest of gas cap shrinkage and the conversion of the reservoir drive mechanism to gas drive/gravity drainage." The trial court approached the issue from this position, and determined that any alternative date which depended on lengthy testimony by expert petroleum engineers as to underground drive mechanisms was not within the intent of Congress since compliance with pricing regulations should be based upon simple objective data, readily observable by agency auditors.[27] The Court further held that since substantial shifts in production had occurred prior to any change in underground drive mechanisms, lease-by-lease accounting thereafter would have allowed Exxon to effectively avoid price controls:

"... the agency's decision to define significant alteration in producing patterns in terms of easily observable events is consistent with the intent of Congress that administration of price controls be workable and effective. The FEA with its limited resources could not afford to satisfy Exxon's desire that the agency send droves of petroleum engineers to the Hawkins Field to conduct elaborate tests to examine the field's underground drive mechanism. That is precisely the 'quagmire' that the agency had to avoid...." 561 F.Supp. at 841.

\* \* \* \* \* \*

"To allow lease by lease accounting to continue after such shifts would have enabled unit operators to circumvent oil price controls. To require the agency to adopt a subjective test based on complex geological phenomena would have plunged the agency into an administrative quagmire which would have had the same result. The agency definition of significant alteration was a reasonable effort by the agency to fulfill its 'duty to reasonably inhibit gerrymandering of boundaries undertaken to avoid price controls.' *Pennzoil Co. v. DOE, supra,* 680 F.2d at 169. Accordingly it must be upheld." 561 F.Supp. 843.

On this appeal, Exxon now claims that *March, 1977,*[28] the month gas plant began operation, is a reasonable alternative date, although its own records show that it calculated a unit BPCL in September, 1976 upon its own finding that a significant alteration had already occurred.

We reject this argument for two reasons. First, and of most importance, any meaningful comparison of production levels between "old" and "new" oil on a lease-by-lease basis became impossible once production across lease lines began in January,

---

**26.** In extensive briefing, Exxon claims that the trial court refused to allow it to justify an alternative date for "significant alteration of producing patterns" at Hawkins Field.

The defense was not raised in Exxon's Answer or Amended Answer, but it was raised as an "issue" to be litigated in its "Statement of Genuine Issues" to be litigated at trial.

While the trial court noted that the question was not before it, the issue was in fact considered and determined adversely to Exxon.

**27.** Exxon contended that no significant alteration occurred at Hawkins Field "until the injection of inert gas stabilized reservoir pressure and altered the reservoir's underground drive mechanisms, *sometime in 1979.*" 561 F.Supp. at 840. (Emphasis supplied.)

**28.** Exxon continues to shift ground, and refine its arguments in this appeal. As previously noted, the alternative date presented to the trial court was "sometime in 1979."

1975. Any date based upon completion of and operation of the gas plant in 1977 would not be a reasonable alternative date for determining the question of when a significant alteration in producing patterns occurred at Hawkins Field.

This Court has previously recognized that:

"The realignment of the pattern of production would have played havoc with the federal pricing system had FEA permitted lease by lease property designations to continue in force after a unitization. It would have resulted in the recognition of artificially high quantities of new oil from some of the participating leases while other leases would be producing less or not at all. It would have permitted an operator to gerrymander production patterns by shifting producing wells from one lease to another." *Department of Energy v. State of Louisiana,* 690 F.2d 180 at 190 (TECA 1982), *cert. den.,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

See also, *Pennzoil, supra,* 680 F.2d at 169; *Grigsby, supra,* 585 F.2d at 1083.

We will not reiterate the evidence recited by the trial court concerning the shutting in of wells, and transfer of production from one lease to another following unitization of Hawkins Field. Exxon personnel, in a report dated June, 1975, attributed the increased volumes of "new oil" directly to unitization. This conclusion was repeated in various Exxon documents.

The Court is satisfied that given the extent and nature of the changes in Exxon production methods once unitization had been accomplished, it became impossible to make any meaningful comparison of "new oil" production on a lease-by-lease basis, long before the commencement of inert gas injection in March 1977. Therefore, no reasonable basis exists for making that occurrence an alternative date for computation of a BPCL at Hawkins Field.

In addition, we fully agree with the trial court's conclusion that any resort to the testimony of expert petroleum engineers for the purpose of determining a reasonable alternative date for a significant alteration in production methods at Hawkins Field would be unworkable, and therefore, not a reasonable basis for determination of the question. Such a method of ascertaining the question would be completely impossible to "audit." We believe that the "key event," as found by the trial court, was the "realignment of producing patterns" among the various leases.

The determination of *when* the significant alteration occurred at Hawkins Field was correctly determined by the trial court, as a matter of law.

## IX. THE EXTENT OF EXXON LIABILITY

The District Court, relying upon our decision in *Sauder v. Department of Energy, supra,* 648 F.2d 1341, determined, on the basis of undisputed testimony, and Exxon's own documents, that since Exxon caused the overcharges, it is fully liable for all of them.

In this appeal, Exxon contends that the principle of operator liability set out in *Sauder* does not apply. In addition, Exxon advances other arguments for the proposition that in any event it should be relieved of certain portions of the overcharges and interest.

We first review the *Sauder* case.

### A. The Sauder Rationale: Operator Liability.

In *Sauder,* the Operator owned 34 percent and 41 percent interests in two properties where exempt stripper well oil was wrongfully claimed. We held that he was liable for all overcharges attributable to the two leases, even though other interest owners had in fact received the majority of the profits.[29] We held that:

---

**29.** In *Sauder* the total overcharges amounted to $342,589, plus interest. Sauder claimed that he

was liable only for $133,000, his share of the total.

"Of all the working interest owners, (Sauder's) is by far the largest single holding. He is the sole operator of the leases and has been the animating force behind the continued production at the Bradfield Pool.... It can fairly be said that it was he who caused the overcharges.

In these circumstances, we think that it is within the authority and discretion of the agency to hold the owner-operator of a lease liable for the full amount of the overcharge. To require the agency to seek refunds from each individual property owner would place a heavy burden on the agency, limiting its ability to repair infractions of its pricing rules. Shifting the burden to one in Sauder's position of responsibility aids the task of enforcement without working unfairness." (648 F.2d at 1347–48)

In applying *Sauder* to the Hawkins Field situation, the trial court summed up Exxon's situation in this manner:

"... Disputing its role as the animating force at the Hawkins Field, Exxon argues that under the terms of the Unit Agreement each Hawkins Field interest owner takes its share of production in kind and independently determines the price at which to sell the oil. Exxon's description of itself as just another interest owner is disingenuous. Exxon was the prime mover and animating force behind the formation and operation of the Hawkins Field Unit and, under the rule of *Sauder* ... Exxon may be held responsible for all overcharges at the field." 561 F.Supp. at 849.

The trial court emphasized that:

"The factual basis for holding Exxon responsible for the full amount of the overcharges at the Hawkins Field is even stronger than in *Sauder*. Throughout the relevant period Exxon's working interest at Hawkins ranged between 76 and 80 percent; its share of unit production, when including royalty interest owners, was about two-thirds.... Exxon was the animating force behind formation of the Hawkins Field Unit, having begun to promote it as early as 1969.... Exxon sought and received permission in 1969 to inject natural gas into the field, which it began the following year.... As operator, Exxon chose the wells to shut-in, the wells where production was to go up or down, where to inject gas, and how much.... Most important, Exxon decided how the unit would account for upper and lower tier oil, first in 1974, before the field was legally unitized ... later after Ruling 1975-15 was issued, ... and finally when it switched to a unit BPCL under Section 212.75 in September 1976. ... Accordingly, Exxon may 'fairly be said (to have) caused the overcharges.' *Sauder v. DOE....*" 561 F.Supp. at 849–850.

The undisputed evidence, so ably summarized by the trial court, supports the conclusion that Exxon is responsible for all of the overcharges under the rationale of *Sauder*. To require the Government to gather evidence and to bring multiple actions against more than 200 working interest owners, and 2200 royalty interest owners at Hawkins Field would "plunge the agency into an 'administrative quagmire' which would effectively block enforcement of oil price controls at the Hawkins Field." 561 F.Supp. at 850.

In this appeal Exxon now takes the position that it cannot be liable for various portions of the liability because it was acting merely as the *agent* of other interest owners, and the trial court failed to determine first that Exxon would be entitled to contribution or indemnification from all other owners who benefited from the overcharges.

While Exxon did not raise the "agency" issue as such in the summary judgment proceedings, and the issue was not specifically discussed by the trial court at 561 F.Supp., Exxon has always resisted the suggestion that it is liable as unit operator for the sales of other interest owners in the Hawkins Field. When Exxon earlier disclaimed its liability as an operator by means of a motion to have this case dismissed for lack of indispensable parties,

contending that the rights of other interest owners were at issue and might be adversely affected because they would be liable for contribution and indemnification should Exxon be found liable, the trial court fully examined the nature of Exxon's liability as operator under the *Sauder* ruling, and discussed the question of Exxon's right to contribution or indemnification from other owners in the field. *United States v. Exxon Corp., supra,* 94 F.R.D. 252, 257–258, (1981):

> "As long as the principal owner-operator caused the overcharges, *Sauder* allows complete recovery from that party, regardless of whether it is actually in possession of the monies received pursuant to the overcharges.
>
> "Similarly, under Rule 19(a)(2)(i), the court's analysis of *Sauder* means that the interests of other unit owners in this case will not, as a practical matter, be impeded. *The court's ultimate disposition of the case will find Exxon liable for those overcharges which Exxon has caused; the decision will not rule upon the actions of other interest owners and, therefore, could not be employed as precedent to hold them liable in the future. That Exxon may attempt to seek indemnification or contribution from the other interest owners for part of the overcharges the court determines Exxon has been responsible for does not alter the court's conclusion.*
>
> "Such a suit by Exxon would turn upon the specific reimbursement agree-ments entered into by the parties, *agreements not at all at issue in the instant case.* Furthermore, if the disposition of this case has any effect upon a subsequent reimbursement suit by Exxon, it may be to *assist* (emphasis of the court) the other interest owners. A finding by the court that Exxon could be found *solely* (emphasis of the court) responsible for all overcharges could arguably aid other interest owners in defending against a suit for contribution or indemnification." (Except as noted, emphasis supplied).

The above decision was not appealed by Exxon. It has now been found that Exxon caused the overcharges. The trial court did note that Exxon "is not without recourse against the other interest owners, and so imposing full responsibility on Exxon will aid in enforcement of price controls without unfairness to Exxon." 561 F.Supp. 850. With regard to this observation, it was noted that Exxon had twice warned other interest owners that recomputations of payments might become necessary because of its interpretation of pricing regulations,[30] and Exxon itself believed that any potential losses because of overpayment could be recovered.[31]

This notation by the trial court was not an attempt to determine the nature or extent of Exxon's right to contribution or indemnity, if any, and it certainly was not an adjudication of the rights or liabilities of absent interest owners, not parties to the litigation.[32]

---

**30.** PX 145, an Exxon letter to interest owners in October, 1975, warned that these interest owners might be required "to refund excess amounts received for oil heretofore classified as 'new crude oil' which the FEA may rule does not qualify for exempt pricing."

PX 246, an Exxon letter to interest owners in January, 1978, sent after a Notice of Probable Violation was filed by the DOE, warned that if a remedial order was issued "it will probably be necessary for Exxon, pending the outcome of the controversy" to reduce payments on future production and take action "with respect to alleged past overpayments as may be necessary . . . ."

**31.** Exxon's decision to proceed with lease-by-lease accounting was based in part upon its belief that it could cut its losses in this manner: (PX 172 at 2.)

> "Potential losses via overpayments of working and royalty interest owners are minimal since most of these are financially responsible parties, and all payments are backed by reserves."

**32.** Our opinion in *Exxon Corp. v. United States, supra,* 655 F.2d 1112, reviews in detail the progress of Hawkins Field litigation through the District of Columbia and the state and federal courts in Texas.

In January, 1978, a Notice of Probable Violation in Hawkins Field was issued, and Exxon and several royalty owners filed suit in the Northern District of Texas seeking declaratory relief on the same issues raised in the Notice.

■ The trial court only observed that "(s)hould Exxon turn to the other Hawkins Field interest owners for contribution or indemnification Exxon, like Sauder, *could attempt* to deduct the other interest owners' share of the overcharges from future royalty payments." 561 F.Supp. at 850. (Emphasis supplied). This it not to say that Exxon's attempt would be successful, or that the government must prove that it would be successful, prior to a finding that a right to restitution has been established. The Section 209 action now before us is not the vehicle for determination of Exxon's rights against, or obligations to third parties. To find otherwise would only serve to embroil the agency in collateral matters, and "hinder, disrupt, and render torpid the statutory scheme for expedited enforcement of pricing controls." *Dyke v. Gulf Oil Corp.*, 601 F.2d 557 at 567, (TECA 1979), *Gulf Oil Corp. v. Dyke*, 734 F.2d 797, (TECA 1984), *cert. den.*, —— U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108.

For all of the reasons discussed above, we find that the trial court correctly determined that Exxon is solely liable for overcharges which it caused at the Hawkins Field Unit, and that this liability is not dependent upon a finding that Exxon is entitled to contribution for such overcharges from other interest owners in the field.

### B. *The Amount of the Overcharges.* .

The trial court found that the calculation of Exxon's overcharges became a straightforward accounting matter and found that the DOE calculations "accorded Exxon the benefit of every favorable modification of the applicable regulations, even if not claimed by Exxon." There was no challenge to the mathematical accuracy of the government's calculation, and the trial court accordingly accepted the figure of $895,501,163.85 as the correct total of all overcharges. 561 F.Supp. at 857.

In this appeal, Exxon contends that the amount of its liability, as described in the judgment, is "grossly overstated" for a number of reasons.

1. *The Texaco Production.* Exxon claims that it has no liability for the share of Hawkins Field production "owned, taken in kind, and refined or sold by Texaco, Inc." The amount of the overcharges attributable to the Texaco share is said to be $53,329,574, before interest.

The trial court correctly disposed of this contention upon the basis of our ruling in *Sauder*. 561 F.Supp. at 850, fn. 52. In *Sauder* we relied upon *Tenneco Oil Company v. Federal Power Commission*, 442 F.2d 489 (5 Cir.1971) in which the Court found that Tenneco was liable for all excess charges for natural gas, including payments made to its co-owners or its prede-

In June, 1978, the DOE withdrew its NOPV, and elected to proceed in this action for civil penalties and restitution under Sections 208, 209 of the ESA. Exxon's declaratory judgment action was transferred to the District of Columbia, whereupon it was dismissed by Exxon and its co-plaintiffs.

In August, 1980, Exxon moved to dismiss the D.C. action for lack of indispensable parties. The trial court held that motion in abeyance, pending the TECA decision in *Sauder*. In October, 1980, Exxon notified HFU royalty owners it would begin to withhold 40–45% of the payments due under purchase agreements to meet possible overcharge liability in the D.C. case. Exxon then filed its Counterclaim in Interpleader in the D.C. Case (discussed, infra).

Some royalty owners (known as the *"Jarvis* plaintiffs") then filed suit against Exxon in Texas state court for conversion and breach of contract. Exxon removed the case to the E.D. of Texas in November, 1980, and filed a coun-

terclaim, joinder and third party action against the DOE, raising the same issues as those involved in the D.C. action.

Following further maneuvering by the parties, all cases were brought before the TECA for the purpose of resolving the "procedural maze". In the exercise of our supervisory powers, we ordered that litigation proceed first in the District of Columbia on the pricing and regulation issues.

We determined that the *Jarvis* plaintiffs were not indispensable parties to the D.C. litigation, but we further held that if these plaintiffs desired "an earlier determination" of their claims, they would be *permitted* to intervene in the D.C. action, and move for summary judgment. *Exxon Corp. v. United States, supra,* 655 F.2d at 1118.

None of the *Jarvis* plaintiffs intervened in the D.C. litigation to press their claims. (Brief for United States at p. 81).

cessor. We disposed of Sauder's argument that a restitution order may not require a refund of money not actually received in this manner:

"Sauder argues that the common law concept of restitution does not encompass the restoration of benefits unjustly received by third parties, and that the agency and the court have undertaken to read a damage remedy into the statute.

We disagree.... we now hold that it is within the agency's authority to order an owner-operator in a situation such as Sauder's to make restitution of the total overcharges." 648 F.2d at 1348, 1349.

It is entirely clear that in the case of the Texaco production, uncontested facts established that Exxon did "cause" the overcharges attributable to the Texaco interest in Hawkins Field. During the first four months of 1975, Texaco calculated the amounts of "new" and "old" oil, using a unit BPCL. Because Exxon was pricing other oil from the field upon a lease basis, it was paying larger royalties than Texaco for "new oil." As a result, some royalty owners threatened to sue Texaco. This caused Texaco to adopt Exxon's method of calculation, and to allow Exxon to determine the breakdown for Texaco's production share for the remaining period of price controls.

Exxon's claim that it is entitled to a reduction in its liability on account of the Texaco production is without merit.

2. *The Interpleader Action: Overcharges October, 1980—January, 1981.* Exxon complains that it can not be held liable for overcharge amounts "that were never paid or received" by anyone. In this respect, Exxon claims that during the period from October, 1980, until the end of price controls on January 28, 1981, it suspended payments to those Hawkins Field interest owners from whom it purchased crude oil of all amounts in excess of a price derived from unit-wide accounting, as opposed to lease-by-lease accounting, so that during this period, Exxon paid only the price for crude oil that was permitted by the regulations under the agency's theory, and as permitted by the trial court.

With its Answer to the complaint filed by the Government in this litigation, Exxon filed a petition and counterclaim for interpleader and declaratory relief, tendering into Court "amounts equal to the disputed amounts resulting from all purchases of Unit crude oil by Exxon" pending a determination of the rights of all claimants to the disputed funds. It was noted that the owners of the crude oil were claiming that they were entitled to the full amount of the prices they had been receiving, including the portion that the DOE claimed to be overcharges. It was further noted that certain of these interest owners had sued Exxon in Texas, seeking a declaration that they were entitled to receive the full amount of the prices they had been receiving. *Exxon Corp. v. United States, supra,* 655 F.2d 1112 (the *Jarvis Christian College* litigation in Texas).

In connection with this Interpleader, bonds totaling $20 million were filed to secure the suspended payments pending resolution of the controversy.

In its Reply to the Proposed Judgment, Exxon claimed that the sums bonded into Court pursuant to the Interpleader action either should not be included in the overcharge amount set out in the judgment, or should be applied in partial satisfaction of the judgment. The amount of this credit or reduction in the judgment sum is said to be $18,039,585, the total of such suspended payments.

The Government responded in this manner:

"Exxon's argument ... that because it established a $20 million bond when it filed a questionable interpleader action, it should have its liability reduced, is difficult to fathom. In any event, Exxon's argument is premised upon the company's blatantly incorrect contention that, because the firm suspended certain payments to those HFU interest owners from whom it purchased crude oil during the period of October 1980 through January 27, 1981 'no overcharges were caused

during the period covered by the interpleader action.' ... Exxon ignores the fact that, although the company suspended certain payments to the interest owners, Exxon reported the higher illegal price to the Department's Entitlements Program as its cost of acquiring this oil ... Hence, Exxon benefited substantially from the higher illegal price which it set and these suspended amounts constitute overcharges...."

The operation of the "Entitlements Program," 10 C.F.R. Section 211.67, and its effect upon sales and certification of old and new oil in the Hawkins Field, was ably described by the trial court, 561 F.Supp. at 852:

"... Exxon's portrayal of itself as victim ignores the workings of the mandatory Entitlements Program which, together with price controls on refiners, resellers and retailers, allowed Exxon to spread the cost of its Hawkins Field overcharges across the land. The purpose of the Entitlements Program was to permit all refiners to share the financial benefits of the limited available quantity of relatively inexpensive price-controlled crude oil. Under the Entitlements Program, the FEA each month allotted to each refiner a certain number of entitlements, equal to that refiner's deemed share of the old oil refined nationwide during that month. If a refiner was in fact able to obtain and refine a proportionately large amount of low-priced old oil, greater than its allotted entitlements, that refiner would have to buy entitlements from those less fortunate refiners which refined a proportionately small amount of low-priced oil. The price of an entitlement was roughly the difference between the price of controlled and uncontrolled oil. The effect of the entitlements transfers, therefore, was to equalize the average weighted crude oil costs of all refiners.

\* \* \* \* \* \*

"As a result of Exxon's misclassification, less old oil was reported to the Entitlements Program. DOE therefore issued fewer entitlements to each refiner, and each refiner had to purchase more, or sell fewer, entitlements than it would have if Exxon had properly classified the Hawkins Field oil. Exxon, by improperly classifying old oil as new oil at the Hawkins Field, thereby increased the average cost of crude oil of all refiners. At the same time, although Exxon as refiner appeared initially to bear the burden of the overcharges of Exxon as producer, in fact Exxon was able to keep the ill-gotten gains by improving its entitlements position. It was able to buy fewer or sell more, entitlements than it had a right to."

Following our review of the record, and in consideration of the workings of the Entitlements Program, as described by the trial court, we agree with the Government's assertion that the fact that Exxon may have suspended payment of "overcharges" attributable to shares of production which it purchased from other interest owners during the period of October, 1980 to January, 1981, does not mean that there were no overcharges during that period. According to Exxon, the money was still due to be paid, and "Exxon reported (and was reimbursed on the basis of) the higher (illegal) price when Exxon reported that oil to the Entitlements Program." Plaintiff-Appellee Brief, p. 93, fn. 118.[33] It is clear that in this manner, overcharges attributable to Exxon's purchase of production from other interest owners although never paid to other owners during this time period, were spread throughout the industry by the operation of the Entitlements Program.

At the request of Exxon, it was excused from responding to any motions filed concerning its petition and counterclaim in Interpleader, pending further order of the

33. Thomas Reeves, an accounting supervisor in Exxon's "Supply Controllers" Department, was responsible for certification of crude oil available for disposition through Exxon Pipeline Company, including production purchased by Exxon from others for processing at an Exxon refinery. He testified that "the higher values" would have been reported under the Entitlements Program.

Court Order, August 20, 1981. A further order was entered by the trial court on November 18, 1981 holding in abeyance all further proceedings in the interpleader action.

The Government points out that Exxon can dismiss its interpleader action at any time, and recover its bond. Exxon has not paid into court any money pursuant to this interpleader, and certainly at this time there is no cash interpleader fund available to be applied as a credit on the judgment entered in this action. Exxon is not entitled to any reduction in the amount of the judgment on account of its suspension of payments to other interest owners.

■ Exxon also contends that the judgment entered below improperly includes the production of some interest owners who were not parties to the Hawkins Field Unit Agreement. Our review of the record discloses that this new argument, presented by a footnote to the Exxon brief, was not properly raised or preserved for our review on appeal.

■ 3. *Consent Orders.* Exxon claims that it is entitled to a reduction of its liability at least in the approximate amount of $70 million because it can not be held liable for overcharges attributable to the interests of others in Hawkins Field who have previously entered into consent orders with the Department of Energy.

The consent orders in question were entered into with such companies as Mobil, Standard Oil of Indiana, Sun Company, Houston Oil and Minerals Corporation, Lyons Petroleum, American Petrofina, and Conoco.

These so-called "global settlements," such as the one entered into with Standard Oil, whose subsidiary, Amoco Production Company held an interest in Hawkins Field, contained provisions to the effect that the agency released "completely all administrative and judicial claims, demands, liabilities, causes of action or other proceedings that (DOE) has asserted or may be able to assert against Standard arising, before or after the date hereof, out of any federal petroleum price or allocation requirement," for the period covered by the consent Order. (3/6/73–12/31/79)

Exxon contends that the settlements have the effect of releasing any claims that the agency might have had against other interest owners at Hawkins Field, and that the settlements also "cured" any violations which such companies may have made in pricing "new oil" at the field. According to Exxon, such releases bar the agency's "effort to impose derivative liability" upon Exxon as the operator, and "purported agent" of the released companies. Exxon's theory of "vicarious liability" is stated in this manner:

> "The only legal basis upon which Exxon could be held liable for the alleged overcharges attributable to these interest owners' shares of HFU production is that Exxon supposedly acted on behalf of these interest owners in the disposition of their shares of HFU production: i.e., the apparent vicarious liability that stems from the DOE's theory of operator liability. However, because these purported 'principals' have obtained releases from the DOE settling any claims that might be asserted against them, there is no basis for holding their purported 'agent' (Exxon) liable." (Exxon Reply to Proposed Judgment).

As an alternative argument, Exxon contends that the settlements, with parties who are jointly liable with Exxon, reduce the Government's "potential recovery from (a) non-settling defendant . . . ," in this case —Exxon.

It appears that the issue of consent orders was first raised by Exxon in a memorandum in support of its motion to dismiss for lack of indispensable parties filed in August, 1980. In urging that any judgment in the action could not avoid prejudice to absent parties, Exxon pointed out that the court did not "have before it the affirmative defenses of the absent interest owners." In this regard Exxon, referring to consent orders with Standard and Mobil Oil Companies, claimed that "the DOE seeks to recover from Exxon monies previously re-

ceived by those interest owners and made an integral part of their settlement agreements with the agency." It was also argued that "(o)ther interest owners may have additional affirmative defenses, such as claims of estoppel and limitations, which cannot be presented in their absence."

In ruling on the motion to dismiss, the trial court, noting our order permitting the *Jarvis* plaintiffs, as well as "all other interest owners" to intervene in the District of Columbia, if they wished to do so,[34] found that the other interest owners would not be prejudiced by not being joined, and further found that Rule 19(b), Fed.R.Civ.Proc., did not require dismissal of the Government's action, even if the parties should be joined under Rule 19(a). *United States v. Exxon, Corp., supra,* 94 F.R.D. at 259.[35]

Our examination of the Consent Orders contained in the Record reveals that Exxon was not a party to any of the settlements, it did not pay any sum of money to the Government for release of any Exxon liability under these settlements, none of the consent orders mentions Exxon, or the Hawkins Field Unit, and, although some of the consent orders identify certain litigation terminated by the settlements, none mentions this litigation which was pending in the District of Columbia at the time the consent orders were executed. In the settlements, the Government agreed not to bring suit "against" the settling parties, and in the Conoco agreement "only civil claims by DOE against Conoco" were settled, while the Sun consent order only required the DOE to terminate actions "against Sun." None of the consent orders could, or did they, purport to release Sun, Conoco, etc., from suits by private parties for damages under Section 210 of the ESA, or for their liability to other parties, if any, for contribution, indemnification, unjust enrichment, or for other relief. Cf. *City of Long Beach v. Department of Energy,* 754 F.2d 379 (TECA 1985).

Any rights under the consent orders accrued solely to the settling parties and not to Exxon. None of the settling parties sought to intervene in this action to assert those rights against the Government, and we do not find that Exxon has ever been given authority as agent to do so on their behalf.

It is readily apparent that Exxon's concern about settlements which may have been made by companies who are not parties to this litigation is in fact a concern about whether or not it will be successful in any future attempt to seek contribution or indemnity from those parties on account of any payment Exxon might make upon the judgment here. As we have previously pointed out, Exxon's liability is not a vica-

---

**34.** Our Order in *Exxon Corp. v. United States, supra,* 655 F.2d 1112, at 1118, provided:

"(3) All plaintiffs in the action in the Texas court *and all other interest owners in the HFU involved in these actions* shall be permitted to intervene in the District of Columbia action if they wish to do so." (Emphasis supplied.)

**35.** Rule 19. Joinder of Persons Needed for Just Adjudication.

(a) Persons to be Joined if Feasible.

A person ... whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. * * *

(b) Determination by Court Whenever Joinder not Feasible.

If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

rious one, based upon ordinary notions of "agency." It has been found that Exxon was the "animating force" responsible for violating the crude oil pricing regulations, and this liability is not dependent upon finding of "joint liability" on the part of third parties who are not defendants in this action, or upon proof of Exxon's right to contribution or indemnity from those third parties.[36]

Under these circumstances, we conclude that Exxon's claim that it is entitled to some adjustment in liability on account of consent orders and settlements made between the Government and others not parties to this case is without merit.

### C. *Prejudgment Interest.*

██ In the exercise of its equitable powers, the trial court determined that restitution by Exxon of overcharges should be made, with interest from the date of overcharge, in order to deprive Exxon of "all enrichment obtained at the (victims') expense," such enrichment necessarily including "the benefits Exxon obtained by having the use over the years of the money illegally obtained." 561 F.Supp. at 858.

The Government proposed several alternative rates, such as the prime rate, the schedule of interest rates which had been applied by the DOE in administrative actions since February, 1980, or a rate based upon Exxon's annual average rate of return, after tax, for capital employed in domestic production from 1975–1981, which was 23.7%.

The Court adopted and applied the schedule used by the Federal Energy Regulatory Commission in administrative enforcement actions, which fluctuated at three month intervals from 9% to 20.31%, and which

had, since October, 1979, been based on average prime rate values as determined by the Federal Reserve. Such rates were imposed upon a finding that these would have been the rates imposed had the overcharges been assessed by Remedial Order, following administrative review, and because these rates had a reasonable relation to the value of the overcharges caused by Exxon. 561 F.Supp. at 858, 864.

For the first time in this appeal, Exxon, relying upon *Eastern Air Lines, Inc. v. Atlantic Richfield Co.,* 712 F.2d 1402, (TECA 1983) *cert. den.,* —— U.S. ——, 104 S.Ct. 278, 78 L.Ed.2d 258 (1983) claims that assessment of any prejudgment interest in this case is error.[37] In *Eastern Air Lines,* a private action for damages under Section 210 of the ESA, the trial court denied a claim for prejudgment interest when the amount of damages claimed to be due was uncertain. Affirming this ruling, we found that "(a)t all times during this litigation it was evident that the amount claimed by Eastern was the subject of great uncertainty, and it would be inequitable and unjust to make such an award in this case." 712 F.2d at 1410.[38]

More recently we found it to be error to award prejudgment interest in a private action under Section 210, when the ultimate amount of overcharges was "subject to great uncertainty." *Gulf Oil Corp. v. Dyke,* 734 F.2d 797, 806, *supra,* (TECA 1984) *cert. den.,* —— U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108. See also, *Zahir v. Shell Oil Co.,* 718 F.2d 1567, (TECA 1983) another private action involving disputes between a gas supplier, franchisee and dealer in possession of gas station franchise, where the damage claim was "not for a liquidated or readily liquidatable sum." We there found that the trial court

---

**36.** Sun Co. and Conoco have filed two suits in the District of Delaware seeking enforcement of consent orders which they entered into with the Department of Energy. *Sun Co., Inc. v. United States,* No. 83–204; *Conoco, Inc. v. United States Dept. of Energy,* No. 83–438. The Court has considered copies of preliminary orders entered in those cases which have been furnished by counsel, and determines that issues pertaining to Exxon's right of contribution, if any, from

third parties are not now a subject of consideration by this Court.

**37.** *Eastern Air Lines* was decided by us in June, 1983, after judgment was entered in this action.

**38.** Considerable difficulty was had in establishing base prices, and in determining the meaning of certain prices listed on computer printouts. See fn. 11, p. 1407, 712 F.2d.

*did not abuse its discretion* in declining to award prejudgment interest. 718 F.2d at 1573.

*Eastern Air Lines, etc.* are clearly distinguishable in that they involved private actions for damages, and not claims for restitution brought by the Government under Section 209 of the ESA. Indeed, in *Eastern Air Lines* we relied upon *Belcher v. Birmingham Trust National Bank,* 488 F.2d 474, 478 (5 Cir.1973) which applied state law, for our conclusion that "prejudgment interest is not available where the amount of damages claimed to be due is uncertain." 712 F.2d at 1410. *Belcher* involved a claim by an appraisal company for services rendered in valuing a corporation's assets. In granting a fee, the trial court included prejudgment interest as part of the award. The Fifth Circuit determined that interest was improperly included because of the applicable state rule in Alabama that interest is not allowed on unliquidated demands.

We need not concern ourselves with any discussion of varying circumstances which may surround the award of damages under state law or under Section 210 of the Act. In *Sauder,* the Remedial Order at issue ordered Sauder to refund "overcharges in the total amount of $342,589.00 plus interest accrued on unrefunded overcharges" at certain specified rates. In overruling Sauder's complaint that he should not be liable for interest, the trial court ruled that such payment was appropriate: [39]

> "Section 209 of the ESA ... gives the Court power to grant an injunction against Sauder. The statute goes on:
> 'In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.'
> "The statute does not provide for the payment of interest on the moneys received. On the other hand, ... courts have imposed interest in situations involving agency orders without express statutory permission.
> \* \* \* \* \* \*

> "The same reasoning applies here. Sauder has had the use of the money which was overcharged to Mobil, and Mobil has been deprived of that use. Therefore, to make Mobil whole, interest on the $342,589 was properly ordered by FEA. The Court will order Sauder to make refunds to Mobil plus interest, in the percentages ordered by the agency."

In affirming the trial court in *Sauder,* we did not separately discuss the issue of prejudgment interest, but our approval of the interest award is inherent in our ruling there regarding the equitable powers of the court and agency "to set things right":

> "Equitable pricing is one of the important objectives of the Emergency Petroleum Allocations Act, 'and this objective cannot be bogged down in an administrative quagmire.' ... Congress has explicitly given the courts 'equitable power ... to set things right and order restitution,' in instances of overcharging ... The district court's order enforcing the agency's decision is fully consistent with this grant of authority." 648 F.2d at 1348. (citations omitted).

In discussing the scope of Section 209 of the ESA, we further observed that:

> "... even if the statute is construed strictly, it appears that the agency's action is within its grant of authority. 'In equity, restitution is usually thought of as a remedy by which defendant is made to disgorge illgotten gains *or to restore the status quo,* or to accomplish both objectives.'
> \* \* \* \* \* \*

> "Here the agency seeks only 'to restore the status quo' and 'to set things right.' It does not seek to recover Mobil's *damages,* which may or may not be the amount of the overcharges, but asks Sauder to make restitution of the precise amount of the overcharges paid to all property owners plus interest.
> "Nor do we believe that Congress intended to limit the agency's and courts'

---

**39.** *Sauder v. DOE,* 4 Energy Mgmt. (CCH) Para. 26,157, at p. 27,397 (D.C.Kan.1979).

power to restore overcharges. The legislative history indicates that the explicit reference to restitution in Section 209 was to settle any doubt that 'there was an inherent equitable power in the court to set things right and order restitution....' There is no indication, however, that the section thereby attempts to limit the power of the courts or the agency to restitution or to a particularly strict interpretation of restitution. 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity the full scope of that jurisdiction is to be recognized and applied....'" (648 F.2d at 1348).

(Emphasis of the court; citations omitted).

Exxon further suggests that it was improper to award interest of any kind in this instance, inasmuch as the judgment here should be considered in the nature of a *penalty*, upon which interest may not be allowed. This argument is based upon Exxon's specious argument that since the trial court did not trace injury to specific victims, there were no "victims" and hence there could be no order of restitution. From this, Exxon claims that an award to state governments, which were not themselves "victims" of overcharges, was in fact an imposition of a penalty and not an award of restitution.

As previously noted, the trial court determined that civil penalties would not be imposed upon Exxon. The Government has not pursued that remedy on appeal. As will be noted in our discussion, *infra*, the court found the ultimate victims of Exxon overcharges to be the consumers of this nation, and its order distributing the recovery of overcharges employs the state governments merely as conduits for such distribution.

We conclude that the award of prejudgment interest under the circumstances of this case was clearly within the discretion of the trial court. We further conclude that the award of such interest, at the rates selected by the trial court in Appendix II to its opinion, 561 F.Supp. at 864, was not an abuse of such discretion, and there was no error.[40]

### D. *Equitable Considerations.*

Exxon has presented, as a separate issue, its contention that that trial court, as a court of equity, erred in requiring restitution of the full amount of the overcharges with interest. In particular, Exxon complains that the court could not determine what was "equitable" without conducting an evidentiary hearing and thereafter "balancing the equities" under the facts presented at such hearing.

The essence of this claim is Exxon's contention that the trial court ignored its own conclusions that the Exxon unitization program was "undertaken for bona fide business reasons" which had begun "long before any regulations on crude oil prices existed," and that Exxon "accurately represented its conduct to the agency," and at times received from the agency informal and puzzling replies to Exxon's inquiries. Exxon further points to alleged "confusion" in interpretation of the regulations, its right to certain amounts of "new oil" which it lost because of unitization under the court's interpretation of the regulations, and its reiterated complaint that it was inequitable to refuse to extend the benefits of Section 212.75, when the "burdens" of that section were applied retroactively.

---

**40.** Exxon contends that for the period from January 1, 1975 through August 26, 1982, interest should be computed as simple interest in accordance with rates established by the IRS in assessing delinquent tax accounts at the following rates:

| Period | Rate |
| --- | --- |
| January 1, 1975 through June 30, 1975 | 6% |
| July 1, 1975 through January 31, 1976 | 9% |
| February 1, 1976 through January 31, 1978 | 7% |
| February 1, 1978 through January 31, 1980 | 6% |
| February 1, 1980 through January 31, 1982 | 12% |
| February 1, 1982 through August 27, 1982 | 20% |

On the prejudgment interest issue, we adopt the able reasoning of the trial court set out at pp. 857–858, 561 F.Supp.

The trial court's findings regarding the retroactive impact of Section 212.75 have been fully discussed and determined, *supra*.

Exxon's arguments concerning the bona fides of its business conduct were resolved in its favor by the trial court in determining that the imposition of civil penalties in this case would be inappropriate, and such findings were before the court in making its order of restitution. In arriving at its decision on penalties, the court pointed out that this did not excuse Exxon's behavior:

> "Exxon pushed the agency at every turn and probed each nuance in the regulations to interpret them to Exxon's advantage, sometimes ignoring their unequivocal dictates." 561 F.Supp. at 858.

Exxon's reference to "confusing regulations" and agency indecision, is simply a recasting of its unsuccessful claim in the trial court that the Government was estopped from challenging the legality of lease-by-lease accounting. The argument made here on "equitable grounds" is no more persuasive, and we adopt the findings of the trial court on that issue, as set out at 561 F.Supp. at 845–848.[41]

Finally, Exxon again raises the issue of prejudgment interest by asserting that it is inappropriate "where a party's actions were not 'willful'," and were not intentionally wrong. For the reasons heretofore discussed, such argument is without merit.

## X. THE REMEDY

Having determined the nature and extent of Exxon's liability, the district court was required to fashion an appropriate remedy in restitution commensurate with the extent of that liability. In so doing, the court first determined that, because of the nature of the Entitlements Program, and the

price control regulations, the effect of Exxon's wrong had been spread throughout the distribution chain, to the ultimate consumers, so that it was impossible to trace the overcharges to specific victims, or to calculate precise damages sustained by such persons. Under these circumstances, the district court concluded that the overcharges should be distributed to those victims by channeling the funds received in restitution through the states, for the purpose of funding energy programs designed to benefit all citizens. In so doing, the Court used as guidance certain principles adopted by Congress in the Warner Amendment, Section 155, Pub.L. No. 97–377, 96 Stat. 1830 (1982), directing the disbursement of unclaimed petroleum violation escrow funds:

> "... Section 155 clearly bespeaks the intent of Congress that violators of the petroleum price regulations should be made to disgorge their illgotten gains even in situations, like the case before the court, where the victims of the petroleum overcharges cannot be identified. The colossal scale of Exxon's wrongdoing, and the workings of pervasive regulations to spread the burden of that wrongdoing impossibly far and wide, must not deter this court from fashioning an appropriate equitable remedy. The purpose of the domestic petroleum price regulations was to keep oil prices down, to relieve consumers of some of the burden of towering oil costs. The five energy conservation programs identified in Section 155 operate across the nation to reduce that same burden, either by reducing overall consumption through conservation or by direct financial assistance to those most in need. Although one might speculate as to alternative remedies, this court respects the wisdom of the solution chosen by Congress and

---

**41.** The estoppel claim, to which the trial court devoted so much attention, was not raised as a separate issue on this appeal. The Government pointed out that this defense "has been dropped." U.S. Brief, p. 4, fn. 1.

In its inimical style, Exxon has responded that "... (c)ontrary to the DOE's assertion, Exxon

has neither 'dropped' its estoppel defense nor failed to press its statute of limitations defense .... As Exxon previously explained, in the event of a reversal and remand because of the improper resolution of factual issues, Exxon intends to assert the legal arguments to which such contested facts relate."

shall adopt it as the most appropriate equitable remedy in the circumstances of this case." (561 F.Supp. at 857)[42]

In this appeal, Exxon contends that the award to uninjured state governments is not "restitution," that such award improperly exposes Exxon to multiple liability, and that the district court assessed liability upon erroneous assumptions concerning the workings of the Entitlements Program, and Exxon's "unproved refiner allocation violations," without granting Exxon any discovery or opportunity to defend charges of refiner violations. The point to these challenges of the remedy adopted by the trial court appears to be that Exxon considers that it should retain or have a share in the overcharge funds because it was a "first purchaser" of production from the field, or because it, as a refiner, was a participant in the Entitlements Program, or because it would be appropriate to leave the overcharges in Exxon's hands because it is impossible to identify the ultimate victims.

A. *Primary Jurisdiction.*

▮▮▮▮ Some suggestion has been made that since the Department of Energy has significant expertise in assessing the implications and impact of its various regulations upon the petroleum industry, the question of ascertaining the victims of the overcharges in this case should be first referred to the agency for determination under the doctrine of primary jurisdiction. *United States v. Western P.R. Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956),

and see *In re Dept. of Energy Stripper Well Exemption Lit.,* 578 F.Supp. 586, 595–596 (D.Kan.1983).[43]

It should be remembered that this appeal involves an action for restitution, brought by the agency under the provisions of Section 209 of the Act—it does not involve proceedings to enforce a Remedial Order issued by the agency through administrative proceedings. When an agency chooses to file suit and is the plaintiff before the Court, the doctrine of primary jurisdiction does not apply. It has been pointed out that "deference to an agency's primary jurisdiction makes little sense in the context of an enforcement proceeding initiated by the agency." *United States v. Alcon Laboratories,* 636 F.2d 876, 888 (1 Cir.1981), *cert. den.,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388.

The litigation began as an administrative proceeding, "and might have continued in that forum had the defendant not filed an action for declaratory relief" in Texas. *United States v. Exxon Corp., supra,* 470 F.Supp. 674. Instead, the DOE withdrew its Notice of Probable Violation and began this action under Section 209. We previously ruled that the Department had dual enforcement authority, and that it need not exhaust its administrative authority before proceeding directly in court to enforce its remedy for restitution. *Exxon Corp. v. United States, supra,* 616 F.2d 526.

While a referral to the OHA might be appropriately ordered by a trial court in the exercise of its discretion under some circumstances,[44] we do not find that the Exx-

---

**42.** The five energy programs to benefit from restitution funds paid over to the states include weatherization of buildings, implementation of state energy conservation programs, reduction of energy consumption in schools and hospitals, promotion of conservation by small businesses and individuals, and assisting the poor with home utility bills. See opinion of the District Court, 561 F.Supp. at 856, fn. 58.

**43.** The agency has set up special procedures for distribution of refunds recovered through Remedial Orders and Consent Orders processed through its administrative procedures. These procedures, sometimes referred to as "Subpart V proceedings," are instituted by petition in the

Office of Hearings and Appeals. The OHA may decline to consider applications for refunds that are "too small to warrant individual consideration," in view of "direct administrative costs" that may be involved. 10 C.F.R. Sections 205.-280 et seq.

In the *Stripper Well Litigation,* which was referred to the OHA in September, 1983, no final report has been made by the agency.

**44.** We understand that in the *Stripper-Well* Multi-District litigation a number of cases involved Remedial Orders requiring modification or further administrative adjustment. The DOE there took the position that it would be appropriate to have all of the cases remanded for the purpose

**1282**

on litigation should be referred as a matter of law under any doctrine of primary jurisdiction. In our view, administrative proceedings would be "unnecessary, unnecessarily expensive, and likely to have a preordained outcome," fostering further needless delay. *United States v. Elrod,* 627 F.2d 813, 818 (7 Cir.1980).

**B.** *Intervenors.*

The appellant intervenors, described above, have presented competing claims as to why each should receive a share of the refunds because of the manner in which each bore the burden of the overcharges.

The refiner intervenors claim that any burden was automatically shifted from first purchaser-refiners to all of the over 200 participants in the Entitlements Program by 10 C.F.R. Section 211.67. They claim the overcharges should be distributed among all refiners. The jobbers and independent gasoline dealers claim that the refiners passed through overcharges to them, and they are entitled to share in the refund. Certain groups of consumers, such as the airline industry, utilities, freight lines and motor vehicle owners claim that they bore the burden of the overcharges, and they suggest a remedy whereby such groups can be individually compensated by shares in the refund.

These intervenors complain that they were not allowed to appear as parties to present evidence on their various claims for refund, and so they were wrongfully denied their "day in court". Only two groups, the Indicated Refiners and the Gasoline Retailers sought to intervene prior to the decision of the trial court.[45]

After judgment was entered in the trial court, we filed our opinion in Cities Service Co. v. Department of Energy, supra, 715 F.2d 572, determining that Cities Service had no right to intervene in a DOE enforcement action against Pennzoil for violation of price controls on crude oil. At issue was a DOE counterclaim against Pennzoil, filed under Section 209 of the ESA, which was settled by Pennzoil's agreement to pay $14,750,000 to the United States Treasury. In so doing, we discussed the significant difference between Section 209 and Cities' private right of action under Section 210 of the Act:

"While sections 209 and 210 have a common purpose—the enforcement of DOE's regulations—they vindicate different rights. 'Actions by the United States under ESA Section 209 are taken to enforce public, not private, rights.' *Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722.... By contrast, the action authorized by section 210 'is intended to be brought by private persons against other private persons.' .... We have previously warned against '(t)he commingling of private and agency enforcement devices for which Congress has made separate provisions....' *Dyke v. Gulf Oil Corp.,* 601 F.2d 557, 567 ... The outcome of the instant case, an agency enforcement action brought by DOE, will in no way affect Cities' private right to sue Pennzoil directly for damages ... Under these circumstances, the district court correctly concluded that Cities has no interest that would be impaired by disposition of this action." (715 F.2d at 573–574)

Exxon attempts to distinguish *Cities Service* upon the ground that the overcharging firm (Pennzoil) had "voluntarily" entered into a consent order with the DOE, thereby taking the risk that it might also have to pay damages to third parties under Section 210 of the Act.

Exxon's claim of possible exposure to "double liability" is without persuasion.

---

of tracing overcharges. The District Court retained jurisdiction, specifically noting that it, and *not* the DOE would decide where the funds go. 578 F.Supp. at 596.

**45.** In December, 1982 and February, 1983 at the request of DOE and Exxon, the trial court stayed the requests to intervene pending resolution of the liability issue. Following entry of the Memorandum decision, intervention was granted solely for the purpose of arguing on appeal the question of distribution of the refund.

Any private action under Section 210 would be governed by state statutes of limitations. See *Gulf Oil Corp. v. Dyke, supra,* 734 F.2d 797, 808, and *City of Long Beach v. D.O.E., supra,* 754 F.2d 379. Exxon claimed that the two year statute of limitations for the State of Texas would apply to any private action under Section 210.

In any event, any Section 210 liability award against Exxon can be adjusted, if necessary, to take into account the restitution award here. See *Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278, 283–284 (TECA 1980), and see *Dyke v. Gulf Oil Corp., supra,* 601 F.2d at 566 (1979).[46]

█ We adhere to our prior rulings in *Dyke* and *Cities Service* to the effect that public and private rights of action are separate and distinct, and not to be mingled in one proceeding. To do otherwise would hopelessly disrupt orderly proceedings in this type of action, and, as pointed out in *Dyke,* "the timing and scope of enforcement would become subject to the vagaries of private litigation.... Any wholesale commingling of discrete administrative and judicial responsibilities in public and private actions likely would hinder, disrupt, and render torpid the statutory scheme for expedited enforcement." 601 F.2d at 567.

Consumer Intervenors, presently without standing to institute private actions against Exxon under Section 210, agree that the overcharges were "passed down" to end consumers. They urge that a separate escrow fund be set up for their benefit before distribution to the states, or, alternatively, they suggest that the ascertainment of the victims of the overcharges be referred to the OHA, as discussed previously.[47] While such procedure would be one method of distributing the overcharges, it is not the only method. For the reasons hereinafter discussed, we determine that the course chosen by the trial court was appropriate under all of the circumstances here.[48]

### C. *The Consumer as Ultimate Victim.*

█ In its attack upon the remedy devised below, Exxon (and some Intervenor appellants) take the position that the trial court was required to trace, or attempt to trace, the overcharges from first purchaser, to refiner, through various monthly accountings required by the Entitlements Program, and its "banking" system, and then to determine the nature and extent of any passthrough of increased costs through the distribution system, such as might be authorized by 10 CFR Sections 212.83(c)–(d) (refiners) and 212.93(a) (resellers and retailers). It is appellants' position that such inquiry is required by our decision in *Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717 (TECA 1982), *cert. den.,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).

In *Citronelle,* the Government sought restitution under the provisions of Section

**46.** Consumers Power and Hudson Refining Company voluntarily dismissed their appeals as Intervenor appellants in this case, and filed a class action suit in the District of Indiana under Section 210(a) of the ESA on behalf of all domestic refiners of crude oil that participated in the "Old Oil Entitlements Program," excluding sixteen large refiners that produced in excess of 100,000 barrels per day of crude oil, etc., *Consumers Power Company, et al. v. Exxon Corporation,* No. H83–0610, N.D. Indiana, filed 10/3/83. It is claimed that Exxon overcharges were borne by plaintiffs to the injury of a class numbering 300, in an amount exceeding $240 million.

**47.** RJG Cab, Inc., and Geraldine Sweeney, Intervenor-Appellants here, representing consumer interests, have filed a class action in the Eastern District of Pennsylvania, for declaratory judg-

ment finding distributions under the "Warner Amendment" unconstitutional, and without effect. This action concerns administrative Consent Orders and settlement agreements entered into by the DOE in lieu of judicial actions brought under Section 209 of the ESA where settlement proceeds were paid into an escrow fund, then distributed in part to the states under the Warner Amendment. *RJG Cab, Inc., et al. v. Donald Hodel, et al.,* No. 83–3265, Eastern District of Pennsylvania, 1983.

The Pennsylvania action does not, of course, involve a judicial exercise of discretion by a court ordering restitution under Section 209.

**48.** The Court appreciates the efforts of counsel for all Intervenor appellants, as well as that of counsel for the Intervenor appellee states. All briefs and arguments were most helpful to the court in reaching its decision.

209 for overcharges involved in four sales of domestic crude oil which had been improperly treated as export oil, exempt from price regulation. The District Court, finding that it could not "envision a formula which could make a meaningful distribution to the millions of consumers from Florida to Massachusetts who purchased power or goods ...", ordered that restitution should be made to the United States Treasury. *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 at 886, (S.D.Ala. 1980).

On appeal we fully recognized the broad equitable powers of the District Court in fashioning equitable remedies, but found that the order requiring payment of the overcharges to the United States Treasury was improper because it was not in accordance with the Section 209 objective of making victims whole, insofar as possible. The case was remanded for the purpose of fashioning some plan for disbursement of restitution funds, in accordance with the requirement that the Government must at least try to ascertain those persons who had been overcharged. *Citronelle*, 669 F.2d at 723.[49]

In our view, the District Court's judgment and order in this action are fully in accord with our ruling in *Citronelle*, where we specifically noted that:

"The District Court, sitting as a Court of Equity, unless otherwise provided by statutes here in contemplation, had 'all the inherent equitable powers of the District Court ... available for the proper and complete exercise of that jurisdiction'; ... and has the power, 'to do equity and mould each decree to the necessities of the particular case'; further, 'It may act so as to adjust and reconcile competing claims ... so as to accord full justice to all the real parties in interest....' The authority inherent in the equity powers guarantees complete rather than truncated justice." 669 F.2d at 722. (Citations omitted.)

Here, the District Court appropriately determined that any attempt to trace the overcharges would be doomed to failure because of the pervasive influence of the Entitlements Program and other regulations which had the effect of passing on and diffusing the HFU overcharges through the distribution system. As pointed out by the trial court, this was a factor not present in the *Citronelle* litigation.[50] We have previously reviewed the consequences of the Entitlements Program. In *Union Oil Co. of Cal. v. U.S. Dept. of Energy*, 688 F.2d 797, 802 (TECA 1982), cert. den., 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983), we noted that:

"Certifications of price-controlled crude oil as exempt crude oil ... reduced the total amount of crude oil production subject to price controls each month and therefore increased the total cost of the available crude oil supply. As a result, the benefits of price-controlled crude oil which were distributed among all refiners by the Entitlements Program were reduced. Thus, to the extent that crude oil producers sold otherwise price-controlled crude oil as uncontrolled crude oil ... the higher cost of such uncontrolled crude oil was distributed among all domestic refiners through the operation of the Entitlements Program.

Once the overcharges were disbursed throughout the refining industry, the regulatory system was designed to insure that money spent or received by the refiners as the result of their purchases or sales of entitlements would be passed along to the ultimate consumers. Thus, all refiners were permitted to pass through increased costs to their customers. 10 C.F.R. Section 212.83. 561 F.Supp. at 853. The EPAA specifically provided for "a dollar-for-dollar passthrough of net increases in the cost of crude oil ... at all levels of distribution from the producer through the retail level." 15 U.S.C. Section 753(b)(2)(A). The refiners

---

**49.** To date, no plan has been devised by the District Court in *Citronelle*.

**50.** There were only four shipments of oil in *Citronelle*. All occurred prior to implementation of the Entitlements Program.

were also permitted to "bank" costs which were not passed through in the sales of products for one month, and to include these banked costs in calculating prices for later months. Calculation of these "banked costs" was subject to variable and complex formulas. 10 C.F.R. Section 212.-83(e).

Additional regulations permitted the resellers and retailers, in turn, to pass on their increased costs to the ultimate consumer. 10 C.F.R. Sections 212.91 et seq.

This Court long ago recognized that the Entitlements Program was intended to "spread the benefit of access to old price-controlled oil and the burden of dependence on uncontrolled oil among all sectors of the petroleum industry, all regions of the country, *and among all consumers of petroleum products....*" *Cities Service Co. v. F.E.A.*, 529 F.2d 1016, 1021 (TECA 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). (Emphasis supplied).

We agree with the trial court's conclusion that any attempt to trace increased costs attributable to the HFU overcharges would require a full scale audit of the entire petroleum industry, and that any effort to do so would be futile. As the Government suggests, the first step in any such audit would require recalculating over seventy monthly entitlement lists issued during the period of the overcharges, taking into account such variables as the volumes of new and old oil produced during each month, the average acquisition costs, and the values of each entitlement. In determining the precise impact of the overcharges on any particular refiner, it would then be necessary to consider the impact of exception relief which may have been granted by the agency over the term of the Entitlements Program. The difficul-

ty of any such accounting is particularly clear in view of the fact that the DOE has not yet completed or issued a final January 1981 "Entitlements List," designed to settle accounts between the refiners following expiration of price controls. 10 C.F.R. Section 211.69 (1983). See *Navajo Refining Company v. United States Department of Energy,* No. 83–1492–M, D.C. New Mexico, Memorandum and Order of March 30, 1984.[51] See also, *Consumers Power Company v. Department of Energy,* 742 F.2d 1468 (TECA 1984), where we recently determined a right to participate in the Entitlements Program.

Even if the HFU overcharges could be traced to individual refiners, it would then be necessary to trace their effect on product resellers, retailers and consumers, through the provisions of passthrough regulations. That this task would be futile is illustrated by the difficulty of applying only one aspect of the regulations, that is, the calculation of "banked costs." Exxon itself admitted that it was unable to supply information on its own costs because:

"... adjustments to the cost bank figures cannot be made until all outstanding questions concerning the proper interpretation of the Mandatory Petroleum Price regulations have been resolved. As a result, a final determination of the actual cost bank figures can only be made after all pending administrative and court proceedings have been concluded.

\*    \*    \*    \*    \*    \*

Because this question involves the basic fabric of the entire passthrough program and could involve millions of documents in possession of Exxon, the DOE and other companies, it cannot be answered with specificity." (Answer to Plaintiff's Interrog. 11(b), 19(e), R. 1592, 1602).

---

**51.** In *Navajo Refining,* more than three years after Navajo had paid $4 million into the program, Navajo had not received any restitution to which the DOE had determined it was entitled. The FERC had denied reimbursement, "stating only that it was 'sure' DOE would implement relief to Navajo consistent with its responsibilities to wind up the Entitlements Program." p. 6, Slip Op.

After publication of the list, the DOE contemplates a series of "Post-clean-up claims and obligations" procedures whereby the OHA, the FERC, or a court may determine final claims payable under the Entitlements Program. 10 C.F.R. Section 211.69(h).

The fact that banked costs might exist as to any particular refiner does not mean of course that increased costs were not passed on through the distribution system. To determine this would require an investigation into the state of mind of each refiner in setting prices for individual petroleum products each month. Such a task would be impossible, and several of the intervenors have so conceded. See Gladieux Brief, p. 9, "No such finding could possibly be made without an extremely time-consuming factual inquiry, one which is almost certainly beyond the capacity of any court or administrative agency;" Marathon Brief, p. 17, "(P)roving passthrough of overcharges would depend entirely on uncertain economic assumptions and impossibly complex measurements."

The refiners' suggestion that refunds be made payable to themselves as "first purchasers" would result in inequities, inconsistent with the fundamental purpose of restitution under Section 209. As the trial court pointed out, prior to decontrol, if a court ordered restitution to a first purchaser, then that refund would eventually be passed along the distribution line to an ultimate consumer of petroleum products. However, in view of the 1981 decontrol of oil prices, "there has existed no ready method of ensuring that overcharges will be refunded to their ultimate victims, the consumer." Under the situation here, the Court found that "(t)o order a refund to the first purchaser would simply result in a windfall gain for that purchaser—ironically, in this case, Exxon itself—who would be under no obligation to pass the refund along." 561 F.Supp. at 854.[52]

There was no need for the District Court in this action to attempt the impossible task of attempting to ascertain the damage sustained by individual consumers of petroleum products. In this respect, it should be noted that this action for restitution under Section 209 differs in significant degree from a private action of damages under Section 210. As noted in *Citronelle-Mobile, supra*, 669 F.2d 717 at 722:

> "The central purpose of restitution is to determine the amount by which the wrongdoer has been unjustly enriched and then to make him disgorge that amount. *No proof is required that the plaintiff was damaged, much less the amount of any damage.*" (Emphasis supplied).

The form of relief chosen by the trial court in this action by which the restitution funds will be channeled through the states for use in the enumerated energy programs designed to benefit the consuming public bears a reasonable relationship to the injury sustained by the consumer public as a consequence of Exxon's violation of federal energy pricing regulations. The judgment in this action requires Exxon to pay the overcharges and interest into an interest bearing Treasury escrow account, to be held in trust by the Treasury. Following the conclusion of all appeals in this case, the Fiscal Assistant Secretary of the Treasury is required to disburse the money, with additional accrued interest to the states, with instructions as to use of the funds which are consistent with the trial court's Memorandum. The judgment further orders that the states and other jurisdictions "shall use all funds so disbursed in a manner consistent with" the trial court's order. The states will be required to report annually to the Court and to the DOE the manner in which the funds have been used, until all have been expended.

We believe this form of disbursement to be equitable, and fair, and a reasonable method of compensating the consuming public for the HFU overcharges. It accomplishes the intent of Congress that violators of the price regulations be required to disgorge their gains, even in situations where it may not be possible to identify

---

**52.** In *DOE, et al. v. Ray L. Hunt, et al.,* No. 5–101, 5–102, an appeal pending before this court, a Remedial Order of 1977 required a refund to be made to the first purchaser. Due to decontrol and "changed circumstances," the

DOE sought a partial remand of the Remedial Order in order to determine whether this refund provision should be modified. The DOE appeals an order requiring payment to the first purchaser.

and compensate each individual victim. While other remedies might have been adopted by the trial court,[53] the remedy chosen avoids further administrative delay and confusion, with additional costs, it prevents the frustration of congressional objectives in securing prompt enforcement of what has been denominated as "emergency" price regulations, and it is a reasonable means to protect the public interest.

The District Court unquestionably possessed broad equitable powers to remedy the wrong caused through Exxon's violation of price regulations at the Hawkins Field Unit. Under all of the circumstances presented in the record, we conclude that the trial court did not abuse that discretion in fashioning its remedy.

The Judgment of the District Court is AFFIRMED in all respects.

WILLIAM H. BECKER, Judge, concurring in part, and dissenting in part.

## CONCURRENCE IN PART

First, I wish to concur in the affirmance of the excellent opinion and judgment of the able District Judge on those difficult and complex issues, finding and concluding that Exxon Corporation was liable for overcharges and interest for violation of the applicable statutes and regulations fixing the maximum prices for the crude oil in question. On these issues, which include nearly all the major issues presented in these appeals, the District Judge found the facts and applied the applicable law in an unusually clear, discriminating and exemplary manner. See *United States v. Exxon Corporation* (D.D.C.1983), 561 F.Supp. 816, for the findings of fact and conclusions of law of the District Court incorporated in the judgment from which these appeals are taken. (Some supplementary undisputed facts in the Record in the District Court are cited in the dissenting opinion which follows.)

## DISSENT IN PART

### ·Scope of Dissent

The portion of the majority opinion in this Court, from which I dissent, is included in the part entitled "X. The Remedy." The majority opinion in this part concludes that the District Court exercised a *legal discretion* in ordering the funds representing illegal overcharges in the principal sum of $1,635,604,638.10 and interest to be paid by the Exxon Corporation to the United States Treasury to be held in trust for disbursement to the States for use in one or more of five energy conservation programs listed in the "Warner Amendment," § 155 of P.L. 97–377, 96 Stat. 1830, 1919 (1982). Whether this disposition might have been within the discretion of the District Court, if the District Court in an efficient judicial manner had satisfied all legally established claims in restitution of victims of the overcharges is not a subject of this dissent. It may be that on a fuller record payments on doctrines of fluid recovery, *cy pres* or *parens patriae* or other applicable doctrines should be made to groups representing all the public or other identifiable groups of victims.

This disposition of the overcharges and interest was finally adjudged by the District Court, without any judicial or administrative attempt by notice and hearing, to identify the victims of the illegal overcharges or the amounts of the damages suffered by each victim or groups of victims. In fact, many parties claiming in good faith to be victims of the illegal overcharges were denied notice and an opportunity to be heard on their claims, or to intervene for these purposes.

In my opinion, this summary denial of a hearing on the claims in good faith of the alleged victims, violated established historical equitable principles of restitution and of procedural Due Process guaranteed by the

---

**53.** In *United States v. Robert B. Sutton, et al.,* No. 82–C–1069–B, (N.D.Okla.) involving a claim for restitution under Section 209 of the ESA, the District Court directed payment be made to the states for use in certain energy programs described in the Warner Amendment. *Sutton* is now pending on appeal in this Court.

Fifth Amendment to the Constitution of the United States.

The historical equitable and constitutional principles, in my opinion, cannot be lawfully ignored in the discretion of a court, as explained hereinafter.

I

## JUDICIAL DUTY AND POWER TO ORDER RESTITUTION

Under the controlling decisions of the Supreme Court of the United States, this Court and the Circuit Courts of Appeals, this dissenting opinion concludes, among other things, that the federal courts have the inherent historic equitable and constitutional duty and power to order restitution to parties damaged by violations of valid statutes or regulations, or both, fixing prices, allocations and incidental rights and duties (as in the Entitlements Program).[1]

Therefore the inherent judicial duty and power to order such restitution exist (a) in civil actions, under § 209 of the Economic Stabilization Act, to enforce such valid statutes or regulations, or both, and (b) also in equitable civil actions in which the violations were temporarily protected by injunctions, wrongfully issued. This judicial duty and power is authorized by general law and was expressly confirmed by Congress in the last sentence of § 209 of the Economic Stabilization Act (ESA). 12 U.S.C. § 1904 note; 1971 U.S.Code, Congressional and Administrative News (USCCAN) 2291 reporting the legislative history of the ESA.[2] As stated by the Supreme Court of the United States in *Porter v. Warner Holding Company*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the judicial duty and

---

1. Such inherent judicial duty and power to order restitution in civil actions exists whether the violations were, or were not, temporarily protected by an improperly issued injunction, later vacated by the issuing court or by an appellate court.

2. The fact of recognition and endorsement rather than creation, by Congress, of the power and duty to order restitution in § 209 is established by the relevant portion of the legislative history of § 209 reported in 1971 USCCAN at page 2291 where it is stated:

---

power to order such restitution are broader and more flexible when the statutes or regulations in issue, or both, primarily serve the public, rather than a private interest, as in the EPAA, the EPCA and regulations thereunder, which primarily serve the public interest.

Selected controlling decisions of the Supreme Court of the United States defining and enforcing the judicial duty and power to order such restitution are cited and summarized hereinafter.

A.

*Selected Controlling Decisions of Supreme Court of the United States on Duty and Power to Order Restitution*

In *Porter v. Warner Holding Company (Warner Holding), supra,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the duty and power of a federal court under the Emergency Price Control Act of 1942 (Act), 50 U.S.C. § 925(a), to order restitution of rents collected in excess of legally permissible ceiling rates were defined and enforced by the Supreme Court. In that case, the District Court had enjoined the defendant landlord from collecting excess rents, but declined to order restitution, holding there was no jurisdiction to do so under the Act. The Eighth Circuit Court of Appeals affirmed the judgment of the District Court.

The Supreme Court reversed the judgment of the District Court finding that the Administrator of the Office of Price Administration had invoked the equitable jurisdiction of the District Court by seeking an injunction to enforce the rent ceiling.

"In addition to injunctive relief, the court may also order restitution of moneys received in violation of any regulation or order. It was not certain that, in these circumstances, there was an inherent equitable power in the court to set things right and order restitution. Restitution has been granted in several cases successfully prosecuted by the Government in Phase I (*United States v. Lieb,* Civil Action No. SA 71 CA 267, D.C., W.D.Tex., Oct. 13, 1971). This provision makes clear that the court has power to grant restitution."

The Supreme Court then held that the District Court had the broad inherent equitable duty and power to do what justice required, stating:

"Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. *And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. Virginian R. Co. v. System Federation, R.E.D.* 300 US 515, 552, 81 L ed 789, 802, 57 SCt 592 [601]. Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles,* 321 US 321, 329, 88 L ed 754, 760 64 S Ct 587 [591]. It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice. *Camp v. Boyd,* 229 US 530, 551, 552 57 L ed 1317, 1326, 1327, 33 S Ct 785 [793]. (Emphasis added.)

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown v. Swann,* 10 Pet. (US) 497, 503, 9 L ed 508, 511. See also *Hecht Co. v. Bowles, supra* (321 US 330, 88 L ed 761, 64 S Ct 587)." *Warner Holding,* 328 U.S. at 398, 66 S.Ct. at 1089, 90 L.Ed. at 1336, 1337.

In *Public Service Commission of Missouri v. Brashear Freight Lines (Brashear Freight),* 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941), many common carriers secured in a District Court an invalid injunction against enforcement of a valid regulatory statute of Missouri imposing taxes and license fees on motor carriers operating in interstate commerce. The Supreme Court held that the District Court had the duty and power to assess damages including costs of litigation, taxes and fees, caused by the improperly granted injunction, under which the challenged taxes and license fees had been deposited in escrow, stating:

"Under long settled equity practice, courts of chancery have discretionary power to assess damages sustained by parties who have been injured because of an injunctive restraint ultimately determined to have been improperly granted. *Russell v. Farley,* 105 U.S. [15 Otto], 433, 44 et seq., 26 L ed 1060, 1064; *Pease v. Rathbun-Jones Engineering Co.,* 243 US 273, 279, 61 L ed 715, 721, 37 S Ct 283 [286], Ann Cas 1918C 1147." *Brashear Freight,* 312 U.S. at 629, 61 S.Ct. at 788, 85 L.Ed. at 1088.

In *Brashear Freight, supra,* the Eighth Circuit Court of Appeals had failed to recognize and enforce the duty and power of the District Court to make restitution, despite the deposit in escrow or trust of the challenged taxes and license fees under the protection of the improperly issued injunction against enforcement of the regulatory statute of Missouri.

In 1960, the Supreme Court of the United States in *Mitchell v. De Mario Jewelry (De Mario Jewelry),* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), expressly affirmed *Warner Holding, supra,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In *De Mario Jewelry, supra,* the Supreme Court quoted the language of *Warner Holding, supra,* stating that a court in equity may

give whatever relief is necessary, and then stated:

"The applicability of this principle is not to be denied, either because the Court there [*Porter v. Warner Holding Co.*] considered a wartime statute, or because, having set forth the governing inquiry, it went on to find in the language of the statute affirmative confirmation of the power to order reimbursement. Id. 328 U.S. at 399 [66 S.Ct. at 1089]. When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, *it must be taken to have acted cognizant of the historic power of equity to provide complete relief* in light of the statutory purposes." *De Mario Jewelry,* 361 U.S. at 291, 292, 80 S.Ct. at 335, 4 L.Ed.2d at 326 (emphasis added).

In *United States v. Morgan (Morgan II),* 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), the Supreme Court of the United States ruled on the disposition of a fund paid into the court pending the outcome of a suit to set aside an order by the Secretary of Agriculture under the Packers and Stockyards Act of 1921, 7 USCA §§ 181–229. The challenged order reduced scheduled rates at the Kansas City stockyards. The fund was the difference between the old, high rate and the new, low rate ordered by the Secretary of Agriculture. [In 1938, in an earlier case, the new low rate had been set aside by the Supreme Court. *Morgan v. United States (Morgan I),* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938).]

In 1939 in *Morgan II, supra,* the Supreme Court stated that:

"Decision turns on the meaning and application of the provisions of the Packers and Stockyards Act, construed in the light of its dominant purpose to secure to patrons of the stockyards prescribed stockyard services at just and reasonable rates, and upon the *authority and duty of the district court* to effectuate that purpose in making disposition of the fund." *United States v. Morgan,* 307 U.S. at 188, 189, 59 S.Ct. at 798, 799, 83 L.Ed. at 1216 (emphasis added).

In 1939 in *Morgan II, supra,* the Supreme Court discussed further the authority and duty of the District Court, stating:

"*The district court,* in staying the Secretary's order and at the same time arresting the excess payments to appellees under the scheduled rates, *assumed the duty of making the proper disposition of the fund upon the termination of the litigation.* The duty was the more imperative here because the court's injunction order not only deprived the public of the benefit of the lower rates but obstructed any effective reparation order by the Secretary. Its action presupposed that the ownership of the excess payments was in doubt and could be finally determined only by an adjudication on the merits of the reasonableness of the filed rates. *In taking the payments into custody it acted as a court of equity, charged both with the responsibility of protecting the fund and of disposing of it according to law,* and free in the discharge of that duty to use broad discretion in the exercise of its powers in such manner as to avoid an unjust or unlawful result. It entered into no contract or understanding with the litigants; it entered into no undertaking as to the manner of disposing of the fund; its duty with respect to it is that prescribed by the applicable principles of law and equity for the protection of the litigants and the public, whose interests the injunction and the final disposition of the fund affect. *Inland Steel Co. v. United States,* 306 U.S. 153, ante, [83 L.Ed.] 557, 59 S.Ct. 415, supra. (Emphasis added.)

"It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies, may be affected by the public interest involved." *United States v. Morgan,* 307 U.S. at 193, 194, 59 S.Ct. at 801, 83 L.Ed. at 1218, 1219.

Later, in *Federal Power Commission v. Interstate Natural Gas Company (Interstate Natural Gas),* 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949), the Supreme Court of the United States ordered that the

Court make restitution to the consumers rather than the first purchasers of natural gas of a fund accumulated in escrow pending review of a Federal Power Commission (FPC) order reducing rates for natural gas. The pipeline companies that were the direct purchasers claimed the fund, but petitioner and several state and municipal agencies claimed that the fund should be paid to the ultimate consumers. The Court of Appeals ordered payment to the pipeline companies on the authority of *Central States Electric Company v. Muscatine (Central States)*, 324 U.S. 138, 65 S.Ct. 565, 89 L.Ed. 801 (1945). The Supreme Court distinguished *Central States, supra*, on the fact that in the *Interstate Natural Gas* case, under review, the pipeline companies were subject to the jurisdiction of the FPC and federal law; and found that the aim of the Natural Gas Act was "to protect ultimate consumers of natural gas from excessive charges" because "[t]hey were the intended beneficiaries of rate reductions ordered by the federal commission...." *Interstate Natural Gas, supra*, 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. at 901. In that case, the Supreme Court reasoned that reduced rates would have been passed through by the wholesaler "unless we are to assume that the passage of the Natural Gas Act was an exercise in futility." *Interstate Natural Gas*, 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. 895 at 901. In that case the Supreme Court further *held that the lower court must look beyond the first purchaser and seek the proper recipients of the fund* stating:

> "But apart from those exceptions [unreasonably low rates by pipeline companies or pass through of rate reductions], it is the duty of the court to look beyond those companies for the rightful claimants of the fund. It is the responsibility of the court which distributes the fund accumulated under its stay order 'to correct that which has been wrongfully done by virtue of its process.' *United States v. Morgan*, 307 US 183, 197, 83 L ed 1211, 1220, 59 S Ct 795 [802]. *That responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.* (Emphasis added.)

> \*    \*    \*    \*    \*    \*

> "When a federal court of equity grants relief by way of injunction it has a responsibility to protect all the interests whom its injunction may affect. *Inland Steel Co. v. United States*, 306 US 153, 83 L ed 557, 59 S Ct 415. It assumes the duty to make disposition of the fund in accord with equitable principles. *United States v. Morgan, supra*, (307 US at 191, 83 L ed 1217, 59 S Ct 795 [at 799]). If in a particular case the court reaches the question of reasonableness of rates, it does so only for purposes of distributing the fund for whose creation it alone was responsible. It does not fix or prescribe rates for the past or the future. The reasonableness of rates charged by the companies who claim the fund is wholly ancillary to the problem of determining what claimants are equitably entitled to share in it.

> \*    \*    \*    \*    \*    \*

> "In conclusion, the task of the federal court in distributing the fund accumulated by virtue of its stay order is to undo the wrong which its process caused. The basic problem, therefore, is not to fix rates but to determine who suffered a loss as a result of the court's action in granting the stay. What in fact would have happened as a consequence of federal or state law if the stay had not been issued, no one can know for a certainty. But federal court must make its prognostication, whether an excursion into federal or state law questions is entailed. Distribution of the fund should not involve prolonged litigation. It is an administrative matter involving the exercise of an informed judgment by the federal court and should have the flexibility and dispatch which characterize the administrative process." *Interstate Natural Gas*, 336 U.S. at 582, 584, 69 S.Ct. at 778, 779, 93 L.Ed. at 901–903.

## B.

### Controlling Cases from this Court on the Judicial Duty and Power to Order Restitution

This Court, the Temporary Emergency Court of Appeals of the United States (TECA), has consistently followed the controlling decisions of the Supreme Court of the United States in ordering restitution in cases in which illegal charges were collected in violation of a statute or regulation, or both. *Citronelle-Mobile Gathering, Inc. v. Edwards* (TECA 1982), 669 F.2d 717, cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982); *Sauder v. Department of Energy* (TECA 1981), 648 F.2d 1341; *United States of America v. Pro Football, Inc.* (TECA 1975), 514 F.2d 1396; *DeRieux v. Five Smiths, Inc.* (TECA 1974), 499 F.2d 1321, cert. denied, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *University of Southern California v. Cost of Living Council* (TECA 1972), 472 F.2d 1065, cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); *United States v. Lieb* (TECA 1972), 462 F.2d 1161.[3]

*Citronelle-Mobile Gathering, Inc. v. Edwards (Citronelle),*[4] *supra* (TECA 1982), 669 F.2d 717, *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982), was our last definitive opinion on the duty and power to order restitution of excess prices collected in violation of statutes and regulations governing the price of petroleum products. In that case, the Secretary of Energy on behalf of the United States asserted an enforcement counterclaim under § 209 of the ESA on behalf of domestic customers alleged to have been overcharged. The District Court granted a partial summary judgment for the United States (Secretary) on the counterclaim under § 209 holding that the appellants (Citronelle-Mobile Gathering, Inc., and others) collected excess prices in violation of the ESA and EPAA and regulations thereun-

der. This Court then ordered and authorized restitution of the illegal excess charges by deposit in a trust account in accordance with the then existing General Accounting Office Procedures, or under a plan for a "Deposit Fund Account" *or other appropriate procedures to be approved by the District Court* stating in part:

### "RESTITUTION IS APPROPRIATE RELIEF

"Having agreed with the district court's determination that appellants have violated the provisions of the ESA, EPAA and the regulations promulgated thereunder which establish the ceiling price for the four sales of domestic crude oil, and the maximum lawful selling price for the resale of domestic crude oil, 6 C.F.R. part 150 and 10 C.F.R. part 212, this Court reviews the relief fashioned by the district court judge. The counterclaim seeks judgment requiring plaintiffs to pay into an escrow account, 'for subsequent distribution to NEPCO customers', the excess charges. Allegations place the sum between $6,000,000.00 and $9,000,000.00, exclusive of interest and civil penalties. No accurate calculations are before the Court at this time.

\*    \*    \*    \*    \*    \*

"An immediate confrontation with the method/process of enforcement emerges. Neither appellants, nor various *amici* attack restitution as being outside the scope of relief authorized, rather, they insist the decision ordering restitution to the United States Treasury is beyond the district court's authority. The Court finds on this issue no justification for allowing plaintiffs to retain their illegal gains.

"The district court, sitting as a Court of Equity, unless otherwise provided by statutes here in contemplation, had 'all the inherent equitable powers of the District Court ... available for the proper and com-

---

**3.** In an unappealed final judgment within the scope of the appellate jurisdiction of this Court, a District Court ordered restitution of unlawful excess charges for football tickets in violation of the Economic Stabilization Act (ESA) of 1970.

*Oakland Raiders v. Office of Emergency Preparedness* (N.D.Cal.1974), 380 F.Supp. 187.

**4.** See additional discussion of *Citronelle, supra,* in Part I C, below.

plete exercise of that jurisdiction'; *Porter, supra* 328 U.S. at 398, 66 S.Ct. at 1089, and has power, 'to do equity and mould each decree to the necessities of the particular case'; further, 'It may act so as to adjust and reconcile competing claims ... so as to accord full justice to all the real parties in interest....' The authority inherent in the equity powers guarantees complete rather than truncated justice. *Camp v. Boyd,* 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913). *The power of a district court to require restitution,* as was pronounced in *United States v. Lieb,* 333 F.Supp. 424 (W.D.Tex.1971), *was specifically endorsed and ratified by Public Law 92–210* [5] (Footnote 5, *See* U.S.Code and Congressional News, 92d Congress, 1st Session (1971) pp. 2283, 2291.) (Sec. 209), but nothing has been pronounced as to payment to the United States Treasury. *Federal district courts unquestionably possess broad discretion in fashioning equitable remedies, Franks v. Bowman Transportation, Co.,* 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1975) but, as contemplated in the exercise of these powers to remedy civil wrongs and restore civil rights, the authority is vested to make the victims whole, 'so far as possible, and restored to a position where they would have been had it not been for' the unlawful violation, such as was practiced here. It follows that payment to the United States Treasury is not restitution, in the true sense of the word, or in the objectives of the statutes here involved. (Emphasis added).

"We face the brilliant rationale of the trial court in its envision of millions of customers along the east coast having been overcharged. Clear, however, is the fact that the sale of the over-priced oil was made to determinable utilities and other institutions along the Atlantic seaboard. Faced with a statute that specifically authorizes restitution, but makes no provision for direct payment to the treasury, we turn to *University of Southern California, supra,* which ordered refunds of excess charges for football tickets.

'While this Court recognizes the considerable burden that such a refund de-

mand places ... we recognize also the right of the agencies to require it.'

*Id.* at 1070.

We believe such a process to be a reasonable application of the power of the district court. This is obviously in the contemplation of defendant as evidenced by its request for relief. Actions by the United States under ESA § 209 are taken to enforce public, not private, rights. Thus, compensation is 'a by-product of the agency's effort to re-establish compliance with its regulatory scheme.' *Bulzan, supra,* at 282. The central purpose of restitution is to determine the amount by which the wrongdoer has been unjustly enriched, and then to make him disgorge that amount. No proof is required that the plaintiff was damaged, much less the amount of any damage:

'Restitution is generally awarded only in order to deprive the defendant of enrichment obtained at the plaintiff's expense ... the general requirement does not mean that the gain to the defendant need be equated to the loss of the plaintiff, nor indeed that there need be any loss to the plaintiff except in the sense that a legally protected interest has been invaded.'

*Restatement of Restitution,* Sec. 1, Comment e (1937), cited in *Sauder v. Doe,* 648 F.2d 1341 (TECA 1981). The district court properly held that because NEPCO and PETCO aided and abetted the Chamberlain firms in their violation of the price regulations, for their material benefit, they are barred by 'unclean hands' from seeking or recovering any of the illegal profits.

"Apparently, however, restitution payments may be made to the Treasury under special order of the court. The Treasury holds the payments in a 'Deposit Fund Account' to be paid out at the direction of DOE. *See* General Accounting Office Procedures Manual, Title 7, Sec. 4.10(6). *Cf. Hodgson v. Wheaton Glass Co.,* 446 F.2d 527, 535 (3d Cir.1971).[6] (Footnote 6, *See also* 28 U.S.C. §§ 2041, 2042.) Receipts contained in those accounts are subject to a

'constructive trust,' *Emery v. United States,* 186 F.2d 900, 902 (9th Cir.1951); are treated as liabilities of the United States, *see e.g.,* Treasury Combined Statement of Receipts, Expenditures, and Balances of the United States Government, Fiscal Year 1978 at 3, 12; and for their disbursement, an appropriation is not required. This affords an opportunity for DOE to pursue those proposals suggested by its request that the Court

'Enter a judgment requiring Gathering, Services and Chamberlain to pay into an escrow account for subsequent distribution to NEPCO customers, a sum of ...'

As determined by the district court the Government has demonstrated injury to a class of persons. Whether the defendant will ask to amend under Rule 15, Federal Rules of Civil Procedure, institute interpleader under Rule 22 and related statutes, or proceed otherwise is not revealed in the record before this Court. Suffice it to note that the Government has a *duty* to try to ascertain those overcharged, and refund them, with interest, from the restitution funds.

"The Order of the district court is modified and the case remanded to that forum for an Order directing the application to the General Accounting Office Procedures, and/or the furnishing of a plan for the 'Deposit Fund Account', and/or other appropriate procedures, to be approved by the district court.

"Meanwhile, within such time as the district court may direct, the parties will enter a stipulation, failing which, file appropriate motions in that forum." *Citronelle,* 669 F.2d at 721–723.

The only different circumstances in this case that did not exist in the *Citronelle* case, *supra,* are the "decontrol" of petroleum prices and allocations in 1981 and the many changes in the statutes and regulations, and in the structure, operations, personnel, remedial policies and administrative decisions which governed the Department of Energy and its predecessors prior to "decontrol" (or "deregulation") of the petroleum industry on January 28, 1981. The effect on restitution by judicial orders of these changed circumstances since "decontrol" are discussed hereinafter in reviewing the currently available remedies and procedures to accomplish judicial restitution.

The following additional decisions of this Court on the issues of restitution are substantially in agreement with the principles announced in the *Citronelle* case, *supra.* They are in inverse chronological order: *United States v. Pro Football, Inc.,* (TECA 1975) 514 F.2d 1396, an action under § 209 ordering restitution of excess charges for football tickets; *DeRieux v. Five Smiths, Inc.,* (TECA 1974) 499 F.2d 1321, cert. denied, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), ordering restitution of excess charges for football tickets; *University of Southern California v. Cost of Living Council,* (TECA 1972) 472 F.2d 1065, cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), ordering restitution of excess charges for football tickets; and *United States v. Lieb,* (TECA 1972) 462 F.2d 1161, ordering restitution of rents in excess of rent guidelines.

C.

*TECA Opinions Relied on in the Majority Opinion in Part "X. The Remedy."*

In the majority opinion in Part "X. The Remedy," the majority concludes that it was within the discretion of the District Court to enter summary judgment (a) denying intervention; (b) refusing to grant a hearing in restitution proceedings to those claiming to be injured by the illegal overcharges; (c) and assuming without a hearing that all illegal overcharges had been spread "through the distribution chain, to the ultimate consumers" and (d) that the overcharges should be paid to the Treasury in escrow to dispense the funds to the States, by analogy to P.L. 97–377, § 155 (the "Warner Amendment").

It is concluded in this dissent that the majority erred in concluding that the District Court in its Memorandum Opinion of March 25, 1983, 561 F.Supp. 816 had *dis-*

*cretion,* without notice and hearing, to enter a summary judgment in conflict with (a) controlling decisions of the Supreme Court of the United States on Due Process; (b) historic equitable principles; (c) the controlling opinions of this Court; and (d) the last sentence of § 209 of the Economic Stabilization Act, *supra,* discussed hereinabove. The discussion, cases cited, statute cited, and conclusions expressed in Parts II and III of this dissenting opinion on Due Process, equitable principles of restitution and intervention are incorporated at this point by reference. They will not be repeated in this Part I, except to the extent necessary in distinguishing the cases relied on by the majority in Part "X. The Remedy."

The following cases are relied on by the majority in Part "X. The Remedy": *Cities Service Co. v. Department of Energy,* (TECA 1983) 715 F.2d 572; *Dyke v. Gulf Oil Corporation,* (TECA 1979) 601 F.2d 557; *Bulzan v. Atlantic Richfield Co.,* (TECA 1980) 620 F.2d 278; *Citronelle-Mobile Gathering, Inc. v. Edwards,* (TECA 1982) 669 F.2d 717; *Cities Service Co. v. Federal Energy Administration,* (TECA 1975) 529 F.2d 1016.

In a supplemental letter [5], the author of the majority opinion cited these additional cases in support of the majority opinion on "The Remedy": *Payne 22, Inc. v. United States of America,* (TECA 1985) 762 F.2d 91; *Midwest Petroleum Co. v. DOE,* (TECA 1985) 760 F.2d 287.

None of these TECA cases, it is submitted, support the conclusions in the majority opinion or could serve as a precedent to hold that the District Court had *discretion* to render a summary judgment contrary to (a) Due Process guaranteed by the Constitution; (b) controlling decisions of the Supreme Court and of this Court on historic equitable principles; and (c) the last sentence of § 209 affirming historic controlling equitable principles on restitution.

The discussion of all the cases relied on by the majority follows.

*Cities Service Company v. Department of Energy (Cities Service),* (TECA 1983) 715 F.2d 572

The *Cities Service* case, *supra,* rules only on the right of intervention and the facts in the *Cities Service* case, *supra,* were distinguished from this case in that:

(a) the counterclaim in the *Cities Service* case under § 209 was *settled* by an Agreed Final Judgment (715 F.2d at 573 and 574), that provided for payment of an agreed sum to the U.S. Treasury;

(b) the District Court found that Cities Service Company *"had no 'interest'* within the meaning of Fed.R.Civ.P. 24(a)(2),"* in contrast to the finding in this case that the intervenors *had an interest* as defined by Rule 24(a)(2) (R. 31607); and

(c) the rule of the controlling TECA case of *Citronelle-Mobile Gathering, Inc. v. Erwards, supra,* 669 F.2d 717, cert. denied 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982), is recognized but distinguished because of the different facts stated above.

The *Cities Service* case, *supra,* is relied on by the majority to support the questionable conclusion that a party, entitled to a hearing on principles of Due Process, restitution and equitable principles of restitution in an action under § 209, has only a private action under § 210. But there is no case holding that any party that has rights under § 210 is not entitled to a hearing in restitution under § 209, under constitutional and equitable principles, principles of procedural Due Process, and the last sentence of § 209 when the illegal overcharges are in the control of the court.

No reconciliation of the ruling of the majority, remitting the victims of the illegal overcharges to separate civil suits

---

**5.** The two cases distinguished in this part are not in the original draft of the majority opinion but were cited by the author of the majority opinion in a letter submitted after circulation of the original draft. Because they may be added to the original draft, they are included in this part.

under § 210 [6] is made by the majority with the controlling cases of the Supreme Court of the United States, in restitution, represented by *Public Service Commission of Missouri v. Brashear Freight Lines, supra,* 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083, a restitution proceeding in which such a ruling such as that of the majority was reversed by the Supreme Court of the United States, which said:

"There can be no question of that judge's right to deal with issues such as those here presented. Under long settled equity practice, courts of chancery have discretionary power to assess damages sustained by parties who have been injured because of an injunctive restraint ultimately determined to have been improperly granted. *Russell v. Farley,* 105 US [15 Otto] 433, 444 et seq., 26 L ed 1060, 1064; *Pease v. Rathbun-Jones Engineering Co.,* 243 US 273, 279, 61 L ed 715, 721, 37 S Ct 283 [286], Ann Cas 1918C 1147. This power is, as stated, discretionary; there are of course cases where the Chancellor might properly conclude that parties should be remitted to an action at law. *But this is not one of those cases.* If petitioners had to bring actions at law, each of the seventy-six respondents might have to be made a defendant in a separate action. There is a controversy between the parties as to whether or not all of these respondents could be sued or served in the State of Missouri; to be compelled to sue some of them elsewhere would work a hardship on the state. *In addition to this, part of the damages for which petitioners seek recovery is made up of various items of cost and expense incurred in the litigation; if petitioners succeed on the merits, there might conceivably be serious problems raised by the seventy-six respondents as to the portion of damages fairly attributable to each—a*

*problem peculiarly appropriate to equity, and pre-eminently adapted to settlement by a single court.*" 312 U.S. at 629–630, 61 S.Ct. at 788–789, 85 L.Ed. at 1088 (emphasis added).

As pointed out above in Part II A. hereof, the rule of the Supreme Court on equitable historic doctrine of restitution in maximum price enforcement actions (all actions under § 209) is the same in injunction actions in which the injunction is later set aside, and overcharges are in an escrow fund. See *Porter v. Warner Holding Company, supra,* 328 U.S. 325 at 398, 66 S.Ct. 1086 at 1089, 90 L.Ed. 1332 at 1337, for analysis and quotation stating controlling rule.

### *Dyke v. Gulf Oil Corporation (Dyke),* (TECA 1979) 601 F.2d 557

The actions involved in the *Dyke* case, *supra,* were private actions under § 210, wholly unlike the *Exxon Corporation* action under review and obviously distinguishable on this fact alone.

Further in the *Dyke* case, *supra,* this Court held that DOE may not be joined as a party in § 210 actions in the absence of compelling circumstances not present in that case. The *Dyke* opinion reiterates generally the "separation of public and private remedies" language, but does not discuss the issues of restitution under § 209.

There is an obvious distinction to be drawn between "commingling of private and agency enforcement devices" proscribed in the *Dyke* opinion, 601 F.2d 557 at 567, and the hearing of victims' claims to restitution under historic equitable and constitutional principles in a § 209 action, in which restitution may be made properly and accurately, as authorized in the last sentence of § 209.

### *Bulzan v. Atlantic Richfield Company (Bulzan),* (TECA 1980) 620 F.2d 278

This action by the plaintiff Bulzan was again a private action under § 210, and

---

**6.** The logical result of the finding of the majority that all members of the public were victims of the overcharges and that each victim is limited to relief in a private action for damage under § 210 is that there are hundreds of millions of claims for relief for damages, a large number of which may be the subject of judicial actions, which would impose great and unbearable burdens on the judiciary and great financial burdens on the victims of the illegal overcharges and the parties liable to the victims.

wholly distinguished from the action under review, in which relief was secured on a claim under § 209.

This Court in its opinion in the *Bulzan* case, *supra*, held that a remedial order by the agency does not bar a private action under § 210, because of the "dual enforcement scheme that Congress incorporated into its regulatory plan." *Bulzan, supra*, 620 F.2d at 284.

The *Bulzan* case arose out of an agency remedial order which required the violator to make compensation to the injured private party. It is very clear from the *Bulzan* opinion that restitution under § 209 is to be made in the action under § 209 to injured parties, for the opinion states that an award under § 210 may be adjusted to take into account that type of earlier award under § 209. *Bulzan, supra*, 620 F.2d at 283–284.

*Citronelle-Mobile Gathering, Inc. v. Edwards (Citronelle)*, (TECA 1982) 669 F.2d 717

The holding of this case is directly contrary to the conclusion reached by the majority. The *Citronelle* case is discussed as a controlling case of this Court earlier in this dissenting opinion in Part I B. on judicial equitable principles of restitution. This earlier discussion is incorporated here by reference, and the following additional comment is made here.

On facts similar to those in these appeals, the TECA Panel in *Citronelle, supra*, rejected the argument that it was impossible to make restitution to the injured parties because they were too numerous. The Court in the *Citronelle* case, *supra*, stated:

> "We face the brilliant rationale of the trial court in its envision of millions of customers along the east coast having been overcharged." *Citronelle, supra*, 669 F.2d at 722.

But this Court, in the *Citronelle* case, did not give up and stop at the possibility that millions of persons were overcharged; on the contrary the Court went on to state:

> "Clear, however, is the fact that the sale of the overpriced oil was made to determinable utilities and other institutions along the Atlantic seaboard. Faced with a statute that specifically authorizes restitution, but makes no provision for direct, payment to the treasury, we turn to *University of California, supra*, (472 F.2d 1065) which ordered refunds of excess charges for football tickets.
>
> While this Court recognizes the considerable burden that such a refund demand places ... we recognize also the right of the agencies to require it. *Id.* at 1070.
>
> We believe such a process to be a reasonable application of the power of the district court." *Citronelle, supra*, 669 F.2d at 722.

In the above quotations this Court held that the District Court in restitution proceedings must look for any identifiable victims of the overcharges, and that it makes no difference if the wrongdoer is caused "considerable burden" in making refunds.

The opinion in the *Citronelle* case, *supra*, goes on to state in 669 F.2d at 723 that "the Government has a *duty* to try to ascertain those overcharged...." This statement is the basis of the holding that the District Court must implement that duty by a judgment in restitution.

*Cities Service Company v. Federal Energy Administration (Cities Service)*, (TECA 1975) 529 F.2d 1016

The *Cities Service* case, *supra*, did not involve an action under § 209 or issues of restitution, due process or intervention, as in this case. The *Cities Service* case, *supra*, was an action to enjoin enforcement of the old oil Entitlements Program.

The opinion in the *Cities Service* case, *supra*, states that the basic purpose of the Entitlements Program was to spread the burden of uncontrolled oil prices among "all sectors of the petroleum industry, all regions of the country, and among all consumers of petroleum products," *Cities Service*, 529 F.2d at 1021. The *Cities Service* opinion states that all sectors of the petroleum industry were to bear the burden of increased oil prices and nowhere states that

consumers were to bear the entire burden of price increases or that a district court could summarily find that unidentified "ultimate consumers" were the only victims of illegal overcharges. Moreover, the language quoted above in the *Cities Service* case, *supra*, is addressed to the purpose of the Entitlements Program, and there is no evidence that reality inevitably conformed to the intentions of the agency in promulgating the Entitlements Program.

Further, the facts discussed in the recent entitlements exception regulations 10 C.F.R. § 211.69 cited in Addendum No. 2 hereof, including the Entitlements Adjustment Mechanisms, are contrary to the inferences drawn in the majority opinion from the *Cities Service* case, *supra*. For example, under 10 C.F.R. § 211.69, DOE authorizes and may pay out of illegal overcharge funds restitution of benefits owing but unpaid as exception relief from the Entitlements Program.

### *Midwest Petroleum Company v. U.S. Department of Energy (Midwest)* (TECA 1985) 760 F.2d 287

In the *Midwest* case, *supra*, there *was no finding that there were illegal overcharges* by Fina, the seller, in any amount. As clearly recited in the opinion of this Court, "[w]ithout any finding that Fina was in fact liable for any overcharges, DOE and Fina agreed to the Consent Order at issue in this case." *Midwest, supra*, 760 F.2d at 288. The consent order *provided for payment of damages from illegal overcharges to alleged victims*. Thereafter the proposed consent order was published for comment in the Federal Register. Notice of adoption of the Order by DOE was later published in the Federal Register. Each of the appellants including Midwest accepted the settlement, and signed a release giving up the right to sue separately under § 210 or the federal petroleum price regulations "based on any 'act, matter, case, statement, conduct, practice or thing whatever....'" *Midwest, supra*, 760 F.2d at 289. The action by Midwest was to rescind the releases for illegality and fraud. The holding was that the releases were valid and that there was no proof "that the $14 million settlement represent-

ed ... overcharges." *Midwest, supra*, 760 F.2d at 292. The *Midwest* case is not in point in this case where there was a finding of overcharges, no release, and no grounds shown to rescind a release given by any victim of the overcharges.

### *Payne 22, Inc. v. United States of America (Payne 22)*, (TECA 1985) 762 F.2d 91

The facts in this case were essentially like those in the preceding *Midwest* case, *supra*. The *Payne 22* case, *supra*, involved (a) a Consent Order signed by the seller Sun Oil Company and DOE; (b) a finding by DOE of no evidence of overcharges; (c) a payment of refunds to certain purchasers of crude oil; (d) publication of the Consent Order in the Federal Register for comment; (e) a failure to comment by Payne 22; (f) publication of adoption of the Consent Order by DOE; and (g) a class action fifteen months later by Payne 22. This case is obviously not in point. Further the Court in the *Payne 22* case clearly and expressly distinguished that case from *Citronelle-Mobile Gathering, Inc. v. Edwards, supra*, in the following words:

"Payne cites *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp.Emer.Ct.App.) *cert. denied*, 459 U.S. 877 [103 S.Ct. 172, 74 L.Ed.2d 141] (1982) to support its contentions. There, however, the district court concluded that Citronelle had violated the Regulations and determined who had been overcharged. Here, on the contrary, in the Consent Order the DOE alleges no violations by Sun and Sun denies any violations of the Regulations." *Payne 22, supra*, 762 F.2d at 94.

This quotation supports the differing conclusions of this dissenting opinion rather than those of the majority.

### D.

### *Selected Leading Cases from Circuit Courts of Appeals on Duty and Power to Order Restitution*

The following leading cases of the Circuit Courts of Appeals of the United States define the duty and power of a District Court, improperly issuing an injunction, to

order restitution of damages caused thereby, to the parties suffering the damages: *Middlewest Motor Freight Bureau v. United States (Middlewest)*, (C.A. 8 1970) 433 F.2d 212, cert. denied, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971); *Coyne-Delaney Co., Inc. v. Illinois Capital Development Board*, (C.A. 7 1983) 717 F.2d 385 at 390–392; *State of Tennessee ex rel. Leech v. Dole*, (C.A. 6 1984) 749 F.2d 331 at 337; *U.S. v. Coca-Cola Bottling Company of Los Angeles*, (C.A. 9 1978) 575 F.2d 222 at 228, cert. denied, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978); *Commodity Futures Trading Commission v. Hunt*, (C.A. 7 1979) 591 F.2d 1211, cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Securities and Exchange Commission v. Texas Gulf Sulphur Company*, (C.A. 2 1971) 446 F.2d 1301 at 1307, cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *Moss v. Civil Aeronautics Board*, (C.A.D.C.1975) 521 F.2d 298 at 306, cert. denied, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976); *Interstate Commerce Commission v. B & T Transportation Co.*, (C.A. 1 1980) 613 F.2d 1182.

These cases confirm the uniform application of the equitable duty and power to order restitution in injunctive actions against enforcement as well as in enforcement actions. In all of the injunction cases, the inherent duty and power of the District Court to make restitution, to devise procedures, and to make equitable awards for the purpose of restitution, were recognized by the Circuit Courts of Appeals.

In the *Middlewest* case, *supra*, for example, the Court of Appeals stated the generally recognized principles of restitution as follows:

"IV. RESTITUTION AS A REMEDY FOR LOSSES SUFFERED BY VIRTUE OF AN INJUNCTION

"The issuance of an injunction will in many cases cause financial losses to interested parties as well as prevent irreparable injury to the procurers. More importantly in cases such as this, where the restraint is directed against an order of an administrative agency charged with regulating rates to be charged to the public at large, the injunction may cause substantial losses to the general public which can never be adequately compensated. In such cases, it is the duty of the court issuing the injunction to take necessary measures to protect the interests of parties before it, as well as the public interest. (This was done in this case by the issuing judge prudently requiring a substantial bond before issuing the temporary restraining order. The temporary restraining order is customarily issued, and usually ex parte, to maintain the status quo pending a detailed review on the merits.)

"For some time, it was thought to be the law in the federal courts that the only remedies available to parties injured by the issuance of an injunction were an action for damages on the injunction bond, if one had been required, in which case the amount recoverable was limited to the amount of the bond, or in the absence of a bond, an action for malicious prosecution where applicable. *Russell v. Farley*, 105 U.S. [15 Otto] 433, 26 L.Ed. 1060 (1881). The substantial limitations inherent in these remedies are readily apparent.

"But in 1919, the Supreme Court significantly expanded the protection to be accorded injured parties by allowing recovery in the nature of restitution in cases where that remedy might be appropriate. *Arkadelphia Milling Company v. St Louis S.W. Ry. Co.*, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517 (1919)." *Middlewest*, 433 F.2d 212 at 225.

The additional cases from the Circuit Courts of Appeals of the United States, cited above, are in agreement with the holding in the *Middlewest* case, *supra*, quoted above.

E.

*Selected Controlling General Authorities on Duty and Power to Order Restitution in Equitable Injunctive Actions and Enforcement Actions*

The general legal authorities on the subject of restitution are in agreement with the controlling judicial authorities of the

Supreme Court of the United States, of this Court and of the Circuit Courts of Appeals reviewed above. This is demonstrated by the following generally recognized authorities: *Restatement of the Law of Restitution,* Topic 1, Underlying Principles and § 74 applying to judgments reversed or set aside, *Restatement of the Law of Restitution 2d* (Tentative Draft No. 1, April 1983), § 1 on Underlying Principles of Restitution, § 1(e) *Fault and wrongful conduct* at pages 13 and 14, § 1(i) *Source of benefit* at pages 22 and 23; II Palmer, *The Law of Restitution* (1978) § 9.19 at pages 290 and 291 on judgments subsequently reversed or set aside; Moore's *Federal Practice,* Second Edition, ¶ 38.11[6] note 8 and ¶ 65.10[1].

## II

### CONTROLLING DECISIONS ON NATURE OF REQUIRED HEARINGS FOR RESTITUTION

#### A.

*Selected Controlling Decisions of the Supreme Court of the United States on the Nature of the Right to Restitution of Parties Damaged by Violations of Valid Statutes or Regulations or Both*

It is a conclusion of this dissent that with the duty and power of district courts to order restitution in enforcement and injunction actions, there exists a correlative right in parties damaged to restitution in judicial actions whether enforcement actions (including those authorized by § 209 of the ESA) or private injunction actions against enforcement, in which the injunction is improperly issued. To further define the remedies available for these rights to restitution, it is necessary and desirable to determine the nature of these rights to restitution in the federal constitutional sense and in the federal equitable sense.

The right to recover monetary and other damages caused by a violation of law, including a legal administrative regulation, is a property right protected by the Due Process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States (and perhaps other clauses).

A recent controlling decision of the Supreme Court of the United States that the nature of these rights to restitution of monetary and other damages is a property right under the Due Process clauses is *Logan v. Zimmerman Brush Company* (*Logan*), 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), in which the Supreme Court stated that "a cause of action is a species of property" citing *Mullane v. Central Hanover Bank and Trust Company* (*Mullane*), 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The Supreme Court in *Logan, supra,* went on to state:

"The Court traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." 455 U.S. at 429, 102 S.Ct. at 1159, 71 L.Ed.2d at 273.

Civil litigants who seek judicial restitution by recourse to the courts are seeking to protect a property right. Other decisions supporting this basic classification of a cause of action or claim for damages as a property right are: *Mullane, supra,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Cleveland Board of Education v. Loudermill* (*Loudermill*), 470 U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The recognized texts on constitutional law in accord are: Nowak, Rotunda and Young, *Constitutional Law* (Second Edition) Chapter 15, Section II D, 546–553; Antieau, *Modern Constitutional Law,* § 7:11 to § 7:16, 540–548 in terms of "Civil Justice"; Tribe, *American Constitutional Law,* § 10–8 to § 10–11, 506–532, tracing the historical development of procedural due process in the context of protected interests.

#### B.

*Selected Controlling Decisions on the Nature and Scope of Right to Due Process of Those Damaged by Violations of Valid Statues or Regulations or Both*

Having recognized that the parties damaged by violations of statutes or regula-

tions, or both, have the right to Due Process under the Fifth Amendment and under historical jurisprudence, this dissenting opinion must define the procedural due process to which they are entitled. Each party that may have a federal claim for restitution is entitled under the Due Process clause of the Fifth Amendment to notice and an opportunity for a judicial (or quasi-judicial administrative) hearing and decision on the claim for restitution. The selected controlling decisions of the Supreme Court of the United States defining the basic procedural due process rights required in federal judicial actions are as follows: [7] *Logan, supra,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Mullane, supra,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Loudermill, supra,* 470 U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

In *Logan, supra,* the Supreme Court stated:

"Justice Jackson, writing for the Court in *Mullane v. Central Hanover Bank & Trust Co.,* 339 US 306, 94 L Ed 865, 70 S Ct 652 (1950), observed: 'Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' Id., at 313, 94 L Ed 865, 70 S Ct 652 [at 656]. At the outset, then, we are faced with what has become a familiar two-part inquiry: we must determine whether Logan was deprived of a protected interest, and, if so, what process was his due.

"The first question, we believe, was affirmatively settled by the Mullane case itself, where the Court held that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan,* 455 U.S. at 428, 102 S.Ct. at 1153, 1154, 71 L.Ed.2d at 273 (footnote omitted).

### C.

*Selected Controlling Decisions on the Type of Hearing on Claims for Restitution Required by Procedural Due Process in Judicial Actions in Which Injunctions are Improperly Issued Before Final Judgment*

In the controlling cases cited in Part I A., *Selected Controlling Decisions of Supreme Court of the United States on Duty and Power to Order Restitution,* it is uniformly held that the District Court has the duty and flexible equitable power to do equity and mould each decree to the necessities of the particular case, so long as procedural due process is accorded all persons claiming constitutionally protectable property and other rights. For example, in an equitable private enforcement action, similar in substance to an action under § 209, the District Court was ordered to employ all its equitable powers of a broader and more flexible character than usual because of the public interest. *Warner Holding, supra,* 328 U.S. at 398, 66 S.Ct. at 1089, 90 L.Ed. at 1336, 1337. And in *Morgan II, supra,* 307 U.S. at 193, 194, 59 S.Ct. at 801, 83 L.Ed. at 1218, 1219, the Supreme Court stated the manner of moulding the remedies in the District Court, a court of equity, performing its duties to order restitution, may be affected by the public interest involved.

Under familiar principles of procedural due process, the Supreme Court has consistently held that under the Due Process clauses, in addition to notice, *some form of hearing* is required before an individual or other party can be deprived of a property interest. *Matthews v. Eldridge (Eldridge),* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly (Goldberg),* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Loudermill, supra,* 470 U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In *Eldridge, supra,* the rule was summarized as follows:

**7.** A similar administrative procedural right to due process required of regulatory administrative agencies exercising delegated quasi-judicial functions will be discussed hereinafter.

"This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff v. McDonnell*, 418 US 539, 557–558, 41 L Ed 2d 935, 94 S Ct 2963 [2975], 71 Ohio Ops 2d 336 (1974). See, e.g., *Phillips v. Commissioner*, 283 US 589, 596–597, 75 L Ed 1289, 51 S Ct 608 [611] (1931). See also *Dent v. West Virginia*, 129 US 114, 125–125, 32 L Ed 623, 9 S Ct 231 [234] (1889). The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Joint Anti-Fascist Comm. v. McGrath*, 341 US 123, 168, 95 L Ed 817, 71 S Ct 624 [646] (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo*, 380 US 545, 552, 14 L Ed 2d 62, 85 S Ct 1187 [1191] (1965). See *Grannis v. Ordean*, 234 US 385, 394, 58 L Ed 1363, 34 S Ct 779 [783] (1914)." *Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902, 47 L.Ed.2d at 32.

### D.

*Selected Controlling Decisions on the Nature of Required Hearings for Restitution in Judicial Actions in Which No Injunction was Issued Before Final Judgment*

In judicial actions in federal courts involving restitution of charges and other injuries caused by a violation of a statute or regulation, or both, fixing maximum charges, the type of hearing required in addition to notice must be adequate to satisfy the procedural Due Process clause of the Fifth Amendment, but is flexible and may be devised to satisfy the existing circumstances and the public interest. *See Warner Holding, supra*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Morgan*

*II, supra*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); *Eldridge, supra*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg, supra*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); and *Loudermill, supra*, 470 U.S. —, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); at the pages cited above.

### E.

*Selected Controlling Decisions on the Nature of Required Hearings for Restitution in Administrative Proceedings*

In many instances a fully functioning regulatory administrative agency of the Executive Branch may exercise statutorily delegated quasi-judicial functions, as well as delegated quasi-legislative and quasi-executive functions.[8] Before decontrol (or "deregulation") in January 1981 and for some time thereafter, the Department of Energy (DOE) exercised such quasi-judicial functions in determining violations and providing remedies for victims of violations. These functions were performed through proceedings for Notice of Probable Violations (NOPV), hearings thereon and proposed Remedial Orders. See Subpart V, 10 CFR § 205.280 through § 205.288 (1983), on administrative procecures of DOE for notice and hearing on alleged violations; See also Subpart O, 10 CFR § 205.190 through § 205.199J (1983), on procedures for administrative remedial action and orders.

Properly applied, these quasi-judicial administrative procedures of DOE, subject to judicial review by the federal courts under the Administrative Procedure Act, were adequate to provide procedural Due Process under the Fifth Amendment. For examples, see the decision of this Court in *Missouri Terminal Oil Company v. Edwards*, (TECA 1981) 659 F.2d 139, and Edles & Nelson, *Federal Regulatory Process*, Chapter 5 and 1984 Supplement.

The very recently published work 1 Koch, *Administrative Law and Practice*

---

**8.** 1 Mezines, Stein & Gruff, *Administrative Law* § 1.01, 1–2 note 2, relying on and citing *The Nature of Administrative Law* by E. Barrett Prettyman, 44 Va.L.Rev. 685 (1958). Judge Pretty-

man was Chairman of the President's Conference on Administrative Procedure, 1953–1955. Also see Schwartz, *Administrative Law*, Second Edition § 5.6.

(West Publishing Company 1985), Chapter 7, §§ 7.1 to 7.8 contains an excellent exposition of the historical and expanding application of the Due Process clause of the United States Constitution to administrative processes. Among other citations, this work cites cases of the Supreme Court of the United States from *Mullane, supra,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), to *Eldridge, supra,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), followed in this dissenting opinion.

But following decontrol in January 1981, the change in personnel, policies, regulations, procedures and the practices of DOE has changed the administrative processes which provided restitution to the victims of violations. These changes have drawn DOE and the violators of statutes and regulations into new controversies about the sufficiency and legality of the actions of DOE, violators and alleged violators of statutes and regulations, under the duty and obligation to make restitution as declared by the controlling decisions of the Supreme Court of the United States and of this Court, summarized above.

### III

### DECISIONS AND AUTHORITIES ON INTERVENTION AND INTERPLEADER

#### A.

*Rights of Claimants to Damages to Intervene in Restitution Proceedings and to Notice and Opportunity to be Heard in District Court*

Following the filing on March 25, 1983 of its decisive Memorandum Opinion reported in 561 F.Supp. 816–864, containing comprehensive findings of fact and conclusions of law, the District Court directed plaintiff DOE to submit a form of proposed judgment in 15 days, 561 F.Supp. at 859. Defendant Exxon was ordered to file its reply thereto within 10 days thereafter. 561 F.Supp. at 859. The District Court, without allowing intervention and without notice to or opportunity for hearing by claimants to restitution of damages caused by Exxon's violations, in the Memorandum Opinion of March 25, 1983 found the facts that restitution to any of the victims of the overcharges was impossible in the following excerpt:

"At the same time, price regulations applicable to refiners allowed them to pass along the inflated costs of Hawkins Field crude oil to purchasers of refined products. Under those rules the price a refiner could charge for a refined product was generally limited to the refiner's May 15, 1973 price plus, among other costs, the increased cost of crude oil. 10 C.F.R. § 212.83(c)(2)(iii). Similar pass-through provisions for increased costs also applied to crude oil resellers, product resellers and retailers. *See* 10 C.F.R. Part 212, Subparts F and L. As a result of the pervasive system of price controls which then existed, therefore, Exxon's overcharges were not, as it simplistically asserts, borne by Exxon itself, but instead were borne by ultimate consumers of petroleum products throughout the entire country.[56]

(Footnote) "56 on November 23, 1982 and on January 20, 1983, certain refiners and independent retailers, respectively, filed motions to intervene in this action, arguing that they as victims of the Hawkins Field overcharges were entitled to any recovery DOE might obtain. *The preceding discussion shows, however, that due to the workings of regulations applicable throughout the oil industry, from producer to retailer, the real victims are the unidentifiable millions of ultimate consumers of petroleum products.* Accordingly, the motions to intervene are denied. (Emphasis added.)

"The broad scattering of the ill effects of Exxon's wrongdoing renders impossible the tracing of the overcharges to their ultimate victims and the calculation of the precise damages suffered by each. Yet this court is still faced with the task of fashioning an equitable remedy." 561 F.Supp. at 853.

The findings of fact and conclusions of law of the Memorandum Opinion of March 25, 1983 were incorporated without change

by reference, in a "JUDGMENT," entered June 7, 1983, which did not mention expressly any claims to restitution or pending petition and counterclaim for interpleader. R. 31658–60. The judgment of June 7, 1983 recites that "the matter came before the Court on the parties' cross-motions for summary judgment," referring to the motions for summary judgment of the United States and Exxon described in the Memorandum Opinion. 561 F.Supp. at 818. The judgment of June 7, 1983, at R. 31659, implemented by reference the finding, quoted above, made without hearing the claimants to restitution, that "[t]he broad scattering of the ill effects of Exxon's wrongdoing renders impossible the tracing of overcharges to their ultimate victims and the calculation of the *precise* damages suffered by each." 561 F.Supp. at 853 (emphasis added). No authority is cited for the assumption that damages to the victims must be *precisely*[9] calculated. On this basis the District Court in the judgment of June 7, 1983 ordered the overcharges of $1,635,604,638.10 and interest to be deposited by Exxon "into an interest-bearing Treasury escrow account" to be "held in trust by the Treasury" to be disbursed to each of the States and other eligible jurisdictions pursuant to instructions "consistent with this court's Memorandum Opinion of March 25, 1983...." R. 31659.[10] Review of the propriety of the proceedings on restitution issues, intervention and interpleader requires a summary of the record in the District Court, which follows.

### B.

*Orders of the District Court Denying and Allowing Intervention, Imposing Limitations on Intervenors and Dates Thereof*

Before the filing of the Memorandum Opinion of March 25, 1983, the District Court had stayed the filing of applications to intervene by industry applicants. R. 38985, 39006. Later on April 29, 1983, the District Court belatedly but properly found the applications to intervene to be timely and that the applicants, who are intervenor-appellants herein, had a right to intervene under Rule 24(a)(2). In each instance, the intervention of right was properly granted but, this dissenting opinion concludes, contrary to law the intervention was limited to intervention for the purposes of appeal on the remedy issue only (with a limited privilege to comment by some intervenors). R. 31607–12. A summary of these orders follows:

1. Orders Denying Intervention Before Judgment of June 7, 1983.

The District Court on March 25, 1983 in its Memorandum Opinion denied in note 56 "motions" (properly, applications) to intervene, filed November 23 or 24, 1982 and January 20, 1983, for purposes of restitution described later of "certain refiners" and "independent retailers." These applicants claimed to be victims of the overcharges later found to have been made by Exxon. The denial of these applications was based on the finding, made without an opportunity by the applicants for intervention to be heard, that "the real victims are the unidentifiable millions of ultimate consumers of petroleum products." 561 F.Supp. at 853, note 56, quoted in full above, and expanded in the text, 561 F.Supp. at 853, 854.

One of the "motions" (properly, applications) to intervene denied in note 56 of the Memorandum Opinion of March 25, 1983 was the Conditional Motion of Indicated Refiners to Intervene filed November 23 or

---

**9.** The law may require only proof of damages by a preponderance of the evidence "with a reasonable certainty." 22 Am.Jur.2d *Damages,* § 22, pages 40–42. The degree of certainty required may be less when the uncertainty is caused by the party at fault. 22 Am.Jur.2d *Damages,* § 23.

**10.** In an Order dated June 17, 1983, the District Court found that "plaintiff and intervenors will not be prejudiced by the issuance of an unsecured stay" and ordered the June 7, 1983 judgment stayed "pending final disposition of all appeals in this case and for a period of 30 days following the issuance of a mandate...." R. 31665.

24, 1982 (stated in note 56 as November 23, 1982). R. 38960–65. This motion (application) to intervene was conditioned only on a decision of the Court granting judgment for plaintiff that defendant has violated the crude oil price regulations of DOE by overcharges; in that event the Indicated Refiners (intervenor-appellants herein) requested that the District Court conduct further proceedings permitting all interested parties to be heard on the issue of ultimate disposition of the overcharges, and ultimately to enter judgment for distribution to participants in the "Old Oil Entitlements Program" (R. 38960–1). This was a request in detail for appropriate restitution proceedings, and intervention therein, which should have been granted or otherwise satisfied. Intervention by the Indicated Refiners was later granted after the decisions of March 25, 1983 but only for the purpose of appeal, as stated hereinafter. R. 31408.

The other of the "motions" (properly, applications) to intervene denied on March 25, 1983 in note 56 was the Petition for Limited Intervention of Luther Griffin and other independent retailers of gasoline (R. 38986–91). The petition (application) to intervene stated that DOE was not adequately representing the petitioners (applicants) and others. (In regard to the States, inadequate representation by DOE as defined by Rule 24(a)(2) was found later by the District Court. R. 38990.) The petition (application) was limited to restitutionary proceedings. R. 38990–1.

By orders of the District Court, entered before March 25, 1983, consideration of these two applications ("motion" and "petition") was stayed. R. 38985, 39006. Without vacating the stay orders and without hearing, these two "motions" (applications) were denied in note 56 of the Memorandum Opinion of March 25, 1983. 561 F.Supp. at 853. At the least, each should have been considered for granting before denial.

2. Orders Allowing Intervention Before Judgment of June 7, 1983.

On April 11, 1983, the District Court granted the "Conditional Motion" of the Indicated Refiners, previously denied and ordered that the refiner Champlin Petroleum Company, five other refiners and the American Refiners Association "may intervene in this action solely for purposes of appeal on the remedy issue." R. 31408.

On April 29, 1983, by "Memorandum" (R. 31607–12) and "Order" (R. 31613–4), the District Court granted limited intervention to two groups of several named parties in each group, described as "A. Industry Intervenors" and "B. States." The Industry Intervenors were permitted to intervene "solely for the purpose of appeal on the issue of the proper remedy...." The States were permitted to intervene "only for the purpose of appeal on the issue of the proper remedy" and of submitting limited comments on the "parties' proposed judgment." R. 31614. The "parties" referred to were United States and Exxon. R. 31607.

On May 5, 1983, Consumers Power Company and three refiners were permitted to intervene solely for the purpose of appeal on the remedy issue; and the States of Minnesota, New Jersey and West Virginia were permitted to intervene for the same limited purpose of appeal and limited comment stated in the Memorandum and Order of April 29, 1983. R. 31616–31619.

3. Order Allowing Intervention on Date of Judgment, June 7, 1983.

By "Order" of June 7, 1983, the District Court granted leave to intervene to "several additional states, territories, and the District of Columbia (the 'States')" and reconsidered *sua sponte* its denial of the "petition" of January 29, 1983 of Luther Griffin, *et al.*, ("Retailers") for limited intervention and granted leave to the Retailers to intervene only on their own behalf. R. 31661–2. The intervention of both the States and Retailers was "limited consistent with the Order of this court of April 29, 1983...." R. 31661–2.

4. Orders Allowing Intervention After Judgment of June 7, 1983.

On June 17, 1983, Philadelphia Electric Company (PECO) was granted leave to in-

tervene in its own behalf only for the limited purpose of appeal on the issue of proper remedy as described in the Order of April 29, 1983.

On July 6, 1983, the Air Transport Association of America was granted leave to intervene for the limited purpose of appeal on the issue of proper remedy. R. 31680.

On July 6, 1983, Geraldine H. Sweeney, RJG Cab, Inc., and National Freight, Inc., were granted leave to intervene for the limited purpose of appeal on the issue of proper remedy. R. 31681.

### C.

### *Validity and Effect of the Limitations on Right of Intervention*

By denying intervention to claimants of constitutional property rights to restitution for a hearing or any other purpose,[11] it is submitted that the District Court failed to perform its constitutional and equitable duties and procedural duties under Rule 24(a)(2) and to exercise its powers to accord Due Process and historic equitable rights to the claimants seeking to intervene and possibly other claimants to restitution. See Parts I and II above and discussion in *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971).

This limitation of intervention to purposes of appeal was also contrary to Rule 24(a) which, in the absence of exceptional circumstances, permits only "housekeeping" limitations or limitations for efficiency on intervention of right under Rule 24(a)(2) F.R.Civ.P.[12]

Timely intervention of right in the District Court under Rule 24(a)(2) should not have been limited to the purpose of appeal. Limitation of intervention under Rule 24(a)(2) is not authorized in absence of special circumstances not present in these

cases. 7A Wright and Miller, *Federal Practice and Procedure,* § 1922, 623 at 625 and cases therein cited, where it is stated:

"Thus, however desirable it may be that the courts have the power to impose reasonable conditions on the intervention of right, the fact that the Committee Note says that they have the power does not create the power if it does not otherwise exist. Nevertheless several courts have shown a willingness to accept the Note at face value and to allow the imposition of conditions on an intervenor of right. So long as these conditions are reasonable and are of a housekeeping nature, this view is likely to prevail. It seems very doubtful, however, that a court has the right to make significant inroads on the standing of an intervenor of right; and in particular, it should not be allowed to limit him in the assertion of counterclaims and other new claims." 7A Wright and Miller, *supra,* at 625–26. (Footnotes omitted.)

It is obvious that no limitation on constitutional procedural Due Process rights and historic equitable rights will be permitted, in intervention under Rule 24(a)(2).

The same conclusion is reached in 3B *Moore's Federal Practice* (Second Edition) ¶ 24.07; ¶ 24.09 and ¶ 24.16. In 3B *Moore's, supra,* ¶ 24.09, there is discussed the lack of discretion to place significant limitations on intervention of right under Rule 24(a) as opposed to permissive intervention under Rule 24(b) which may be limited in the exercise of a judicial discretion. In 3B *Moore's, supra,* ¶ 24.16[4] discussing *Status of the Intervenor,* the right to press a claim of right by raising questions on the merits for protection of the intervenor is stated. So no limitations on constitutional

---

**11.** The denial of intervention and hearing was before rendition of the Memorandum Opinion of March 25, 1983 and judgment of June 7, 1983, on grounds that "Exxon's wrongdoing renders impossible the tracing of the overcharges to their ultimate victims and the calculations of the precise damages suffered by each." 561 F.Supp. at 853.

**12.** The District Court expressly and properly found Rule 24(a)(2) to be applicable and satisfied in all particulars in granting intervention on April 29, 1983 before final judgment. R. 31609.

and historic equitable rights to be heard are permitted.

## D.

### Proper Allowance of Intervention Under Rule 24(a)(2) by the District Court

In its approach to decision on these applications for intervention, the District Court properly found a right to intervene under Rule 24(a)(2), stating:

"In this case, the industry applicants—refiners, wholesalers, and retailers—all allege that they, not the ultimate consumers of petroleum products, bore the burden of Exxon's overcharges and are entitled to restitution. For purposes of deciding whether to allow intervention the court must accept a party's well-pleaded allegations as true, and cannot look behind those allegations to reach the merits of the applicant's claims as a basis for denying intervention. *United States v. AT & T, supra,* 642 F.2d at 1291. The industry applicants have properly pleaded an interest in the overcharges by Exxon, and so have satisfied the 'interest' test. The States, for their part, obviously have a strong interest in defending before this court and on appeal this court's decision that they, on behalf of their citizens, are to receive restitution of the overcharges." R. 31609–10.

In the "Memorandum" on intervention of April 29, 1983 containing findings of fact and conclusions of law, the District Court concluded that it had the power to limit the scope of intervention to the purpose of appeal on the remedy issue, citing *U.S. v. American Telephone and Telegraph Company,* (C.A.D.C.1980) 642 F.2d 1285, and *Smuck v. Hobson,* (C.A.D.C.1969) 408 F.2d 175. R. 31611. In each of those cases there was a failure of any formal party to appeal, a circumstance not present in these appeals. Therefore, for that reason and probably other reasons, those two cases do

not support the limitations on intervention to purposes of appeal in these cases. It is not desirable to extend this opinion by further discussion of the exceptional circumstances in those interesting cases, not present in these cases.

## E.

1. Claims of Intervenor-Appellant Public Utility Philadelphia Electric Company (PECO), Consumers Power Company and Other Public Utilities.

Despite the fact that no notice and opportunity to file and prove claims for restitution were given to public utilities, Intervenor-Appellant Philadelphia Electric Company (PECO), an investor owned public utility, claiming to be damaged by the illegal overcharges of Exxon sought leave to intervene in its own behalf, and sought certification as representative of a class of investor owned utilities supplying electricity and gas to consumers. As stated in Part III B. 4. above, after the decisive Memorandum Opinion and judgment of the District Court, this application to intervene was granted for the limited purpose of appeal on the issue of remedy only. R. 31681. The effect of this action of the District Court was to deny PECO the right to intervene for purposes of filing and presenting any claim for restitution of damages.[13] (No comment will be made on the request for class certification because of the absence of a ruling by the District Court on the record and a fuller record.)

PECO and those joining in its brief on appeal, among other things, claim that the District Court erred in concluding without a hearing that all the overcharges were passed through to the ultimate consumers as a result of the pervasive system of price controls. They contend that the system of price controls (10 C.F.R. Part 212) did not require passing through of increased costs but merely permitted it.

---

**13.** PECO, claiming to be an end user, has filed Joint Briefs with Geraldine H. Sweeney (Sweeney), RJG Cab Inc. (RJG) and National Freight Inc. (National Freight) alleged to be gasoline and diesel fuel consumers and end users in commercial and non-commercial motor vehicles.

In regard to PECO it is reasonable to believe that PECO as a public utility supplying electricity and gas to consumers may have included the illegal overcharges in its rate base; and that as a public utility PECO would have standing to present a claim for restitution on behalf of its ratepayers to the extent that the overcharges were passed on. This dissent asserts that to summarily deny a claim for restitution under these circumstances is error. This conclusion is clear under the decisions of the Supreme Court of the United States, cited above, including *Morgan II, supra,* 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), and *Interstate Natural Gas, supra,* 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949). Decisions of this Court, and of the Circuit Courts of Appeals, on the duty and power to order restitution clearly support this conclusion.

Further, PECO and others claim that market forces may have prevented the passing through of the illegal overcharges. This is a possibility that may be a fact.

To the extent that PECO did not pass on the overcharges it may have a claim to restitution in its own behalf. In a related case we judicially noticed on the remedy issue that the DOE on reference by the District Court of Kansas filed an Interim Report of the Office of Hearings and Appeals (OHA) on the issue of the impact of illegal overcharges which reported that overcharges on natural gas may have been passed through to customers and that any refund may be passed through to customers. This Interim Report is quoted *verbatim* in part in *Department of Energy v. Hunt,* (TECA 1984) 734 F.2d 816 at 824–825. The memorandum and order of the District Court of Kansas retaining ultimate jurisdiction and referring the task of finding the facts concerning "the impact of the overcharges" to the OHA is reported in *In re: The Department of Energy Stripper Well Exemption Litigation (Stripper Well),* (D.Kan.1983) 578 F.Supp. 586. It is judicially noticed that the presumably final *Report of the Office of Hearings and Appeals of the Department of Energy, (Report)* was filed in the District Court of Kansas shortly after June 19, 1985, the date of the signature thereon of the Director of the Office of Hearings and Appeals of the DOE. It is a conservative appraisal of this Report to find that at least some of the damages from the illegal overcharges for stripper well crude oil can be proven in approximate amounts, and in regard to public utilities in some instances in amounts passed on to its rate payers.

Most of what has been determined concerning PECO may apply to Consumers Power Company, whose application to intervene and the action thereon is described in Part III B. 2. above.

2. Claims of the Appellant-Intervenors Users of Gasoline and Diesel Fuel in Motor Vehicles.

As noted in footnote 13 in the section immediately above, Sweeney and other consumers and end users of gasoline and diesel fuel in commercial and non-commercial vehicles asserted in the District Court and in this Court on appeal claims for restitution of damages caused by the illegal overcharges of Exxon. Like PECO they were summarily denied the opportunity to file and present these claims in the District Court. This action was contrary to the controlling decisions on restitution of the Supreme Court of the United States, and of this Court, reviewed in detail above. The District Court had the constitutional and equitable duty and authority to provide a suitable notice and hearing of these claims, among others, and to award any proven damages.

At least, to the extent that evidence shows that the overcharges were not passed on to others, damages may be claimed.

3. Claims of the Indicated Refiners, Other Refiners, American Refiners Association, Independent Retailers, Industry Intervenors and States.

As noted above in Part III B. 1., a group of refiners, entitled Indicated Refiners, and other refiners sought to intervene in No-

vember 1982 before the decisive Memorandum Opinion of March 25, 1983 and the judgment of June 7, 1983. R. 38960–65.

This group requested that the District Court conduct further proceedings on disposition of the overcharges and the effect on victims including the effect of the "Old Oil Entitlements Program" which may have caused damages to those affected by illegal overcharges which resulted from misclassification of "old oil," thereby wrongfully relieving purchasers thereof of payments to the Entitlements Fund and adversely affecting amounts paid to beneficiaries of the Entitlements Fund.

The applications to intervene of the refiners, and the American Refiners Association, and the action thereon is described in Parts III B. 1. and III B. 2. hereinabove.

The rulings and discussions hereinabove covering the Indicated Refiners apply to the claims of the other refiners, including intervenor-appellants Gladieux Refinery, Inc., U.S. Oil and Refining Company, Marathon Petroleum Company, Mobil Oil Corporation and Murphy Oil Corporation, and possibly to the American Refiners Association, if it has standing to claim damages in any respect.

The applications to intervene of independent retailers of gasoline including Luther Griffin and the action thereon is described in Parts III B. 1. and III B. 3. above. These independent retailers were entitled to participate as claimants in restitution proceedings. It was error to limit their intervention solely to purposes of appeal on the remedy issue.

The applications to intervene of the States, including the District of Columbia, the "Industry Intervenors" and the actions thereon are described in Parts III B. 1., III B. 2. and III B. 3. hereinabove. The limitations on intervention by these applicants to purposes of appeal on the issue of remedy was unauthorized.

Intervenor-Appellant Tosco Corporation (Tosco) and others described as small and independent refiners were permitted to intervene solely for the purpose of appeal. Tosco and six others were interpled by Exxon as crude purchasers against whom interpleader and declaratory relief were sought. Tosco and the six other refiners were entitled to notice and hearing on their claims to restitution.

Further, reasonable notice and opportunity to intervene in restitution proceedings should have been given to qualified claimants, including those who did not file applications to intervene.

4. Claims of Air Transport Association of America and Members.

The post-judgment action on the application of the Air Transport Association of America (Air Transport) to intervene limiting the intervention to the purpose of appealing the issue of proper remedy is described in Part III B. 4. hereinabove. The Intervenor-Appellant Air Transport states that its action is taken on behalf of 29 airlines, listed in Appendix A of its brief in this Court, that are direct purchasers from Exxon and end user consumers of kerosene base aviation jet fuel (kerojet).

While Air Transport as an association may, or may not have standing to claim damages sustained by its members, each of its members that was a direct purchaser and end user of jet fuel, the cost of which was increased by the overcharges, should have reasonable notice and an opportunity to present its claim to damages in restitution proceedings.

An airline which was an end user of the jet fuel may have passed on the illegal overcharges to its passengers, customers and others. But it cannot be assumed summarily that all damages were wholly passed on to the passengers and customers of any airline that claims the contrary. It is judicially noticed that an airline may at times be unprofitable and unable to pass on all its costs, and unable to make a normal profit.

F.

*Conclusion on Right of Intervenors and Other Claimants to Restitution, Notice and Hearing*

The (1) unconstitutional denial of procedural Due Process, to claimants to restitu-

tion, (2) the improper limitations on the right to intervene under Rule 24(a)(2) F.R. Civ.P., and (3) the rendition of a summary judgment without hearing and without an adequate factual basis, considered separately and jointly, it is submitted, were prejudicial errors in respect to all claimants to restitution. Before the District Court as a constitutional court of equity, proceeding in the exercise of its discretion, may order disposition of the funds remaining after satisfying all meritorious claims for restitution, the law requires as a minimum, notice and an opportunity for a hearing for all claimants to restitution.

## G.

### Failure to Consider Petition for Interpleader

In addition to failing to consider intervention requested before the decisive Memorandum Opinion of March 25, 1983 was entered, no action was expressly taken by the District Court to grant or deny the Petition and Counterclaim for Interpleader and Declaratory Relief of Exxon, filed December 5, 1980 (R. 105–302), requesting that appellant Tosco and six other "Crude Purchasers," listed in Exhibit B thereto (R. 283), over 2,000 "Selling Owners" of crude oil from Hawkins Field, listed in Exhibit A thereto (R. 114–282), and the plaintiff United States be ordered to interplead their respective claims to the alleged *excessive purchase prices and refunds* (R. 111). On February 5, 1981 the District Court *sua sponte* by an "Order" chose to "defer consideration and resolution of the administrative problems" caused by the Petition and Counterclaim for Interpleader and Declaratory Relief (R. 864). In the same order the Court provided that the defendants named in the Petition and Counterclaim "answer or otherwise respond within 20 days from the date of service of notice by this court that such answers or other responses shall be filed." R. 865. There is no record that the notice was ever filed or served on the United States, the Selling Owners or Crude Purchasers. This opportunity to begin restitution proceedings through interpleader

was preempted without notice and hearing by the judgment of June 7, 1983.

## IV

## IMPROPER SUMMARY JUDGMENT ON RESTITUTION

In addition to violation of the constitutional principles, and the equitable historic duty and power to order restitution after notice and hearing, this dissenting opinion concludes that the District Court improperly rendered a summary judgment on restitution in implementing, in its judgment of June 7, 1983, its conclusion that it was impossible to identify the victims of the overcharge and determine the precise amount of damages, quoted above from its Memorandum Opinion of March 25, 1983. No proof exists in the record to support this factual conclusion; nor is any supporting proof cited by the District Court. If this conclusion of the District Court in whole or in part is based on judicial notice, the judicial notice of the underlying facts was unauthorized without a hearing, Rule 201(e), F.R.E., and probably unauthorized in any event. 1 *Weinstein's Evidence* ¶ 201[03], from Davis, *A System of Judicial Notice Based on Fairness and Convenience*, Perspectives of Law, 69 at 93 (1964), as follows:

"The reason we use trial-type procedure, I think, is that we make the practical judgment, on the basis of experience, that taking evidence subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts, that is, facts pertaining to the parties. The reason we require a determination on the record is that we think fair procedure in resolving disputes of adjudicative facts calls for giving each party a chance to meet in the appropriate fashion the facts that come to the tribunal's attention, and the appropriate fashion for meeting disputed adjudicative facts includes rebuttal evidence, cross-examination, usually confrontation, and argument (either written or oral or both)."

The power of the District Court to render this summary judgment on its own initiative, without hearing, was not authorized by the Federal Rules of Civil Procedure, or by Rule 56 in particular. The cases supporting this conclusion are too numerous to list and discuss, but the leading controlling cases of the Supreme Court of the United States are *Sartor v. Arkansas Natural Gas Corporation,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *Arenas v. United States,* 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363 (1944); *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Elgin Joliet & Eastern Railway Company v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), decision adhered to on rehearing, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *White Motor Company v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Agosto v. Immigration and Naturalization Service,* 436 U.S. 748, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978). These cases are chosen in 6 *Moore's Federal Practice,* Second Edition, ¶ 56.15[1–00], as the leading cases from the Supreme Court that state that Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, and that no genuine issue remains for trial. A very large number of cases in accord are collected in 6 *Moore's, supra,* ¶ 56.15. In 10A Wright, Miller and Kane, *Federal Practice and Procedure,* § 2725 at pages 95–112, the same rule is stated citing many cases in accord. Further, in § 2725, *supra,* at page 112, the rule is stated that normally the court should notify the interested parties before rendering summary judgment in order to allow briefing and argument. In this case neither the parties designated as interpleader defendants in the petition and counterclaim by Exxon nor the applicants for intervention before the District Court before June 7, 1983 were notified or given an opportunity to be heard.

It is assumed that a summary judgment on the issues of restitution, if otherwise appropriate, may be entered on the initiative of the District Court as in this case, and that a summary judgment on restitution issues may be rendered without being so entitled as in this case. But such a summary judgment may not be entered without notice and hearing in the circumstances of this case. The District Court did in fact, if not in name, issue an unauthorized summary judgment on restitution issues, made easier by the limitations on the scope of intervention, the times of intervention and the stay of the interpleader issues, all without hearing those claiming to be victims of the violations of law by Exxon.

*No Discretionary Equitable Disposition of Damages to Unidentifiable Victims Should Be Made Before Attempting to Identify and Make Restitution to Actual Victims*

As discussed above, the District Court concluded without notice and hearing that it was impossible to trace the damages caused by the illegal overcharges of Exxon to the parties that were harmed thereby. Therefore, the District Court chose as a remedy to use by analogy the procedures of the "Warner Amendment," P.L. 97–377, § 155, 96 Stat. 1919–1920 (1982). The Warner Amendment, 96 Stat. 1919, required overcharge refund payments be directed to the States (as defined) for use in one or more of five listed energy conservation programs when the victims of the overcharges could not be identified.

The District Court in its Memorandum Opinion of March 25, 1983, at 561 F.Supp. at 856–857 stated:

"The court shall order Exxon to make restitution to the United States Treasury of the full amount of the Hawkins Field overcharges, together with interest from the date of overcharge, the monies to be deposited into an escrow account, held in trust by the Department of Energy, to be disbursed in accordance with the procedures set forth in Section 155 of Pub.L. No. 97–377, 96 Stat. 1830, 1919 (1982).

"In formulating its order, the court in no way relies on Section 155 as an express statutory grant of authority to this court, but acts instead in the exercise of its broad equitable powers to order restitution.[59]

However, Section 155 clearly bespeaks the intent of Congress that violators of the petroleum price regulations should be made to disgorge their illgotten gains even in situations, like the case before the court, where the victims of the petroleum overcharges cannot be identified. The colossal scale of Exxon's wrongdoing, and the workings of pervasive regulations to spread the burden of that wrongdoing impossibly far and wide, must not deter this court from fashioning an appropriate equitable remedy. The purpose of the domestic petroleum price regulations was to keep oil prices down, to relieve consumers of some of the burden of towering oil costs. The five energy conservation programs identified in Section 155 operate across the nation to reduce that same burden, either by reducing overall consumption through conservation or by direct financial assistance to those most in need. Although one might speculate as to alternative remedies, this court respects the wisdom of the solution chosen by Congress and shall adopt it as the most appropriate equitable remedy in the circumstances of this case."

_____

"[59] Accordingly, the escrow fund established pursuant to this court's order shall of course not be subject to the provisions of subsection (e)(1) of Section 155 which limit the monies the Secretary of Energy may disburse to $200 million—received in settlements, not pursuant to judicial order—and which require a finding that the funds to be disbursed 'are not likely to be required for satisfying claims of potential claimants ...' and that 'the use [of funds] under this section would be consistent with the remedial order or consent order covering such funds.' Section 155 shall otherwise apply in its entirety under this court's order as the set of terms and conditions governing DOE's handling of the escrow account established to receive restitution payments from Exxon.

As quoted above, the District Court stated that P.L. 97–377, § 155 was not followed as an express statutory grant of authority.

That lack of authority is very clear from § 155 and its legislative history, for the following reasons:

1.  Under § 155, the funds to be distributed must be "likely not to be ... refunded to injured persons because the purchasers of the refined petroleum products cannot be reasonably identified or paid or because the amount of each purchaser's overcharge is too small to be capable of reasonable determination." Section 155(a)(2), 96 Stat. 1919. The District Court did not make any attempt by any sort of equitable judicial restitution proceedings to refund the amounts overcharged by Exxon to injured parties. Therefore the District Court could not properly order all of Exxon's overcharges be restored through § 155, even if the Warner Amendment could be applied by analogy, a question this dissent asserts need not be decided on these appeals.

2.  Section 155 limited the amounts to be disbursed to $200,000,000. Section 155(e)(1), 96 Stat. 1919. Exxon's overcharges, with interest, which the District Court properly found subject to restitution, far exceed that amount, even if any prior funds distributed under § 155 are ignored.

3.  The funds to be distributed in § 155 were to come from _settlements_ of alleged petroleum pricing and allocation violations, rather than from adjudications of a Court as in this case.

4.  According to the legislative history of § 155, the statute was to establish "a _one-time_ distribution of $200,000,000 to states ...." House of Representatives Conference Report No. 97–980 at page 198 (emphasis added). Representative John D. Dingell emphasized these limits as follows:

    "The provision is a one-time provision. It should not be viewed as a precedent. It does not confer on DOE any new restitutional or remedial authority or imply that the DOE has such authority. It is a very limited provision aimed at helping people. It is, I stress, an exclusive, one-time disbursement authority." 128 Congressional Record H10435 (December 20, 1982).

The District Court seeks to avoid the above limits of § 155 by relying on its "broad equitable powers" but its equitable powers cannot bypass but must recognize the legal rights to restitution that exist in parties harmed by Exxon's overcharges. Section 155 provided for the rights of potential claimants by expressly requiring funds to be used which "are not likely to be required for satisfying claims ...." Section 155(e)(1)(A), 96 Stat. 1919. In the discussion of the "Warner Amendment," Senator J. Johnston, Jr., made the following statements:

"What we have involved here is a fund collected from those who overcharged but where the consumers cannot be identified, and that is the fund involved, and no other money.

"If it were involved with those who could be identified then indeed they should receive the money and *they would have a vested right to receive that money*.

"That money is not involved here but rather money from consumers who cannot be identified." 128 Congressional Record S15126 (December 16, 1982) (emphasis added).

The fact that Congress chose to distribute a certain amount of money through § 155 should not be decisively significant in the exercise of a court's equitable power to make restitution for the following reasons:

1. Congress showed no intention of making more than one distribution under § 155, although it could have done so.

2. Congress limited the amount to be distributed to $200,000,000 although it could have chosen a higher amount.

3. Portions of the legislative history indicate that an important motivation for the introduction of what became § 155 was the desire to ease the burden on the poor of rapidly increasing energy prices. Senator John W. Warner stated:

"I am convinced that this amendment is the best way to get these funds into the hands of Americans suffering from rapidly escalating energy prices during this frigid winter season." 128 Congressional Record S15116 (December 16, 1982).

## V

## ENTITLEMENTS PROGRAM, RESTITUTION ISSUES AND DOE ACTIONS

The old oil Entitlements Program was fully operative during the control of prices and allocation of crude oil under the EPAA and the EPCA, and the Entitlements Program necessarily affected the issues to be resolved in restitution proceedings in the District Court for reasons which follow.[14] The Entitlements Program was established by regulation of the predecessor of the DOE which prescribed its operation, includ-

**14.** See the Application for Limited Intervention filed April 29, 1983 (R. Index) in the District Court by the Intervenor-Appellants Gladieux Refinery, Inc. (Gladieux) and U.S. Oil and Refining Company (U.S. Oil) as members of the "Consumers Power Group" in which they stated, among other things, the following:

"1. Each member of the Consumers Power Group was a participant in the Old Oil Entitlements Program prior to the decontrol of crude oil in January 1981.

"2. This Court, in its Memorandum Opinion of March 25, 1983, found defendant, Exxon, liable for price overcharges (including interest) resulting from miscertification of crude oil at its Hawkins Field Unit, in an amount close to $1.5 billion.

"3. If a final determination with respect to this overcharge had been made prior to January 27, 1981, this substantial amount would automatically have been paid to all participants in the Entitlements Program. Those regulations no longer expressly require participants in the Entitlements Program to recertify their reported crude oil receipts to correct for overcharges. Consequently, no automatic mechanism for restitution of these overcharges to Entitlements Program participants now exists.

"4. No party is before this Court to represent the interests of Entitlements Program recipients during the relevant period.

"5. The Consumers Power Group are, therefore, entitled to intervene in this action as a matter of right, pursuant to Rule 24(a) of the Federal Rules of Civil Procedure. In the alternative, this Court should grant the Consumers Power Group permission to intervene pursuant to Rule 24(b)." (R. 38468–9, duplicated at R. 38471–2.)

ing obligations and benefits. 10 C.F.R. § 211.67 (1974). The Entitlements Program was continued until decontrol on January 28, 1981, by regulation 10 C.F.R. § 211.67, as amended from time to time.

A good brief description of the Entitlements Program, and its purposes, by Judge Estes of this Court, is found in the opinion in *Pasco, Inc. v. Federal Energy Administration (Pasco),* (TECA 1975) 525 F.2d 1391, as follows:

"To minimize the inflationary impact of world-wide oil prices and at the same time to provide an incentive for increased domestic production of crude oil, the 'two-tier' pricing system for crude oil was promulgated. The 'two-tier' pricing system basically imposes a ceiling price of approximately $5.25 per barrel on all 'old' oil and allows new and released oil to be sold without respect to the ceiling price, i.e., at approximately $11.28 per barrel. The FEA found, however, that while the 'two-tier' system met certain necessary objectives, the great disparity between the price of controlled and uncontrolled crude oil was having an unequal impact on all refiners. During the base period of May, 1973, composite crude oil costs of all refiners were approximately equal; however, with the pricing system in effect, the major integrated oil companies, who as a class had far greater access to old oil, had significantly lower composite crude oil costs in refining their products than did the small and independent refiners.

"To insure that all refiners and marketers shared equally in the benefits of price-controlled crude oil and the burdens of uncontrolled crude oil, the FEA adopted the Entitlements program. Under this program, a refiner must have one 'entitlement' for each barrel of old oil

it refines during a particular month. All refiners are initially issued for each month an amount of entitlements equal to their proportionate share of the old oil refined during the month on a nationwide basis. Thus, a refiner running more old oil as a percentage of its total refinery runs than the national average would have to buy additional entitlements from a refiner which ran a smaller percentage of old oil during the month than the national average. The national ratio of old oil runs to total refinery runs is lowered somewhat by the issuance of additional entitlements to small refiners under the 'small refiner bias' built into the regulation and to certain eligible firms which import residual fuel oil and home heating oil. By requiring refiners and importers who sell entitlements to reduce their crude oil or product costs by the amount of the entitlement sales proceeds, and allowing a purchaser of entitlements to include the cost of entitlements in its crude oil costs, the FEA basically equalized the average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the 'two-tier' pricing system." (Footnotes omitted.) *Pasco, supra,* 525 F.2d at 1394–1395.

After decontrol, as before decontrol, the DOE has been legally obliged to calculate and collect the obligations, and pay the benefits of the Entitlements Program accrued during control.[15] The decontrol by the Executive in January 1981 under the provisions of the EPCA in 1975 seemed to contemplate that the DOE, as successor to the FEA, would continue its quasi-judicial actions to proceed, as before decontrol, to order refunds (make restitution) of illegal overcharges such as by Subpart V (10 C.F.R. §§ 205.280 through 205.288) and adjustments in the Entitlements Program, to

---

**15.** For example, in *Ashland Oil, Inc. v. DOE (Ashland),* (TECA 1985) 760 F.2d 298, this Court affirmed the dismissal of Ashland's suit under ESA §§ 209 and 210 to overturn or modify a settlement between DOE and Cotton Petroleum Company. This Court stated that:

"There has been no factual inquiry as to who was injured by Cotton's overcharges. Instead,

one of the purposes of the pending Subpart V proceeding is to make precisely that determination." *Ashland, supra,* 760 F.2d at 301.

In the Subpart V proceedings the Office of Hearings and Appeals "explicitly proposed to permit such refiners [as Ashland] to submit claims in the refund procedure and demonstrate their injury." *Ashland, supra,* 760 F.2d at 300.

those damaged by the overcharges. For this purpose, there was enacted in 1975 § 6401 of Title 42 U.S.C., (§ 531 of Pub.L. 94–163, Title V) which provides as follows:

"§ 6401.  Expiration of authority

"Except as otherwise provided in subchapter I or subchapter II of this chapter, all authority under any provision of subchapter I or subchapter II of this chapter and any rule, regulation, or order issued pursuant to such authority, shall expire at midnight, June 30, 1985, but such expiration shall not affect any action or pending proceedings, civil or criminal, not finally determined on such date, nor any action or proceeding based upon any act committed prior to midnight, June 30, 1985."

The current status of administrative proceedings and actions by DOE to determine these obligations and benefits are not clear and should be determined by the District Court on notice and hearing. It is known that the DOE began to perform its obligations after decontrol by prescribing in detail the manner and timing of final adjustment of the Entitlements Program in 10 C.F.R. § 211.69 designated as "Entitlements Adjustment Mechanism," adopted July 13, 1981 and amended thereafter. The purpose of this § 211.69 was stated in paragraph (b) thereof to be "a method for an orderly termination of the domestic crude oil entitlements program established in § 211.67." The probability that claims would be allowed in administrative or judicial proceedings was recognized in the definition of "claim" in paragraph (c) of § 211.-69 as follows:

" 'Claim' means the dollar amount determined by ERA to be owed to a firm resulting from adjustments, amendments or other modifications to any one or more Entitlements Notices issued by ERA pursuant to § 211.67 for the period from October 1, 1980, through January 27, 1981, *or resulting from an administrative or judicial determination.*" (Emphasis added.)

The effect on the obligations of Exxon to the DOE as administrator of the Entitle-ments Program, and to the potential or certified beneficiaries of the Entitlements Program was not determined by the District Court. It is possible that claimants under the Entitlements Program in addition to the applicants for intervention in the District Court might appear if given the opportunity and might prove their claims to restitution. It is established that applicants for intervention Gladieux and U.S. Oil sought the right to do so for themselves and others.

The performance by DOE of its obligations to administer the lawful orderly termination of the Entitlements Program could not be judicially assumed without a hearing of interested parties, and might be disproved. See *Navajo Refining Company v. United States Department of Energy,* (TECA 1984) 750 F.2d 966.

After the final judgment of the District Court on June 7, 1983, the DOE made some formal "final" and tentative decisions in 1984 and 1985 concerning the Entitlements Program. Nevertheless because these actions of the DOE are relevant to future judicial restitution proceedings, and may be judicially noticed by this Court, it is noted that the DOE on June 28, 1984, through the Economic Regulatory Administration (ERA) issued a "Notice of final decision; notice of public proceeding and public hearing" entitled "January 1981 and Entitlements Adjustment Notices." This document was published in 49 Federal Register (F.R.), Number 129 of July 3, 1984 at pages 27410–27420. The final decision was the decision not to issue the January 1981 and Final Entitlements Adjustment Lists. 49 F.R. *supra* at 27413. The tentative decision dealt with "Outstanding Exception Orders." 49 F.R. *supra* at 27418–27420. In this document described above, the final decision was supported by a relatively long recitation of history, administrative determinations of fact, notice of discretionary action and related matters concerning the subject matter. 49 F.R. *supra* at 27410–27418. No determination of the validity of any part thereof is in order since the document was not before the District Court.

Also, on January 9, 1985 the ERA, for DOE, filed a "Final Decision" published in 50 Federal Register, No. 9, 1919–1925 of January 14, 1985, summarized therein as follows:

"The Economic Regulatory Administration (ERA) of the Department of Energy (DOE) is announcing the final decision concerning the Department's policy on Entitlements exception orders. If the Office of Hearings and Appeals (OHA) determines that refiners as a class were injured by overcharge activity, OHA will fund receive orders from that portion of refund money which corresponds to the injury sustained by refiners as a class. Dispense orders will not be effectuated." 50 F.R. at 1919.

The validity of any part of these, or any other administrative actions that may exist, is not discussed except to note that any material part of such document that is invalid under the Administrative Procedure Act (APA) or other statute, the United States Constitution, or historic equitable principles is ineffective.

It seems clear that the miscertification of crude oil as upper tier oil during control, and collection of wrongfully charged prices may have had some effect on the rights of others under the Entitlements Program, and that the resulting damages of the victims of overcharges might be satisfactorily shown in fact and amount. At least the contrary should not be assumed on judicial notice without notice and hearing, for reasons stated above.

VI

STATUTORY DUTIES AND POWERS OF THE COMPTROLLER GENERAL

The Comptroller General of the United States is and was obligated and empowered to monitor the operations of the DOE (and its predecessors) by Title 42 U.S.C. Section 7137 which provides as follows:

"The functions of the Comptroller General of the United States under Section 12 of the Federal Energy Administration Act of 1974 [15 USCS § 771] shall apply with respect to the monitoring and evaluation of all functions and activities of the Department under this Act [Department of Energy Organization Act, P.L. 95–91] or any other Act administered by the Department. (Aug. 4, 1977, P.L. 95–91, Title II, § 207, 91 Stat. 574.)"

Title 15 U.S.C. Section 771 referred to in the paragraph quoted immediately above states in part the following:

"(a) Scope of activities; monitoring activity; data to Comptroller General from Administration; reports and recommendations to Congress. For the duration of this Act, the Comptroller General of the United States shall monitor and evaluate the operations of the Administration including its reporting activities. The Comptroller General shall (1) conduct studies of existing statutes and regulations governing the Administration's programs; (2) review the policies and practices of the Administration; (3) review and evaluate the procedures followed by the Administrator in gathering, analyzing, and interpreting energy statistics, data, and information related to the management and conservation of energy, including but not limited to data related to energy costs, supply, demand, industry structure, and environmental impacts; and (4) evaluate particular projects or programs. The Comptroller General shall have access to such data within the possession or control of the Administration from any public or private source whatever, notwithstanding the provisions of any other law, as are necessary to carry out his responsibilities under this Act and shall report to the Congress at such times as he deems appropriate with respect to the Administration's programs, including his recommendations for modifications in existing laws, regulations, procedures, and practices."

*Critical Opinions of the Comptroller General Since Decontrol on Duty to Attempt to Order Restitution of Illegal Overcharges*

In the performance of these statutory duties and powers the Comptroller General

has repeatedly and formally advised DOE that it has exceeded its statutory power to collect and to dispose of funds collected in consent order settlements of monetary claims for alleged violations of petroleum price and allocation regulations by depositing funds in the Treasury, or otherwise disposing of them, without prior efforts to make restitution to victims of the overcharges. The first instance of judicial notice by this Court of the actions of the Comptroller General in so advising DOE was made in *Department of Energy v. Hunt,* (TECA 1984) 734 F.2d 816 at 824.

The Comptroller General has recently made a comprehensive report to the House of Representatives of the United States through the Subcommittee on Oversight and Investigations and the Committee on Energy and Commerce which in part, in Chapter 3 on the subject of restitution of illegal overcharges, states:

### "CHAPTER 3

### DOE NEEDS TO ENSURE THAT OIL OVERCHARGE DISTRIBUTIONS RESULT IN RESTITUTION TO INJURED PARTIES

"When parties injured by oil companies' overcharges are not readily identifiable, ERA is required by DOE's regulations to refer these cases to OHA, which is responsible for allowing potentially harmed parties to file a claim for a refund. If funds remain after all eligible claims are made, OHA can make payments to states. ERA, however, has bypassed OHA and has issued four consent orders that provide for oil companies to make direct payments to states without prior efforts to identify those overcharged and the amount of the overcharges. ERA did refer six other cases to OHA as required by DOE's regulations.

"In these consent orders, ERA has agreed to several types of distributions as settlement of the oil companies' alleged violations. Some of the orders have involved payments to institutions, such as state governments, that were not actually injured by the overcharges. The decision by the Comptroller General of the United States (62 Comp.Gen. 379 (1983)) concluded that ERA was in these cases improperly using the consent orders by making, or allowing the oil companies to make, distribution of overcharge refunds without prior efforts to identify those overcharged and the amount of the overcharges.

"DOE maintains that its regulations are not mandatory and that it has the authority to take such actions. As discussed in this chapter, we disagree and believe that DOE should follow its mandatory regulations and assure that the injured parties receive the benefit of the oil overcharge distributions.

"The following illustration shows, as of July 18, 1984, the four ERA consent orders and six OHA decisions and orders which resulted in payments to states. (The illustration in appendix II shows the payments that the eight states had received as of July 18, 1984, as a result of these orders and decisions. As discussed on page 6, we did not review the Virgin Islands' use of funds received as a result of individual oil company consent orders.)

*"Illustration 3*
*ERA Consent Orders and OHA Decisions and Orders*
*Which Resulted in Payments to States*
*as of July 18, 1984* [a]

| "Company distributions ordered by ERA | Authorized uses of the funds | Amount [b] |
|---|---|---|
| Chevron | —Highways and bridge maintenance and repair | |
| | —Ridesharing (i.e. vanpool and carpool) programs | |
| | —Public transportation projects | |

| "Company distributions ordered by ERA | Authorized uses of the funds | Amount [b] |
|---|---|---|
| Chevron | —Residential or commercial building energy audits | |
| | —Grant or loan programs for weatherization or other energy conservation equipment installation | |
| | —Energy assistance programs | |
| | —Airport maintenance or improvement | |
| | —Reduction in airport user fees | |
| | —Energy conservation or energy research offices and administration | $25,000,000 |
| Standard Oil Company (Ohio) | Although DOE encouraged the states to use the funds for energy-related projects, DOE intended to provide maximum flexibility to the states in determining appropriate uses of the funds | 10,000,000 |
| Imperial Refineries Corporation | —Same as Sohio | |
| Site Oil Company of Missouri and Flash Oil Corporation (Site and Flash) | —Energy-related purposes | 600,000 |
| | | 450,000 |
| Total ERA-approved distributions | | $36,050,000 |

| "Distributions ordered by OHA | Authorized uses of the funds | Amount [b] |
|---|---|---|
| Palo Pinto Oil and Gas | —Energy-related plans | 266,904 |
| PVM Oil Associates, Inc. | —Projects to benefit heating-oil customers in New York City | 67,961 |
| Worldwide Energy Corporation | —Projects to benefit natural gas liquids users in Oklahoma and Texas | 49,400 |
| Armstrong and Associates | —Projects to benefit parties injured by overcharges (Tex.) | 9,863 |
| Standard Oil Company (Indiana) | —Projects to benefit class of persons injured by the overcharges—consumers of motor gasoline and middle distillates | 24,000,000 |
| Belridge Oil Company | —Projects to benefit those citizens most likely affected by overcharges | 95,821 |
| Total OHA-ordered distributions | | 24,489,949 |
| Total | | $60,539,949 |

"[a] Does not include payments to any state which, as a customer of the oil companies whose alleged violations were settled by terms of a consent order, qualified for a refund as a purchaser of petroleum products.

"[b] Amounts shown are the payments to the states specified in ERA's consent orders and OHA's decisions and orders and do not include any interest which DOE may have required the companies to pay.

**"ERA–ORDERED DISTRIBUTIONS MAY NOT RESULT IN RESTITUTION TO INJURED PARTIES**

"The first four companies listed in the illustration are those which ERA ordered to make payments totaling $36 million to the states to settle alleged overcharges. The requirement for those payments was contained in the consent orders ERA and the companies signed in settling the companies' alleged overcharges. We believe that ERA has improperly used these consent orders because the payments were made without giving overcharged customers an opportunity to present their claims through DOE's established procedures. Also, the authorized uses of the funds were so general that there was little assurance that the funds would be used for restitutionary purposes.

"DOE's regulations (10 C.F.R. Part 205, Subpart V), promulgated pursuant to the Emergency Petroleum Allocation Act of 1973, establish procedures for distributing oil overcharge refunds when those overcharged and the amounts of the overcharges cannot be readily identified. These procedures are designed to protect the rights of overcharged consumers and require ERA to refer overcharge cases to OHA when ERA cannot readily identify the parties injured by the oil companies' overcharges. OHA then is responsible for obtaining public comments on its proposed method of making refunds and allowing potentially injured parties to file a claim for a refund. These procedures were followed for the last six companies listed in the illustration.

"ERA bypassed these procedures for the first four companies listed in the illustration. The consent orders for those companies did not present potentially injured parties an opportunity to file claims. Rather, payments went directly to the states without prior efforts to identify those overcharged and the amounts of overcharges.

"We have previously brought this matter to DOE's attention in two opinions and two decisions of the Comptroller General of the United States.[1] (Footnote 1, Comptroller

General of the United States Opinions B–200170 Apr. 1, 1981, and 60 Comp.Gen. 15 (1980); and Decisions 62 Comp.Gen. 379 (1983) and 63 Comp.Gen. 189 (1984).) In these two documents, we said that DOE is legally bound to follow its own regulations, which require that the administrative procedures discussed above be followed in determining appropriate restitutionary distribution mechanisms. Consequently, we have concluded that DOE does not have the authority to avoid its subpart V regulations by agreeing to consent order provisions that distribute funds directly, without prior efforts to locate injured parties.

"DOE has maintained that it has the authority under the Emergency Petroleum Allocation Act of 1973 to take any action necessary to eliminate or compensate for the effects of a violation of its petroleum pricing and allocation regulations. In its May 25, 1984, *Federal Register* ruling, DOE said that it is not required by its regulations or statute to use the administrative procedures. Rather, DOE asserts that it has the authority to employ various forms of indirect restitution, including refunds to the miscellaneous receipts of the U.S. Treasury and payments to state governments.

"Based on our research of the applicable court decisions,[2] (Footnote 2, See 62 Comp. Gen. 379, 382–383, 386–387 (1983).) We believe DOE's authority is limited to making refunds to overcharged customers and to those likely to have been injured by the overcharges. We also believe that DOE has not been expressly granted any authority to promote the interests of consumers in general through direct payments to them or through grants made on their behalf to states or other entities. Therefore, we believe DOE did not have the authority to agree to consent order provisions such as the four discussed above.

"In addition to not following the subpart V procedures for these four cases, ERA has agreed to settlement terms which may not provide for restitution to injured parties. As shown in the illustration on page 22, the states can use these four settlement

distributions for purposes such as highway and bridge maintenance and repair, airport maintenance or improvement, energy conservation or energy research offices and administration, and energy-related projects. Based on our review of these four consent orders and the *Federal Register* notices announcing them, we did not find any provisions therein which would enable ERA to ensure that these refunds would result in direct restitution to injured parties.

"Even though a state may be complying with the provisions of the consent order, it might not be using the funds for restitutionary purposes. For example, Pennsylvania funded basic and applied research on energy use, New York funded its state energy office, and Georgia funded airport improvement projects. Texas, which as of July 18, 1984, had received $798,858 as a result of four consent orders (Chevron, Standard Oil (Ohio), Site and Flash, and Armstrong and Associates [3]) (Footnote 3, The Armstrong and Associates consent order accounted for only $14,232 ($9,863 refund plus $4,369 of interest) of the $798,858 and was the only one of these four which OHA handled, under DOE's subpart V procedures. As discussed in the next section, OHA usually approves states plans before disbursing the refunds. Because the Armstrong and Associates case involved only a small amount of funds, OHA did not require such approval in this case.) appropriated these funds to its Bureau of Economic Geology, University of Texas at Austin. The Deputy Director of the Bureau told us that they plan to use the funds for the following two research projects:

—identifying, classifying, and researching methods to enhance the recovery potential of existing Texas oil reservoirs and

—identifying and classifying Texas' lignite deposits and researching the economic recovery factors which would make exploration feasible.

"In our opinion, these two projects would directly benefit energy producers. Energy consumers would only indirectly benefit, and then only if the research resulted in the production of sufficient additional oil and/or lignite to help stabilize consumer prices of products produced from these resources.

"OHA'S PROCEDURES FOR ENSURING THAT STATES PROPERLY USE OIL OVERCHARGE DISTRIBUTIONS

"Although OHA ensures that states properly use the distributions which it orders, prior to March 1984 it had not ensured that the states were using the interest earned on these distributions in accordance with OHA-approved state plans. After we brought this matter to OHA's attention in March 1984, it began to require the states to use such interest in accordance with state plans.

"For five of the six OHA-ordered distributions, OHA required the states to have their planned uses of the funds approved by OHA before the states received the funds. Also, for these five cases the states are required to submit a follow-on report to OHA on how they have used the funds.

"For the sixth case, Armstrong and Associates, OHA did not require either an approved plan or a follow-on report. OHA decided that in view of the small amount of funds ($9,863), it would not be cost effective to require the state to channel these funds to specific segments of the population who were most affected by the overcharges. Rather, OHA decided to deposit the $9,863 in Texas' escrow account established to hold such funds pending the state legislature's approval of how the funds would be used.

"We discussed this case with an OHA official, particularly because, in the Worldwide Energy Corporation case ($49,400 in May 1983), OHA required a plan and follow-on report from Oklahoma even though its share was only $8,828. The OHA official said that Armstrong and Associates was the first of these distributions (Jan. 1983) to the states. Since that time, OHA has been requiring a plan and follow-on report irrespective of the amount of the refund.

"Although OHA monitored five of the six refunds to the states, prior to March 1984 it did not monitor the states' use of

the interest earned after they received these refunds. Of the eight states we visited, four (California, Georgia, Pennsylvania, and Texas) were using the interest they had earned on both the ERA-ordered and OHA-ordered distributions for general purposes, rather than for the same purposes as the refunds themselves. Arizona and New York were appropriately using their earned interest for the same purposes as their refunds. Florida officials had not yet decided how to use the interest and Louisiana officials could not provide adequate documentation on how they have used or will use their interest.

"After our discussion with an OHA official in March 1984, OHA began requiring states to use the interest earned on these refunds in accordance with the OHA-approved state plans. We agree with this requirement because we believe that the states' use of the interest earned as a result of these oil overcharge refunds should be monitored and controlled by DOE.

"CONCLUSIONS

"Under DOE's subpart V procedures, ERA is supposed to refer oil overcharge cases for which it is difficult to readily identify the injured parties to OHA for resolution. ERA, however, has not followed these procedures in all cases. As a result, the ERA-approved distributions of oil overcharge funds to the states may not have resulted in restitution to the injured parties. Rather, ERA has approved distributions to the states without ensuring that the distributions are directly related to those who were injured by the overcharges. To provide adequate assurance that the injured parties receive the benefit of the oil overcharge refunds, we reiterate the Comptroller General of the United States' opinions and decisions that the Secretary of Energy comply with DOE's mandatory procedures to identify injured parties."

These recitations are factually supported by records too lengthy to quote, that are judicially noticed, listed in Addendum No. 1, hereof.

The opinions and decisions of the Comptroller General cited in footnotes 1 and 2 of the above quotation are judicially noticeable and should be considered as advisory in determining whether to rely on the DOE to assist in identifying those damaged by illegal overcharges and the amounts thereof. Those opinions and decisions, in part, rely on opinions of this Court on restitution.

Judicial notice has also been taken of the actions since decontrol in discontinuing the monthly publications of the Entitlements Program which served the purposes of restitution of damages resulting from illegal overcharges and implementing the restitutional purposes of exception determinations. See the complaint of *Navajo Oil Co. v. United States Department of Energy,* (TECA 1984) 750 F.2d 966.

Some of the records of the DOE concerning the Entitlements Program since decontrol are listed in Addendum No. 2 hereof.

If a district court finds that the DOE is unable or unwilling to assist in the process of identifying those damaged by the illegal overcharges found to have existed in this or other basic litigation, then other means including, if necessary, reference to a special master or special masters should be considered.

VII

POWER OF DISTRICT COURT TO TAX COSTS OF MAKING RESTITUTION

It is obvious that in restitution proceedings in equity the usual costs may be allowed by a district court to the prevailing party under Rule 54(d) F.R.Civ.P. against the party other than the United States, adjudged to have violated the statutes or regulations, or both. Because restitution proceedings may require additional costs and expenses in special circumstances a district court has the power to assess additional costs. *Brashear Freight, supra,* 312 U.S. 621 at 629, 61 S.Ct. 784 at 788, 85 L.Ed. 1883 at 1088 (1941); 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2668; 6 *Moore's Federal Practice,* Second Edition, ¶ 54.77[1] at 1702.

If a district court finds it necessary or desirable under the exceptional circumstances to appoint a special master to conduct proceedings on all or some of the issues in the restitution proceedings, subject to judicial order of the district court the appointment and taxation of the additional cost and expenses, including compensation of the master, is authorized by Rule 53 F.R.Civ.P. 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2670; 6 *Moore's Federal Practice*, Second Edition, ¶ 54.77[3].

## CONCLUSIONS

For the foregoing reasons, the judgment of the District Court on the basic issues of the violations of the statutes and regulations, including misclassification of crude oil by Exxon and allowance of interest are properly affirmed. The detailed findings of fact and conclusions of law of the District Court on the basic issues supporting its judgment on the illegal overcharges and the amount thereof are sound and represent judicial performance of complex and difficult tasks in keeping with the best traditions of the judiciary of the United States.

The action of the District Court in ordering the entire amount of the overcharges and interest paid to the Treasury of the United States for disposition analogous to that provided in the Warner Amendment, § 155 of P.L. 97–377 should be reversed, and the issues of restitution of damages to those injured by the illegal overcharges should be remanded to the District Court for further proceedings in accordance with the controlling equitable, constitutional and statutory principles discussed herein.

*Addendum No. 1*

*Summary of Some Principal Administrative Decisions, Opinions and Orders Relevant to Restitution of Excessive Charges Under EPAA and EPCA (1977 to Present)*

I.

Relevant Published Decisions and Published and Unpublished Opinions of the Comptroller General (CG) on Powers and Duties of the Department of Energy (DOE) Concerning Restitution of Overcharges under the EPAA and EPCA.

A. Published Decision by Special Assistant to CG in 63 Comp.Gen. 189 (1984), cited in *Department of Energy v. Hunt*, (TECA 1984) 734 F.2d 816 at 824;

B. Unpublished opinion of General Counsel (CG) directed to Theodore J. Garrish, General Counsel, DOE, B–210176 (October 4, 1984).

C. Unpublished opinion by Special Assistant to CG directed to Donald Paul Hodel, Secretary of Energy, B–210176 (October 4, 1984).

D. Published decision by Special Assistant to CG in 62 Comp.Gen. 379 (1983).

E. Unpublished opinion No. B–200170 (April 1, 1981).

F. Published opinion of CG in 60 Comp. Gen. 15 (1980).

II.

Final Decisions, Rulings and Notices about Refund Procedures of DOE, Economic Regulatory Administration (ERA) or Office of Hearings and Appeals (OHA) (one or more of them) 1983–1985.

A. Recent Notices of Implementation of Special Refund Procedures (February 1985):

1. Notice of Implementation of Special Refund Procedures, 50 F.R. 6244 (February 14, 1985).

2. Notice of Implementation of Special Refund Procedures and Solicitation of Comments, 50 F.R. 6240 (February 14, 1985).

3. Notice of Implementation of Special Refund Procedures, 50 F.R. 5307 (February 7, 1985).

4. Notice of Implementation of Special Refund Procedures, 50 F.R. 5305 (February 7, 1985).

5. Notice of Implementation of Special Refund Procedures, 50 F.R. 4785 (February 1, 1985).

6. Notice of Implementation of Special Refund Procedures, 50 F.R. 4774 (February 1, 1985).

7. Notice of Implementation of Special Refund Procedures, 50 F.R. 4766 (February 1, 1985).

8. Notice of Implementation of Second Stage Refund Procedures, 50 F.R. 4763 (February 1, 1985).

9. Notice of Implementation of Special Refund Procedures, 50 F.R. 4757 (February 1, 1985).

10. Notice of Implementation of Special Refund Procedures, 50 F.R. 4749 (February 1, 1985).

11. Notice of Implementation of Special Refund Procedures and Solicitation of Comments, 50 F.R. 4739 (February 1, 1985).

B. Noteworthy Final Decisions, Rulings and Notices about Refund Procedures:

1. Final Decision, 50 F.R. 1919 (January 14, 1985).

2. Notice of Final Decision; Notice of Public Proceedings and Public Hearing, 49 F.R. 27410 (July 3, 1984).

3. Ruling, 49 F.R. 22063 (May 25, 1984).

4. Notice of Issuance of Proposed Decision and Order for the Implementation of Special Refund Procedures, 49 F.R. 6542 (February 22, 1984).

5. Notice of Implementation of Special Refund Procedures and Solicitation of Comments, 49 F.R. 3125 (January 25, 1984).

6. Notice of Implementation of Special Refund Procedures and Solicitation of Comments, 48 F.R. 57608 (December 30, 1983).

7. Notice of Action Taken on Consent Order, 48 F.R. 28536 (June 22, 1983).

### III.

Delegation Orders to OHA or ERA to Take Action or to Establish Policy of DOE, Issued by DOE.

A. Delegation Order No. 0204-4 (1977), quoted at 10 C.F.R. Part 1001, Appendix (1984).

B. Delegation Order No. 0204-24 (March 30, 1978).

C. Delegation Order No. 0204-24, Amendment No. 1 (May 5, 1980).

D. Delegation Order No. 0204-114 (December 20, 1984).

### IV.

Ruling of Office of General Counsel of the DOE of May 22, 1984 "to clarify the scope of its remedial authority under the Emergency Petroleum Allocation Act, 15 U.S.C. 751 *et seq.*, and to address certain opinions that the Comptroller General of the United States has offered on the subject." This ruling was published in full in 49 F.R. pages 22063–22068, May 25, 1984, for the following express purpose: "Title 10 of the Code of Federal Regulations is hereby amended by adding Ruling 1984–1 to the Appendix to subchapter A to read as follows: ...." 49 F.R. 22063.

### *Addendum No. 2*

*Some Records of the DOE Concerning the Entitlements Program Since Decontrol Including a Regulation and "Final Decisions."*

Regulation 10 C.F.R. § 211.69 *Entitlements Adjustment Mechanism,* as amended at 46 F.R. 43654, August 31, 1981; 46 F.R. 63209, December 31, 1981.

"Final Decision" of Economic Regulatory Administration (ERA) "not to issue the January 1981 and Final Entitlements Adjustments lists ('lists') thereby ending the Entitlements Program" and "intent to receive additional comments on the most appropriate manner to handle outstanding exception orders. DOE's tentative decision is not to give effect to the entitlements exception orders, but to consider potential mechanisms which would effectuate those orders under which firms would have received money." This order includes parts entitled: "I. The History of the Entitlements Program."; "II. The Decontrol Order and Subsequent Events Affecting the Issuance of Any Further Entitlements Lists."; "III. Decision."; "IV. Analysis

of Public Comments."; "V. Treatment of Outstanding Exception Orders—Tentative Decisions."; "VI. Comments Requested."; "VII. Public Comment Procedures."; "VIII. Procedural Matters." 49 F.R. No. 129, 27410, July 3, 1984.

"Final Decision" of ERA of DOE "concerning the Department's policy on Entitlements exception orders. If the Office of Hearings and Appeals (OHA) determines that refiners as a class were injured by the overcharge activity, OHA will fund receive orders from that portion of refund money which corresponds to the injury sustained by refiners as a class. Dispense orders will not be effectuated." 50 F.R. No. 9, 1919, January 14, 1985. This decision includes parts entitled: "I. Introduction"; "II. Decision"; "III. Discussion of Comments"; and "IV. Procedural Matters." In part III, among other things, it is stated:

"One commenter questioned the extent to which the Citronelle exception order would be affected by this proceeding. The Citronelle order was an exception relating to the Tertiary Incentive Program and the certification regulations. Issues related to the Citronelle order are being adjudicated before DOE and the Courts." 50 F.R. at 1925.